1   JONATHAN D. SELBIN (Cal. Bar No. 17022)
    jdselbin@lchb.com
2   ANNIKA K. MARTIN (admitted *pro hac vice*)
    akmartin@lchb.com
3   RHEA GHOSH (admitted *pro hac vice*)
    rghosh@lchb.com
4   LIEFF CABRASER HEIMANN & BERNSTEIN
    275 Battery Street, 29th Floor
5   San Francisco, CA  94111-3339
    Telephone: (415) 956-1000
6   Facsimile: (415) 956-1008

7   ELIZABETH A. FEGAN (admitted *pro hac vice*)
    beth@feganscott.com
8   FEGAN SCOTT, LLC
    150 S. Wacker Dr., 24th Floor
9   Chicago, IL 60606
    Telephone: (312) 741-1019
10  Facsimile: (312) 264-0100

11  LYNN A. ELLENBERGER (admitted *pro hac vice*)
    lynn@feganscott.com
12  FEGAN SCOTT, LLC
    500 Grant St., Suite 2900
13  Pittsburgh, PA 15219
    Telephone: (412) 346-4104
14  Facsimile: (412) 785-2400

15  *Attorneys for Plaintiffs and the Proposed Class*

16

17              **UNITED STATES DISTRICT COURT**
         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
18                   **SAN JOSE DIVISION**

19  ERIN ALDRICH, LONDA BEVINS, JESSICA          Case No.: 5:20-cv-01733-EJD
    JOHNSON, and BEATA CORCORAN
20  individually and on behalf of all other similarly   **PLAINTIFFS' RESPONSE TO NCAA**
    situated,                                     **AND REMBAO'S MOTIONS TO**
21                                                **DISMISS THE FIRST AMENDED**
                        Plaintiffs,               **COMPLAINT**
22
              vs.                                 Filed Concurrently with the Declaration of
23                                                Jonathan D. Selbin
    NATIONAL COLLEGIATE ATHLETIC
24  ASSOCIATION, THE BOARD OF                     Judge: Hon. Edward J. Davila
    GOVERNORS OF THE NATIONAL                     Date: September 3, 2020
25  COLLEGIATE ATHLETIC ASSOCIATION,              Time: 9:00 a.m.
    and JOHN REMBAO,                              Crtrm.: 4
26
                        Defendants.
27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

SUMMARY OF FACTS ................................................................................................1

I.      NCAA knew or should have known the risk to student-athletes but did nothing. ...........1

II.     Plaintiffs Aldrich, Johnson, Bevins, and Corcoran.....................................................2

ARGUMENT...................................................................................................................3

I.      This Court has personal jurisdiction over the NCAA and its Board. ...............................3

        A.      The NCAA is subject to general jurisdiction in California. ................................4

                1.      The NCAA avails itself of this jurisdiction when it suits it.....................4

                2.      NCAA members are heavily concentrated in California........................5

                3.      NCAA's activities establish physical and economic presence here. ........7

        B.      This Court has specific jurisdiction over the NCAA........................................8

II.     Venue is proper because the Court has personal jurisdiction over the NCAA..............11

III.    The NCAA Board is an entity with the capacity to be sued...................................12

IV.     Plaintiff Corcoran has standing to bring claims for injunctive relief. ...........................12

V.      Plaintiffs' claims are not barred by the statute of limitations. ...............................14

        A.      Erin Aldrich's claims are timely....................................................................14

                1.      Arizona law applies to Aldrich's statute..............................................15

                2.      A.R.S. § 12-502 tolled Aldrich's statute.............................................17

                3.      The discovery rule also tolled Aldrich's statute. ..............................18

        B.      Bevins and Johnson's claims are timely.........................................................20

                1.      Equitable tolling applies. ...................................................................20

                2.      Equitable estoppel and fraudulent concealment also apply. ...............22

                3.      This Court should apply equitable principles to create a victimization
                        exception for Bevins and Johnson's claims. ......................................25

VI.     Plaintiffs state plausible negligence, breach of contract, and vicarious liability claims.26

        A.      The NCAA and its Board owed Plaintiffs a duty of care. .................................27

                1.      The NCAA voluntarily assumed its duty...............................................27

                2.      The NCAA owes a duty based on its special relationship with
                        student-athletes. ..........................................................................27

                3.      The NCAA owes a duty to Plaintiffs based on its special relationship
                        with and control over its coaches.......................................................29

                4.      Plaintiffs plausibly allege the NCAA's duty based on the *Rowland*
                        factors..........................................................................................30

        B.      Plaintiffs adequately allege a fiduciary relationship with the NCAA. ..............32

        C.      Plaintiffs plausibly plead negligent misrepresentations and omissions.............32

        D.      Plaintiffs plausibly allege claims for breach of express and implied contract....33

1

2

3

4

E.      Plaintiffs plausibly allege that they are third-party beneficiaries. ......................34

F.      Plaintiffs plausibly allege vicarious liability against the NCAA. .......................36

VII.    Plaintiffs plausibly allege the NCAA ratified Rembao's actions. ..................................38

VIII.   Plaintiffs State a Claim for False Imprisonment Against Rembao. ...............................40

CONCLUSION..............................................................................................................................40

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## Cases

*Addison v. State,*
21 Cal. 3d 313 (1978) .................................................................................................20

*Araiza v. U.S. W. Bus. Res.,*
183 Ariz. 448 (Ct. App. 1995) ....................................................................................34

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).....................................................................................................26

*Axiom Foods v. Acerchem Int'l,*
874 F.3d 1064 (9th Cir. 2017) .................................................................................3, 9

*Baires v. United States,*
2010 WL 3515749 (N.D. Cal. Sept. 8, 2010) .............................................................10

*Beliveau v. Caras,*
873 F. Supp. 1393 (C.D. Cal. 1995) ...........................................................................37

*Binder v. Aetna Life Ins. Co.,*
75 Cal. App. 4th 832 (1999) .......................................................................................33

*Bloom v. NCAA,*
93 P.3d 621 (Colo. App. 2004)....................................................................................35

*Borderlon v. Peck*
661 S.2.2d 907 (Tex. 1996) .........................................................................................22

*Bradley v. NCAA.,*
No. 16-346 (D.D.C. April 12, 2017).............................................................................28

*Bromlow v. D & M Carriers,*
2020 WL 701979 (N.D. Cal. Feb. 11, 2020) ...............................................................12

*Brown v. USA Taekwondo,*
40 Cal. App. 5th 1077, *as modified on denial of reh'g,* (2019)............................29, 31

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985).....................................................................................................11

*C.R. v. Tenet Healthcare,*
169 Cal. App. 4th 1094 (2009), *as modified on denial of reh'g* (Feb. 3, 2009) .........39

*City of Houston v. Williams,*
353 S.W.3d 128 (Tex. 2011) ........................................................................................34

*Cohane v. NCAA,*
2014 WL 1820782 (D. Mass. May 8, 2014) ..................................................................7

*Coremetrics v. Atomic Park.com,*
370 F. Supp. 2d 1013 (N.D. Cal. 2005).........................................................................8

*Cortina v. Bristol-Myers Squibb,*
2017 WL 2793808 (N.D. Cal. June 27, 2017)...............................................................11

*Cossman v. DaimlerChrysler Corp.,*
108 Cal. App. 4th 370 (2003) ......................................................................................15

*Daimler AG v. Bauman,*
134 S. Ct. 746 (2014)......................................................................................................4

*Doe v. Bakersfield City School Dist.*,
  136 Cal. App. 4th 556 (2006) ..................................................................................................24

*Doe v. Roe*,
  955 P.2d 951 (Ariz. 1998) ..............................................................................16, 17, 18, 19

*Doe v. Uber Techs.*,
  184 F. Supp. 3d 774 (N.D. Cal. 2016) ..............................................................................37, 38

*Donatelli v. Nat'l Hockey League*,
  893 F.2d 459 (1st Cir. 1990) ...................................................................................................6

*Estate of Amaro v. City of Oakland*,
  653 F.2d 808 (9th Cir. 2011) ..........................................................................................22, 23, 24

*Fox v. Ethicon Endo-Surgery*,
  35 Cal. 4th 797 (2005) ...........................................................................................................19

*Francis v. Wynn Las Vegas*,
  557 Fed. App'x 662 (9th Cir. 2014) ......................................................................................16

*Ganezer v. DirectBuy.*,
  2012 WL 12867971 (C.D. Cal. Jan. 30, 2012) ....................................................................12

*Garcia v. Superior Court*,
  50 Cal. 3d 728 (1990) .......................................................................................................32, 33

*George v. NCAA*,
  2008 WL 5422882 (C.D. Cal. Dec. 17, 2008) .......................................................................5

*Greiber v. NCAA*,
  2017 WL 6940498 (N.Y. Sup. Ct. Sep. 08, 2017) ................................................................28

*GT Sec. v. Klastech GmbH*,
  2014 WL 2928013 (N.D. Cal. June 27, 2014) .......................................................................11

*Guar. Tr. Co. of N.Y. v. York*,
  326 U.S. 99 (1945) ..................................................................................................................26

*Hill v. Slippery Rock Univ.*,
  138 A.3d 673 (Pa. Super. 2016) ............................................................................................28

*Huddleston v. John Christner Trucking*,
  2017 WL 4310348 (E.D. Cal. Sept. 28, 2017) .....................................................................10

*In re United Servs. Auto. Ass'n*,
  307 S.W.3d 299 (Tex. 2010) ..................................................................................................20

*Insurance Co. of N. Am. v. Federal Express Corp.*,
  189 F.3d 914 (9th Cir. 1999) ..................................................................................................15

*Int'l Shoe Co. v. Washington*,
  303 F.3d 310 (1945) ..................................................................................................................4

*John R. v. Oakland Unified School Dist.*,
  48 Cal. 3d 438 (1989) ......................................................................................................23, 24, 25

*Johnson v. Columbia*,
  437 F.3d 894 (9th Cir. 2006) ...................................................................................................5

*Jones v. Blanas*,
  393 F.3d 918 (9th Cir. 2004) .................................................................................................21

*Juarez v. Boy Scouts of America*,
  81 Cal. App. 4th 377 (2000) ..................................................................................................31

*Kemether v. Pennsylvania Interscholastic Athletic Ass'n,*
  15 F. Supp. 2d 740 (E.D. Pa. 1998) ........................................................................5

*Klaxon Co. v. Stentor Elect Mfg. Co.,*
  313 U.S. 487 (1941) ................................................................................................15

*Knelman v. Middlebury Coll.,*
  898 F. Supp. 2d 697 (D. Vt. 2012), *aff'd,* 570 F. App'x 66 (2d Cir. 2014) ..............35

*Langston v. Mid-Am. Intercollegiate Athletics Ass'n,*
  2020 WL 1445631 (N.D. Ill. Mar. 25, 2020) ...................................................23, 28

*Lanni v. NCAA,*
  42 N.E.3d 542 (Ind. Ct. App. 2015) ........................................................................28

*Lantzy v. Centex Homes,*
  31 Cal. 4th 363 (2003) ........................................................................................21, 22

*Lopes v. Vieriai,*
  488 F. Supp. 2d 1000 (E.D. Cal. 2007) ...................................................................14

*Love v. United States,*
  915 F.2d 1242 (9th Cir. 1998) .................................................................................26

*Lu v. Powell,*
  621 F.3d 944 (9th Cir. 2010) ...................................................................................37

*Luna v. Kernan,*
  784 F.3d 640 (9th Cir. 2015) ...................................................................................22

*Malloy v. Fong,*
  37 Cal. 2d 356 (1951) ..............................................................................................36

*Mark K. v. Roman Catholic Archbishop,*
  67 Cal. App. 4th 603 (1998) ...............................................................................19, 20

*Marketing West v. Sanyo Fisher (USA) Corp.,*
  6 Cal. App. 4th 603 (1992) ......................................................................................22

*Mary M. v. City of Los Angeles,*
  54 Cal. 3d 202 (1991) ..................................................................................36, 37, 38

*McCann v. Foster Wheeler,*
  48 Cal. 4th 68 (2010) ....................................................................................15, 16, 17

*McCollum v. Friendly Hills Travel Ctr.,*
  172 Cal. App. 3d 83 (Ct. App. 1985) .......................................................................36

*Menken v. Emm,*
  503 F.3d 1050 (9th Cir. 2007) ..............................................................................9, 11

*Meyer v. Holley,*
  537 U.S. 280 (2003) .................................................................................................35

*Milton H. Greene Archives v. Marilyn Monroe,*
  692 F.3d 983 (9th Cir. 2012) .....................................................................................5

*Morales v. Paredes,*
  2001 WL 1203418 (Cal. Ct. App. Oct. 11, 2001) ...................................................40

*Morin v. Henry Mayo Newhall Mem. Hospital,*
  29 Cal. App. 4th 473 (1994) ....................................................................................37

*Murillo v. Rite Stuff Foods,*
  65 Cal. App. 4th 833 (1998) ...............................................................................38, 39

*Myers v. Trendwest Resorts*,
  148 Cal. App. 4th 1403 (2007) ................................................................................36

*Nissan Motor Co. v. Nissan Computer Corp.*,
  89 F. Supp. 2d 1154 (C.D. Cal.), *aff'd*, 246 F.3d 675 (9th Cir. 2000) .......................12

*Noriesta v. Konica Minolta Bus. Sols. U.S.A.*,
  2019 WL 6482222 (C.D. Cal. July 8, 2019).............................................................12

*Oliver v. NCAA*,
  155 Ohio Misc. 2d 8 (2008).....................................................................................35

*Parrish v. Nat'l Football League Players Inc.*,
  2007 WL 1624601 (N.D. Cal. June 4, 2007)..............................................20, 22, 27

*Paz v. California*,
  22 Cal. 4th 550 (2000) .............................................................................................27

*People v. Ghipriel*,
  1 Cal. App. 5th 828 (2016) ......................................................................................40

*Picot v. Weston*,
  780 F.3d 1206 (9th Cir. 2015) ...................................................................................9

*Pro Sports v. West*,
  639 F. Supp. 2d 475 (D.N.J. 2009) .............................................................................5

*Regents of University of California v. Superior Court*,
  4 Cal. 5th 607 (2018) ..........................................................................27, 28, 29, 31

*Richardson v. NCAA*,
  No. 1:16-cv-09980 (N.D. Ill. Feb. 14, 2018) ...........................................................34

*Rose v. NCAA*,
  346 F. Supp. 3d 1212 (N.D. Ill. 2018) .....................................................................35

*Rowland v. Christian*,
  69 Cal. 2d 108 (1968) ......................................................................................27, 30

*S.G. v. San Francisco Unified Sch. Dist.*, 2018 WL 1876875 (N.D. Cal. Apr. 19, 2018)..............39

*Schmitz v. NCAA*, 67 N.E.2d 852 (Ohio Ct. App., Dec. 8, 2016)............................................28, 32

*Schwarzenegger v. Fred Martin Motor Co.*,
  374 F.3d 797 (9th Cir. 2004) ..................................................................................4, 9

*Secci v. United Independant Taxi Drivers*,
  8 Cal. App. 5th 846 (2017) ......................................................................................36

*Sellery v. Cressey*,
  48 Cal. App. 4th 538 (1996) ....................................................................................19

*Sher v. Johnson*,
  911 F.2d 1357 (1990) ................................................................................................5

*Shute v. Carnival Cruise Lines*,
  897 F.2d 377 (9th Cir. 1990) .....................................................................................9

*Stoll v. Runyon*,
  165 F.3d 1238 (9th Cir. 1999) .................................................................................21

*Teledyne Risi, Inc. v. Martin-Baker Aircraft Co.*, 2016 WL 3212162 (C.D. Cal. Apr. 8, 2016) .....1

*Threlkeld v. Tucker*,
  496 F.2d 1101 (9th Cir. 1974) ...................................................................................5

*Tuazon v. R.J. Reynolds Tobacco Co.*,

- vii -

433 F.3d 1163 (9th Cir. 2006) ...........................................................................4, 7, 8

*Ulibarri v. Gerstenberger*,
  871 P.2d 698 (Ariz. Ct. App. 1993)...........................................................16, 20, 26

*Vasilenko v. Grace Family Church*,
  3 Cal. 5th 1077 (2017) .............................................................................................31

*Walden v. Fiore*,
  571 U.S. 277 (2014).........................................................................................8, 9, 11

*Webb v. Jarvis*,
  575 N.E.2d 992 (Ind. 1991) ....................................................................................27

*Wells Fargo v. Transamerica Life Ins. Co.*, 2020 WL 833518 (C.D. Cal. Feb. 19, 2020).............10

*Weston v. Big Sky Conf.*,
  2020 WL 3129548 (N.D. Ill. June 12, 2020) ......................................................34, 35

*Wisniewski v. Diocese of Belleville*,
  943 N.E.2d 43 (Ill. App. 2011)................................................................................24

*Wolf v. Superior Court*,
  107 Cal. App. 4th 25 (2003) ...................................................................................32

*Yost v. Wabash College*,
  3 N.E.3d 509 (Ind. 2014) ........................................................................................30

*Young v. United States*,
  535 U.S. 43 (1992) ...........................................................................................21, 26

**Statutes**

28 U.S.C. § 1391(b)(1) ...................................................................................................11

28 U.S.C. § 1391(c)(2) ...................................................................................................12

A.R.S. § 12-502 ...............................................................................................14, 15, 16

Cal. Code Civ. Proc. § 340.16 .......................................................................................25

Cal. Code Civ. Proc. § 352 ............................................................................................16

Cal. Code Civ. Proc. § 361 ............................................................................................15

Cal. Code Civ. Proc. § 410.10 .........................................................................................3

Cal. Corp. Code § 105 ...................................................................................................12

Cal. Corp. Code § 18020(a) ...........................................................................................13

Cal. Corp. Code § 18250 ...............................................................................................24

Cal. Corp. Code § 18620(a) ...........................................................................................13

Cal. Evidence Code § 623 ..............................................................................................22

**Other Authorities**

Assembly Floor Analysis (9/5/19) (Con. in Sen. Amends. to Assem. Bill. No. 1510 (Reyes), as
  amended (Aug. 30, 2019))........................................................................................25

Fed. R. Civ. P. 12(b) (6) ................................................................................................26

Fed. R. Civ. P. 17(b) ......................................................................................................12

U.S. Senate, Committee on Commerce, Science and Transportation, "Promoting the Well-Being
  and Academic Success of College Athletes," (July 9, 2014) .......................................1

**INTRODUCTION**

The NCAA expressly promises to protect the health, safety and welfare of its student-athletes. Indeed, its President and Board Member, Mark Emmert, proclaimed in Congressional testimony that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes."[1] Yet, for decades—and to this day—it has failed to uphold that promise with respect to sexual abuse of student-athletes by college coaches, including Plaintiffs here. The NCAA has long known its coaches wield power over student-athletes that allows coaches who are sexual predators to groom, sexually harass, and abuse NCAA student-athletes with impunity. While many other sports-governing bodies adopted policies prohibiting sexual contact between coaches and athletes since at least the 1990s, the NCAA deliberately chose *not* to enact any such rules. Now, the NCAA and its Board of Governors baldly assert they owe *no* duty to protect student-athletes—despite their express promises to do just that, and despite promulgation of hundreds of pages of rules regulating the lives of coaches and student-athletes in countless ways. As a result, predators like John Rembao preyed on NCAA student-athletes, while the NCAA looked the other way. As detailed below, Plaintiffs respectfully request that Defendants' motions to dismiss be denied in their entirety.

**SUMMARY OF FACTS**

**I.   NCAA knew or should have known the risk to student-athletes but did nothing.**

As detailed in the First Amended Complaint ("FAC" or "Complaint"), the NCAA knew or should have known that student-athletes were at risk of sexual abuse and other forms of inappropriate sexual contact by athletics department personnel, including coaches. Academic research papers and studies reflect that student-athletes are easily sexually manipulated because of the power imbalance in the coach/athlete relationship. FAC ¶¶ 37-57. Public records show an

---

[1] *See* U.S. Senate, Comm. on Commerce, Science and Transportation, "Promoting the Well-Being and Academic Success of College Athletes," (July 9, 2014) *available at* https://bit.ly/3i596YO ("Senate Tr."). This Court may take judicial notice of congressional hearings. *Teledyne Risi, Inc. v. Martin-Baker Aircraft Co.*, 2016 WL 3212162, at *3 (C.D. Cal. Apr. 8, 2016).

1   alarmingly high number of coaches accused of sexual abuse and assault. *Id.* ¶¶ 99-103. Other

2   governing sports organizations, including the U.S. Olympic Committee, adopted policies

3   prohibiting sexual contact between athletes and coaches as "exploitative." *Id.* ¶¶ 62-76.

4        The NCAA *never* adopted formal polices to protect student-athletes from predatory coaches

5   at its member institutions. This is true even though the NCAA expressly promises that its

6   intercollegiate athletics programs are "designed to protect the physical and educational wellbeing

7   of student-athletes," *id.* ¶¶ 89-92, and promulgates extensive rules and regulations related to *other*

8   aspects of student-athlete and coach behavior. Had the NCAA established and enforced policies

9   preventing NCAA coaches from engaging in sexual contact and relationships with student-

10  athletes, Plaintiffs and others like them would not have been put at risk or subjected to sexual

11  abuse and harassment inflicted by Coach Rembao and others like him.

12  **II.    Plaintiffs Aldrich, Johnson, Bevins, and Corcoran.**

13       Plaintiffs Aldrich, Johnson, and Bevins (collectively, the "Rembao Plaintiffs") were each

14  star athletes on their high school track and field teams. *Id.* ¶¶ 147-49, 189-90, 247-48. During

15  their high school careers, Defendant John Rembao began grooming them, sending them letters, *id.*

16  ¶¶ 195-201, talking to them for hours on the phone, *id.* ¶¶ 151, 195, 248, and expressing interest

17  in their personal lives, *id.* ¶¶ 152, 154-56, 252, 254. Based on his grooming, each of them

18  committed to the schools where he was then coaching. *Id.* ¶¶ 153, 204, 250.

19       Before her freshman year of college at Arizona, Erin Aldrich was to compete at the World

20  Junior Championships in Sydney, Australia. On the plane there, Rembao fondled and digitally

21  penetrated her. *Id.* ¶¶ 161-63. Rembao sexually abused Aldrich throughout her freshman year. *Id.*

22  ¶¶ 163-68. After being caught by Aldrich's roommate, Rembao left for UT-Austin. *Id.* ¶¶ 169-72.

23  While Aldrich later transferred to UT-Austin, she resisted further abuse. *Id.* ¶¶ 179-81.

24       As for Jessica Johnson, Rembao and his wife often invited Johnson over for dinner, after

25  which Rembao would give Johnson inappropriate massages. *Id.* ¶¶ 202-10. He repeatedly called

26  her in to his office and demanded extremely uncomfortable physical contact. *Id.* ¶ 215. On other

27  occasions, he licked Johnson's neck and appeared without consent in her dorm room while she

28  was sleeping and touching her. *Id.* ¶¶ 217-18, 228-29.

1    Similarly, Rembao began abusing Londa Bevins at UT-Austin. In his office, Rembao would

2    embrace her, rub her with his erection, touch her hair and legs, kiss her head and neck, and rub

3    her shoulders. *Id.* ¶¶ 269-271.

4    On August 9, 2000, Johnson filed a complaint about Rembao's conduct with UT-Austin,

5    and on November 21, 2000, the university issued a report after an investigation ("UT-Austin

6    Report"). *Id.* ¶¶ 320-33. The report concluded that Rembao did nothing wrong, causing Johnson

7    and Bevins to conclude they did not have any legal rights. *Id.* ¶ 339. It was not until 2019, when

8    Aldrich watched the movie *Leaving Neverland*, that she realized she was the victim of sexual

9    abuse. *Id.* ¶¶ 186, 318. In October 2019, Johnson received a telephone call out of the blue from

10   Aldrich, who divulged that she was sexually abused by Rembao. *Id.* ¶ 328. Johnson called Bevins.

11   *Id.* ¶ 342. Plaintiffs filed their complaint on March 11, 2020, within a year of Aldrich watching

12   *Leaving Neverland* and the subsequent calls to Johnson and Bevins.

13   Plaintiff Beata Corcoran is a sophomore at Princeton University, and a member of the

14   NCAA Division I Women's Rowing team. As a condition of participation, she signed a Form 19-

15   1a, affirming that she read and agreed to relevant portions of the NCAA Division I Manual. *Id.* ¶

16   408; *id.* Ex. A.

17                                    **ARGUMENT**

18   **I.      This Court has personal jurisdiction over the NCAA and its Board.**

19   This Court has both general and specific personal jurisdiction over the NCAA and its Board.

20   Where, as here, no federal statute governs personal jurisdiction, the court applies the law of the

21   state in which it sits. *Axiom Foods v. Acerchem Int'l*, 874 F.3d 1064, 1067 (9th Cir. 2017).

22   California's long-arm statute is coextensive with federal due process requirements. Cal. Code Civ.

23   Proc. § 410.10. Thus, "[f]or a court to exercise personal jurisdiction over a nonresident defendant,

24   that defendant must have 'minimum contacts' with the relevant forum such that the exercise of

25   jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"

26   *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (quoting *Int'l Shoe*

27   *Co. v. Washington*, 303 F.3d 310, 316 (1945)). Because the motion is based solely on written

28   materials, Plaintiffs need only make a *prima facie* showing of jurisdictional facts. *Id.* at 800.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A.    The NCAA is subject to general jurisdiction in California.**

The Supreme Court long ago observed that there are "instances in which . . . continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe,* 326 U.S. at 318. General jurisdiction exists when a defendant's contacts "are so continuous and systematic as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014). This turns on the "reality of the defendants' activities rather than a mechanical checklist." *Tuazon v. R.J. Reynolds Tobacco*, 433 F.3d 1163, 1173 (9th Cir. 2006).

Here, the NCAA Defendants are subject to general jurisdiction in California based on the following contacts: (1) intentional prior availment of California courts; (2) the 58 NCAA members located in California, over which the Association exercises significant influence and control; and (3) the Association's meaningful and continuous economic, physical, and political presence in California. Taken together, they unmistakably establish that the NCAA Defendants' contacts with California render them "essentially at home" in the State, such that the exercise of personal jurisdiction is appropriate. *Daimler*, 134 S. Ct. at 761.

**1.    The NCAA avails itself of this jurisdiction when it suits it.**

*First*, despite its claim to be subject to general jurisdiction only in Indiana, the NCAA affirmatively avails itself of jurisdictions outside of the Southern District of Indiana—including in California—when it perceives a benefit to do so. *See, e.g., NCAA v. Ken Grody Mgmt.*, No. 8:18-cv-00153 (C.D. Cal.); *NCAA v. Corbett*, No. 1:13-cv-00457 (M.D. Pa.). Having "avail[ed] [it]self of this forum's judicial mechanisms," the NCAA cannot "cry foul when [its] adversary seeks relief in the same forum." *Pro Sports v. West*, 639 F. Supp. 2d 475, 482 (D.N.J. 2009)*; see also, e.g., Threlkeld v. Tucker*, 496 F.2d 1101 (9th Cir. 1974).

The NCAA's position also conflicts with its position in at least one other case. In *George v. NCAA*, the NCAA conceded personal jurisdiction and venue were proper in California. 2008 WL 5422882, at *3 (C.D. Cal. Dec. 17, 2008). The NCAA should be estopped from arguing otherwise here. *See Milton H. Greene Archives v. Marilyn Monroe*, 692 F.3d 983, 996 (9th Cir. 2012) (finding a "textbook case for applying judicial estoppel" where defendant, who claimed New

York domicile in earlier cases, later asserted California domicile in a different case).

### 2.   NCAA members are heavily concentrated in California.

*Second,* the NCAA membership base is heavily concentrated in California, and meaningfully controlled by it. Fifty-eight NCAA members are in California, twenty-four of which are Division I members—the most in any state. Declaration of Jonathan D. Selbin ("Decl."), Ex. A. Although no California court has ruled on whether an unincorporated association is subject to general jurisdiction where its members are located, it is well-established that for purposes of diversity jurisdiction an unincorporated association "has the citizenships of all of its members." *Johnson v. Columbia*, 437 F.3d 894, 899 (9th Cir. 2006). There is no rational basis for a different rule with respect to personal jurisdiction. Indeed, in the analogous context of partnerships—which the Ninth Circuit has classified as a type of unincorporated association, *see id.*—the Ninth Circuit held that "a partner's actions may be imputed to the partnership for the purpose of establishing minimum contacts[.]" *Sher v. Johnson*, 911 F.2d 1357, 1366 (1990). This follows from two well-established principles: that each partner "is an agent of the partnership when carrying on the business of the partnership in the usual way," and, in turn, that "for purposes of personal jurisdiction, actions of agent are attributable to principal." *Id.* at 1362. Application of those principles here counsels that an unincorporated association, like the NCAA, is subject to general jurisdiction wherever any member may be sued in connection with the "common enterprise" of the association. *See Kemether v. Pennsylvania Interscholastic Athletic Ass'n*, 15 F. Supp. 2d 740, 763 (E.D. Pa. 1998) (finding that an unincorporated association of schools, on the one hand, and its member schools, on the other hand, stand in a relationship of mutual agency with each other).[2]

---

[2] Although the NCAA attempts to analogize an unincorporated association-member relationship to a corporate parent-subsidiary relationship, *see* NCAA Mem. 16 (citing *Daimler*), this comparison is inapt given the "strong presumption" of legal separateness between a corporate parent and its subsidiary, which does not extend to unincorporated associations. *Vasquez v. Wells Fargo Bank, Nat'l Ass'n*, 77 F. Supp. 3d 911, 922 (N.D. Cal. 2015).

1       Even if the NCAA is not subject to general jurisdiction through the presence of its California

2  members, standing alone, its relationship to its California members goes far beyond casual

3  affiliation. The NCAA exercises significant control through imposition of onerous requirements

4  on members' athletics programs and operation of an expansive enforcement program. *See* FAC

5  ¶¶ 93-95, 142. That control is independently sufficient to support general jurisdiction here.

6       In *Donatelli v. Nat'l Hockey League*, 893 F.2d 459 (1st Cir. 1990), the only Circuit Court

7  decision to consider the minimum contacts necessary to subject a non-resident unincorporated

8  association to general jurisdiction, plaintiff alleged general jurisdiction in Rhode Island based on

9  a non-resident NHL team with contacts in the state. Observing that "the very breadth of the array

10  of associational institutions, and their diverse nature, necessitates using a functional, flexible,

11  case-specific methodology," the court reasoned that an assertion of general jurisdiction would

12  depend on the "degree of control" exercised by the association over its members. *Id.* at 468-69.

13  Because "the NHL's influence over individual members seem[ed] insubstantial," and "the clubs

14  perform[ed] virtually all of their crucial functions . . . independently of the [NHL]" the First

15  Circuit reversed the district court's finding of general jurisdiction. *Id.* at 468-69, 472.

16       By contrast, the existence of general jurisdiction here is clear. The NCAA has 58 members

17  in California, and an extremely broad mandate "to legislate, through bylaws or by resolutions of a

18  Convention, *upon any subject of general concern to the members* related to the administration of

19  intercollegiate athletics." FAC ¶ 88 (emphasis added). It exercises significant control and

20  influence over its California members, imposing burdensome requirements related to all elements

21  of college athletics, including recruitment, salary, personnel, disciplinary policies, and even

22  athletic uniforms. *See id.* ¶¶ 93-95, 142; Decl., Ex. B. It also routinely exercises its power to

23  punish members for non-compliance and employs a nearly 60-member enforcement staff to

24  investigate potential violations of its extensive, 451-page Constitution and Bylaws. *Id.* ¶ 142.

25       *Mehr v. Fed'n Int'l de Football Ass'n*, 115 F. Supp. 3d 1035 (N.D. Cal. 2015) does not alter

26  this analysis. *Mehr* looked to the contacts of an *international* organization (FIFA), whose only

27  members were national associations (*e.g.*, U.S. Soccer) based outside of California. *Id.* at 1048.

28  Had FIFA's members been California-based, state associations – akin to the NCAA member

schools at issue here – the relationship of those members to California, as well as FIFA's degree of control over them, would have been relevant to the court's inquiry.

In short, the NCAA has substantial influence and control over its California members; under such circumstances, it would be "unfortunate if an organization with as great power as the [NCAA] has in … directing the conduct of (its) members" were not subject to general jurisdiction in a state in which it has an outsized influence on institutions of public education. *Cohane v. NCAA*, 2014 WL 1820782, at *3 (D. Mass. May 8, 2014) (brackets in original).

### 3.  NCAA's activities establish physical and economic presence here.

*Third*, the NCAA engages in a continuous stream of activities in and directed toward California, both directly and through its members, that exceed its activity in other states and "render it essentially at home in California." *Daimler*, 134 S. Ct. at 761. This "confluence of . . . physical, economic, and political presence" in California gives rise to personal jurisdiction. *See Tuazon*, 433 F.3d at 1175.

Here, the NCAA's long-standing "confluence of" physical, economic, and political presence in California, exceeding its presence in other states, warrants general jurisdiction. Since its founding in 1916, the NCAA has received substantial revenue directly tied to activities in California. California has the largest number of Division I member institutions in the country— the Division that generates virtually all NCAA revenue. Decl., Exs. A, C. California members are thus responsible for an outsized portion of the NCAA's $1 billion annual revenue. *See* Decl., Ex. C. California members also contribute tens of thousands of dollars in membership dues to the NCAA. Decl., Exs. A, C.

The NCAA also affirmatively elects to host many of its largest and most prominent revenue-minting events in California. The oldest and most famous college football playoff game, for example, the Rose Bowl, has been held in California continuously since 1916—evidencing more than *100 years* of continuous and highly profitable commercial activity by the NCAA in the State. *Id.*, Exs. D, E. Overall, during the 2019 to 2020 academic year, prior to COVID-19, California was slated to host 43 championship games—more than almost any other state. *Id.*, Ex. F. These games are attended by NCAA representatives, giving the NCAA a meaningful physical

1    presence in the State throughout the year in addition to an economic one. *Id.*, Ex. G ("the NCAA

2    will spend more than $31 million to transport . . . NCAA staff and committee members to and

3    from their destinations," including championships). *See Walden v. Fiore*, 571 U.S. 277 (2014)

4    (while "physical presence in the forum is not a prerequisite to [general] jurisdiction, physical

5    entry into the State—either by the defendant in person or through an agent, goods, mail, or some

6    other means—is certainly a relevant contact"). Thus, the NCAA's purposeful activities and

7    membership base in California are critical to its financial success.

8        The NCAA has also engaged in sustained lobbying efforts specifically targeted at California.

9    On September 18, 2019, the Board wrote a letter to California Governor Gavin Newsom urging

10   him to reject a bill that would allow athletes in the state to be compensated for use of their name,

11   image and likeness. Decl., Ex. H. Their efforts were unsuccessful, and the law will take effect in

12   2023—but not before the NCAA spent $450,000 on lobbying efforts in 2019, much of it directed

13   at California. *Id.*, Ex. I. *See Tuazon*, 433 F.3d at 1174 (defendant's lobbying efforts in forum state

14   supported exercise of general jurisdiction).

15       In sum, "the totality of the contacts" are such that the NCAA could reasonably anticipate

16   being—and, indeed, has been—"'haled into court' in California.'" *Coremetrics v. Atomic

17   Park.com*, 370 F. Supp. 2d 1013, 1021 (N.D. Cal. 2005). The extent of these contacts goes

18   beyond the NCAA's contacts with other states, rendering the NCAA essentially at home in

19   California. Thus, general jurisdiction exists here.

20       **B.    This Court has specific jurisdiction over the NCAA.**

21       Specific jurisdiction over the NCAA also exists under California's long-arm statute. The

22   NCAA is subject to specific jurisdiction because the contractual and tortious actions these claims

23   arise from—the NCAA's policies, which failed to protect student athletes from sexual misconduct

24   by coaches—occurred with the involvement of the NCAA's California members. They also gave

25   Rembao license to move from Cal Poly in California (where Plaintiffs plausibly allege he

26   engaged in sexual misconduct) to the University of Arizona (where he abused Aldrich).

27       The Ninth Circuit uses a three-prong test to determine specific jurisdiction: (1) the defendant

28   must either purposefully direct his activities toward the forum or purposefully avail himself of the

1  privileges of conducting activities in the forum; (2) the claim must be one which arises out of or

2  relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must be

3  reasonable. *Axiom*, 874 F.3d at 1068. Plaintiff bears the burden of satisfying the first two prongs;

4  if she does, the burden shifts to the defendant to make a "compelling case" that exercise of

5  jurisdiction would not be reasonable. *Id*.

6      Where, as here, Plaintiffs allege both contract and tort claims, the first prong of the test can

7  be satisfied by showing either purposeful direction of activities toward the State or purposeful

8  availment of the benefit of doing business there. *Schwarzenegger*, 374 F.3d at 802 ("purposeful

9  availment analysis is most often used in suits sounding in contract," while the purposeful

10  direction test "is most often used in suits sounding in tort."). Even "a single forum state contact

11  can support jurisdiction if the cause of action arises out of that particular purposeful contact of the

12  defendant with the forum state." *Menken v. Emm*, 503 F.3d 1050, 1060 (9th Cir. 2007).

13      As to the second requirement—that the claims "arise out of" or "relate to" the defendant's

14  activities in the forum—"'[b]ut for' causation is all that is required since a restrictive reading of

15  the 'arising out of' requirement is not necessary to protect potential defendants from unreasonable

16  assertions of jurisdiction." *Shute v. Carnival Cruise Line*, 897 F.2d 377, 385 (9th Cir. 1990), *rev'd*

17  *on other grounds*, 499 U.S. 585 (1991). "Any event in the causal chain leading to the plaintiff's

18  injury is sufficiently related to the claim to support the exercise of specific jurisdiction." *Wells*

19  *Fargo v. Transam. Life Ins.*, 2020 WL 833518, at *6 (C.D. Cal. Feb. 19, 2020).

20      The NCAA policy decisions at issue here are the result of voluntary agreements between

21  the NCAA's members, including the 58 located in California. Through these agreements, the

22  NCAA imposed strict requirements on California schools—which it was empowered to enforce if

23  necessary—and received millions of dollars in membership dues, and ticket and broadcast

24  revenue. Yet, it failed to adopt formal policies to monitor, prohibit, or otherwise address rampant

25  sexual misconduct, the very factual basis of this case. Put differently, the NCAA's California

26  members both contributed to development (or lack) of appropriate policies to address sexual

27  abuse and were (or should have been) governed by those policies through their contracts with the

28  NCAA. Such contacts are "more than sufficient for purposeful availment." *Baires v. U.S.*, 2010

1    WL 3515749, at *6 (N.D. Cal. Sept. 8, 2010) (allegations that non-resident defendants "crafted a

2    policy that shapes the behavior of an enormous governmental entity within the State of

3    California" easily established purposeful availment for purposes of specific jurisdiction).

4          Plaintiffs allege that "[w]ithout NCAA rules requiring member institutions to report

5    predators like Rembao to the NCAA, Rembao moved among NCAA schools, preying on female

6    track and field student-athletes." FAC ¶ 145. The policies that the NCAA adopted and

7    implemented in California, with input of California members, allowed Rembao to form an

8    inappropriate relationship with a student-athlete he was coaching, Sue McNeal, in California. *Id.*

9    ¶ 31. Those policies then allowed him to move freely to a new institution, the University of

10   Arizona, where he abused Aldrich. *Id.* ¶¶ 28, 30. Thus, the NCAA Defendants' purposeful

11   availment and direction of activities in California are plainly "related to" Plaintiffs' claims. *See*

12   *Huddleston v. John Christner Trucking*, 2017 WL 4310348, at *5 (E.D. Cal. Sept. 28, 2017)

13   ("The policies at issue may have their origin in Oklahoma, but [defendant's] decision to

14   purposefully direct its activities toward California and apply those policies in this forum give rise

15   to specific personal jurisdiction.").

16         Contrary to the NCAA's contentions, Plaintiffs plausibly allege that Rembao began an

17   inappropriate sexual relationship with McNeal while coaching her at Cal Poly. Plaintiffs plainly

18   allege that Rembao coached women's track and field at Cal Poly in 1984 (FAC ¶ 30), and began

19   dating Sue McNeal while she was a member of the track team (*id.* ¶ 31). The NCAA's claims that

20   "Plaintiffs nowhere allege that Rembao abused McNeal or that he coached her while she was an

21   athlete at Cal Poly" thus lack merit—the straightforward inference to be drawn from the

22   allegations is that Rembao coached McNeal while she was a student-athlete, and that their

23   relationship was inherently abusive due to the power imbalance. Moreover, based on Rembao's

24   pattern of preying on student-athletes who he coached, for purposes of a motion to dismiss it is at

25   a minimum plausible that Rembao and McNeal began their sexual relationship while Rembao was

26   her coach. Further, the NCAA's claims that Rembao met McNeal while *he* was a student-athlete

27   and coached her only after she graduated contradict Plaintiffs' well-pleaded factual allegations

28   and present, at most, factual disputes inappropriate for resolution at this stage.

It is also immaterial that Plaintiffs do not allege that they were abused by Rembao in California. NCAA Mem. 7. The "proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290. A clear nexus exists between California and Plaintiffs' claims: the NCAA's inadequate policies, implemented in California through the input of California members, shielded Rembao from accountability for his abusive behavior as a coach at Cal Poly, and gave him license to move from California to other schools. Put differently, but for the NCAA's failure to prevent coaches involved in inappropriate student relationships from transferring schools, Plaintiffs would not have been harmed. Thus, specific jurisdiction exists because the actions in California, with consent of the NCAA and for its benefit, are "part of the unbroken chain of events leading to Plaintiffs' alleged injury." *Cortina v. Bristol-Myers Squibb*, 2017 WL 2793808, at *3 (N.D. Cal. June 27, 2017); *see also Menken*, 503 F.3d at 1060 (even a single contact with the forum state can establish specific jurisdiction).

Finally, the NCAA fails to even address its burden under the third prong to "present a compelling case" that exercising personal jurisdiction would be unreasonable. *Menken*, 503 F.3d at 1057 (listing seven "reasonableness" factors).

## II.   Venue is proper because the Court has personal jurisdiction over the NCAA.

Venue is also proper in this District under 28 U.S.C. § 1391(b)(1). At the motion to dismiss stage, "[a] *prima facie* showing of proper venue is sufficient to defeat a motion to dismiss." *Nissan Motor Co. v. Nissan Computer Co.*, 89 F. Supp. 2d 1154, 1161 (C.D. Cal.), *aff'd*, 246 F.3d 675 (9th Cir. 2000). "As a result, at least until facts are resolved, in many cases the non-moving party will survive the Rule 12(b)(3) motion." *Id.* at 1139.

Under 28 U.S.C. § 1391(b)(1), a civil action may be brought, *inter alia*, in "a judicial district in which any defendant resides." For venue purposes, entities like the NCAA reside "in any judicial district in which [they are] subject to the court's personal jurisdiction with respect to" the action in question. 28 U.S.C. § 1391(c)(2). As discussed, NCAA is subject to the Court's personal jurisdiction in this District. The location of NCAA's headquarters does not alter this analysis; "that [Indiana] has significant contacts with the [Defendants] does not mean that [California] does

1  not, and personal jurisdiction does not cease to exist in [California] solely because it also exists in

2  [Indiana]." *Ganezer v. DirectBuy.*, 2012 WL 12867971, at *4 (C.D. Cal. Jan. 30, 2012).

3      The NCAA, in the alternative, requests that the Court approve transfer to the Southern

4  District of Indiana. But the moving party "bears the burden of showing that the inconvenience of

5  litigating in this forum favors transfer," *Bromlow v. D & M Carriers*, 2020 WL 701979, at *2

6  (N.D. Cal. Feb. 11, 2020), and the fact that the NCAA is headquartered elsewhere, standing alone,

7  does not meet that burden, *see Noriesta v. Konica Minolta Bus. Sols. U.S.A.*, 2019 WL 6482222,

8  at *2 (C.D. Cal. July 8, 2019) (denying motion to transfer notwithstanding the defendants'

9  headquarters and witnesses in New Jersey). Venue is proper in this Court.

10 **III.  The NCAA Board is an entity with the capacity to be sued.**

11     The NCAA's argument that the Board "does not have the capacity to be sued independently

12 of the NCAA" is also without merit. NCAA Mem. 9. The NCAA asks the Court to infer that a

13 board may not be sued independently of a corporation based on a single provision in California's

14 Corporations Code, which states that "[a] corporation or association may be sued[,]" without

15 expressly allowing or disallowing suit against a board. Cal. Corp. Code § 105. But California law

16 expressly *permits* suit against "[a] member, *director*, officer, or agent of a nonprofit association"

17 for "injury, damage, or harm caused by an act or omission of the association or an act or omission

18 of a director, officer, or agent of the association." *Id.* § 18620(a) (emphasis added). This provision

19 suggests that board of a nonprofit association, like the NCAA, is subject to suit as an entity

20 independent from the association itself.

21     The case cited by NCAA does not compel a different conclusion. In *Theta Chi Fraternity v.

22 Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816, 821 (N.D. Cal. 2016), the court - implicitly

23 declining to adopt the reading of Cal. Corp. Code § 105 advanced by NCAA - relied on two out of

24 circuit cases to strike allegations against a fraternity board. But the tentative conclusion in that

25 case is not binding here.

26 **IV.  Plaintiff Corcoran has standing to bring claims for injunctive relief.**

27     Plaintiff Corcoran has standing to seek injunctive relief because she faces an increased risk

28 of sexual abuse due to the NCAA's deficient policies. To establish Article III standing, a plaintiff

1  must show that she (1) suffered an injury in fact, (2) arising out of the defendant's conduct, that

2  (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-

3  61 (1992). For purposes of a motion to dismiss "general factual allegations of injury resulting

4  from the defendant's conduct may suffice," *id.*, and the Court must "draw all reasonable

5  inferences" in the Plaintiffs' favor, *Bernhardt v. County of L.A.*, 279 F.3d 862 (9th Cir. 2002).

6      The NCAA challenges the first prong of the standing inquiry—the sufficiency of the injury

7  alleged by Plaintiff Corcoran. It is well-established that "the possibility of future injury may be

8  sufficient to confer standing on plaintiffs; threatened injury constitutes injury in fact." *Central

9  Delta Water Agency v. U.S.*, 306 F.3d 938, 947 (9th Cir. 2002). In *Central Delta*, plaintiff-farmers

10 challenged a U.S. Bureau of Reclamation policy that they alleged may raise salinity levels in

11 irrigation water, thereby damaging their crops. 306 F.3d at 947. The Ninth Circuit concluded that

12 plaintiffs "need not wait to challenge the Bureau's action until" their crops were damaged or

13 destroyed; they suffered a cognizable injury-in-fact based on the "credible threat" of potential

14 harm. *Id.* at 950. Similarly, in *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010),

15 the Ninth Circuit held that an "increased risk of future identity theft" due to a stolen laptop

16 containing plaintiffs' personal data constituted "a credible threat of real and immediate harm."

17     Sexual assault is an actual, imminent concern for *all* student-athletes:  the NCAA itself

18 acknowledged that "[s]exual relationships between coaches and student-athletes have become a

19 serious problem." FAC ¶ 1. The Complaint further alleges that the NCAA had and has a duty to

20 protect its student-athletes from that problem. *Id.* ¶¶ 4-5, 88-92, 361-74, 392-98. It details the fact

21 that, despite its knowledge and duty, the NCAA, unlike many peer organizations, failed to adopt

22 adequate policies to address this pervasive problem. *Id.* ¶¶ 43-49, 61-85, 93-144, 361-74, 392-98.

23 And it alleges Corcoran is a current student-athlete at Princeton. *Id.* ¶ 25. Read as a whole, the

24 Complaint thus adequately alleges that the NCAA's failure to enact policies protecting student-

25 athletes from that "serious problem" puts Corcoran, a current student-athlete, at increased risk of

26 sexual assault.

27     Sadly, that risk is not "conjectural" or "hypothetical," but an actual, credible threat, the

28 severity and pervasiveness of which has been confirmed by the NCAA's own reports, substantial

1    third-party research, and tragic, high-profile examples of abusive coaches. *See* FAC ¶¶ 46, 53-57,

2    60, 97-144. Further, as in *Central Delta* and *Krottner*, the nature of the potential harm here makes

3    Plaintiff Corcoran's "ability to challenge actions creating [the] threatened [harms] particularly

4    important": "in contrast to many other types of harms, monetary compensation may well not

5    adequately return plaintiffs to their original position." *Id.* at 950.

6        Contrary to the NCAA's suggestion, Plaintiff Corcoran need not allege that she was abused

7    by Rembao or any other coach to establish an actual injury-in-fact. The Ninth Circuit has

8    routinely concluded that "threatened injury constitutes injury in fact," irrespective of whether the

9    plaintiff has experienced the same injury in the past. *See, e.g.*, *Ocean Advocates v. U.S. Army*

10   *Corps*, 402 F.3d 846, 860 (9th Cir. 2005) (plaintiffs had standing based upon the increased risk of

11   an oil spill, even though the plaintiffs had never before been injured by an oil spill).

12       In sum, Plaintiffs have alleged sufficiently cognizable harm to confer standing for injunctive

13   relief. *See Bledsoe v. Webb*, 839 F.2d 1357, 1361 (9th Cir. 1988) (female employee of the Navy

14   had standing to bring Title VII action based on her continuing status in which she "remain[ed]

15   employed by the Department of the Navy," and there was "some likelihood that the injury will

16   recur"); *Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788, 813 (M.D. Tenn. 2016) (student-plaintiff

17   had standing to assert injunctive relief claims based on her "increased risk of sexual assault" due

18   to university's inadequate policies). "Plaintiffs have at the very least raised a material question of

19   fact with respect to the issue whether they suffer a substantial risk of harm as a result of the

20   [NCAA's] policies." *Central*, 306 F.3d at 948.

21   **V.    Plaintiffs' claims are not barred by the statute of limitations.**

22       Statute of limitations is an affirmative defense that involves questions of fact. Thus,

23   "dismissal under Rule 12(b)(6) is appropriate only if it can be determined from the face of the

24   Complaint that the[ ] claims are time-barred." *Lopes v. Vieirai*, 488 F. Supp. 2d 1000, 1043 (E.D.

25   Cal. 2007) "When a motion to dismiss is based on the running of the statute of limitations, it can

26   be granted only if the assertions of the complaint, read with the required liberality, would not

27   permit the plaintiff to prove that the statute was tolled." *Jablon*, 614 F.2d at 682.

28   **A.    Erin Aldrich's claims are timely.**

1        Pursuant to A.R.S. § 12-502, an Arizona tolling statute, and the delayed discovery rule as

2   applied by the Arizona courts, Aldrich's claims did not accrue until March 2019, when she saw

3   the movie *Leaving Neverland* and realized that she was a victim of sexual abuse. Since she filed

4   her claims within a year of that date, her claims are timely under California, Arizona, Texas, and

5   Indiana law. *See* NCAA Mem., App. A (limitations periods in Arizona, Texas, and Indiana).

6                      **1.   Arizona law applies to Aldrich's statute.**

7        The California Supreme Court requires a choice of law analysis to determine the law to be

8   applied to issues such as accrual and tolling. *See McCann v. Foster Wheeler,* 48 Cal. 4th 68, 87

9   (2010).[3] When undertaking such an analysis, the forum state's choice of law rules apply. *Klaxon*

10  *Co. v. Stentor Elect Mfg. Co.,* 313 U.S. 487, 496 (1941). California applies the "governmental

11  interest" test to resolve choice of law questions. *McCann,* 48 Cal. 4th at 83. Under this test a

12  court:

13         must first consider whether the two states' laws actually differ; if so, we must examine each

14  _____

15  [3] Defendants argue without analysis that California law applies to determine the timeliness of

16  Aldrich's claim (NCAA Mem. 12; Rembao Mem. 4-5), relying on *Cossman v. DaimlerChrysler*

17  *Corp.,* 108 Cal. App. 4th 370, 376 (2003). But *Cossman* is inapposite. There, Indiana plaintiffs'

18  claims were untimely under Indiana law but not under California law. While plaintiffs argued for

19  application of California's statute of limitations, the court applied California's borrowing statute

20  to hold that Indiana law barred their claims. *Id.* at 376-78. The court noted that the borrowing

21  statute was enacted to prevent non-residents with expired claims from filing in California to

22  revive their claims if the California limitations period was more favorable. *Id.* Here, however,

23  Aldrich is not looking to avail herself of a more favorable statute of limitations in California.

24  Instead she contends that Arizona law applies to the issues of tolling and accrual, and accordingly,

25  California's borrowing statue and *Cossman* are irrelevant. This is confirmed by *G&G Prods.*

26  *LLC. v. Rusic*, 902 F.3d 940, 948 n.6 (9th Cir. 2018), cited by the NCAA, which notes that the

27  California Supreme Court has *not* decided whether for purposes of the borrowing statue accrual is

28  a question of California law or the law of the foreign jurisdiction in which the claim arose.

state's interest in applying its law to determine whether there is a 'true conflict'; and if each state has a legitimate interest we must compare the impairment to each jurisdiction under the other's rule of law.

*Insurance Co. of N. Am. v. Federal Express Corp.*, 189 F.3d 914, 921 (9th Cir. 1999). As to the first question, Arizona and California have different tolling statutes, with Arizona's being more expansive. Arizona's tolling statute provides:

> If a person entitled to bring an action…is at the time the cause of action accrues…of unsound mind, the period of such disability shall not be deemed a portion of the period limited for commencement of the action. Such person shall have the same time after removal of the disability which is allowed to others.

A.R.S. § 12-502. Statutes of limitations are tolled if the plaintiff is of "unsound mind" at the time the cause of action accrues or thereafter. *Id.* "Unsound mind" is applied broadly and extends beyond legal incapacity. A person can be of "unsound mind" when he is unable "to understand his legal rights or liabilities." *Doe v. Roe*, 955 P.2d 951, 964 (Ariz. 1998). This interpretation has been applied when a survivor of sexual abuse is unable to appreciate and timely pursue her legal rights. *See id.*

California has a similar, but narrower, tolling provision which applies only to juveniles or legally incapacitated individuals. Cal. Code Civ. Proc. § 352 ("If a person entitled to bring an action… is, at the time the cause of action accrued either under the age of majority or lacking the legal capacity to make decisions, the time of the disability is not part of the time limited for the commencement of the action."). Because Arizona's tolling provision is broader, there is a material conflict in the laws of Arizona and California.

The second question in a choice of law analysis "examine[s] each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *McCann,* 48 Cal. 4th at 83. Here, Arizona has the greater interest in seeing its law applied. First, Aldrich was abused by Rembao in Arizona. Further, "Arizona does not look with favor on the statute of limitations defense," and thus finds it inequitable to hold persons under such disabilities to strict time limitations for filing legitimate claims. *Ulibarri v. Gerstenberger,* 871 P.2d 698, 706 (Ariz. Ct. App. 1993). Therefore, Arizona's interest is paramount, and Arizona law should apply.

If, however, this Court finds that both states have equal interests in seeing their laws applied,

the Court must then evaluate the nature and strength of the interest of each jurisdiction in the application of its own law to determine which would be more impaired if its policy were subordinated to that of the other state. *McCann,* 48 Cal. 4th at 96-97. As discussed above, declining to apply Arizona law would significantly impair Arizona's interest. Further, California courts recognize that a "jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders…." *Id.* at 98; *see also Francis v. Wynn Las Vegas,* 557 Fed. App'x 662, 664 (9th Cir. 2014) ("The state with the predominant interest in applying its law normally is the state in which the underlying conduct occurs"). That Rembao now lives in California is a coincidence insufficient to outweigh Arizona's numerous and weighty reasons for application of its statute. Thus, the tolling provision of A.R.S. § 12-502 should apply.

### 2.   A.R.S. § 12-502 tolled Aldrich's statute.

Aldrich's claims are timely under A.R.S. § 12-502 because she was of "unsound mind," as defined by Arizona law, where she was unable to understand her legal rights until 2019.

In *Doe v. Roe*, a 34-year-old plaintiff filed suit after she experienced a flashback memory of her father sexually abusing her when she was a child while watching a television program on incest. 955 P.2d at 953. She "developed feelings of hysteria, even panic, and immediately sought counseling," and was hospitalized for psychiatric care. *Id*. The Arizona Supreme Court addressed "how the discovery rule and the tolling provisions of the statute of limitations are to be applied when a plaintiff alleges that her memories of severe childhood sexual abuse were repressed and not recalled until adulthood." *Id.* at 955-56.

> [M]emory repression is the involuntary blocking of memory so that the memory remains stored but inaccessible to the conscious mind. Repression is a psychological defense mechanism that protects the individual from being confronted with the memory of an event that is too traumatic to cope with…. The memory is not lost but remains dormant and inaccessible. The individual functions with no conscious awareness of the traumatic event.

*Id.* at 975 (citations omitted). The court found that, under A.R.S. § 12-502, plaintiff's repressed memories and denial of the sexual abuse demonstrated she was unable to understand and assert her legal rights at the time her cause of action accrued. *Id.* at 967. The Arizona Supreme Court reversed the trial court's grant of summary judgment, finding that issues of repressed memory present questions of fact for a jury to consider. *Id.* at 960.

Here, Aldrich, like the plaintiff in *Doe*, repressed her memories of Rembao's abuse. While she had the ability to recall some of the events, she did not realize she had been sexually abused, and experienced feelings of complicity and shame. *Leaving Neverland* was the stimulus or "trigger" for her realization that she was a victim of sexual abuse. The realization had a physical effect on Aldrich, like the plaintiff in *Doe.* Shortly after watching the movie, with the pressure and stress of the past triggered and realized, Aldrich was hospitalized with sepsis from bacterial pneumonia for eight days. FAC ¶ 187. Until that point, she was of an "unsound mind" under Arizona law, *i.e.* she was unable to understand and assert legal rights. *Doe,* 955 P.2d at 967. Because "[t]he facts here create a genuine issue on [plaintiff's] ability to understand and assert one's legal rights," the motions to dismiss should be denied. *Id.*

Citing *Scarborough v. Altstatt,* 140 A.3d 479 (Md. Ct. Spec. App. 2015), Rembao argues that the intent of A.R.S. § 12-502 "is that it be applied to minor victims of abuse." Rembao Mem. 11. But *Scarborough* did not address the Arizona statue, but the Maryland discovery rule under controlling Maryland precedent, making that case inapplicable. *See id.* at 508. Further, Rembao's reliance on *Florez v. Sargeant,* 917 P.2d 250 (Ariz. 1996), for the proposition that the statute is tolled only if a person is incapable of carrying on their day-to-day affairs is similarly misplaced because, as Rembao recognizes, "unsound mind" can be established where an individual like Aldrich is unable to understand her legal rights. *See* Rembao Mem. 12. In fact, the *Doe* court expressly held that *Florez* "does not stand for the proposition that summary judgment is appropriate just because there is evidence that an alleged victim is able to manage any of her daily affairs." *Doe,* 955 P.2d at 965.

NCAA does not address Aldrich's reliance on this statutory tolling in its motion to dismiss. Failure to address an argument on a motion to dismiss may be construed as an admission of the merits. *See Hover v. Seattle-First Nat'l Bank*, 2018 WL 6169194 (W.D. Wash. Apr. 6, 2018).

### 3. The discovery rule also tolled Aldrich's statute.

The *Doe* court also found that the discovery rule provided a basis to delay accrual of the plaintiff's claims. The discovery rule applies where "a cause of action does not accrue until the plaintiff knows or with reasonable diligence should know the facts underlying the cause." *Id.* at

960. The rationale of the discovery rule is that it would be unjust to deprive a plaintiff of a cause of action before plaintiff believed such claim existed. *Id.*[4]

In *Doe,* the Arizona Supreme Court found the plaintiff's cause of action did not accrue until sometime after plaintiff had her first flashback. *Id.* at 967. The court stated that the "policy behind the discovery rule is thus served by application to repressed memory cases involving childhood sexual abuse and is, we believe, logically appropriate given that the intentional act of the tortfeasor caused both the damage and the repression of memory." *Id.* Like the plaintiff in *Doe,* Aldrich's recognition of her legal rights occurred when her memories of abuse were triggered by watching *Leaving Neverland* in spring of 2019.

The NCAA and Rembao argue the discovery rule should not apply because Aldrich "does not allege that she repressed all memories of Rembao's conduct." NCAA Mem. 13; Rembao Mem. 12-13. Yet no authority mandates that a victim become an amnesiac; to the contrary, "[a]s people are being traumatized, this narrowing of consciousness sometimes evolves into amnesia for parts of the event, or for the entire experience." *Doe*, 955 P.2d at 957, n.4. *See also Sellery v. Cressey*, 48 Cal. App. 4th 538, 547 (1996) ("total repression of all memory of the abuse is not necessary to toll the statute").

The NCAA also contends that the discovery rule should not apply because "Aldrich appreciated the wrongfulness of Rembao's conduct when it took place." NCAA Mem. 13. However, Aldrich's recognition that Rembao was treating her improperly is entirely different than the suppression of memories of the sexual abuse. *See Doe,* 955 P.2d at 956-57 n.4. The NCAA's

---

[4] Like Arizona, California applies the discovery rule where "statutes of limitation do not begin to run until a cause of action accrues." *Fox v. Ethicon Endo-Surgery,* 35 Cal. 4th 797, 806 (2005). But because the Arizona Supreme Court in *Doe* applied the discovery rule to repressed memories, and the NCAA contends that the California courts would not apply it to Aldrich's claims (NCAA Mem. 12-13), there is a conflict in the laws. As set forth above, a choice of law analysis, for the reasons set out above, would mandate the application of Arizona law.

1    citation to *Mark K. v. Roman Catholic Archbishop*, 67 Cal. App. 4th 603, 612, n.9 (1998),

2    supports Plaintiffs' argument. There, plaintiff did *not* allege that he failed to appreciate the

3    wrongfulness of the priest's conduct until some subsequent event triggered his memory that the

4    priest acted inappropriately. *Id.* Yet here, Aldrich did allege a trigger for her realization that she

5    was a victim of Rembao's grooming and sexual abuse: watching *Leaving Neverland* in 2019.

6          Rembao contends that *Doe* does not dictate the timeliness of Ms. Aldrich's claims because

7    she does not allege that she repressed childhood memories, but adult memories, and *Doe* applies

8    only to victims of childhood sexual abuse. Rembao Mem. 7. But Arizona applies the discovery

9    doctrine to adult victims of abuse where the defendant was in a relationship of trust or an

10   authority figure because "sexual exploitation of this relationship may have factors similar to the

11   sexual exploitation of a child by an adult." *Ulibarri,* 871 P.2d at 705.

12         Given the detailed allegations regarding the power imbalance in the coach/athlete

13   relationship, FAC ¶¶ 37-57, and Rembao's exercise of that power differential for improper

14   purposes, *id.* ¶¶ 160-167, 175-177, the discovery rule should apply. At a minimum, these accrual

15   and tolling issues present fact questions that are inappropriate for a motion to dismiss.

16         **B.    Bevins and Johnson's claims are timely.**

17              **1.   Equitable tolling applies.**

18          Bevins and Johnson filed this action within a year of Aldrich's phone call identifying that

19   they were indeed victims of Rembao's abuse. As such, their claims are timely under the doctrine

20   of equitable tolling. Because the laws of Texas (where the events were concentrated) and

21   California (the forum) both recognize equitable tolling (*In re United Servs. Auto. Ass'n,* 307

22   S.W.3d 299, 311 (Tex. 2010); *Addison v. State,* 21 Cal. 3d 313, 319 (1978)), a conflict of laws

23

24

25

26

27

28

1    analysis is not necessary and California law applies.[5]

2        "It is hornbook law that limitations periods are customarily subject to equitable tolling."

3    *Young v. U.S.,* 535 U.S. 43, 49 (1992). Equitable tolling is a "judge-made doctrine" that suspends

4    or extends a statute of limitations as necessary to ensure fundamental practicality and fairness.

5    *Lantzy v. Centex Homes,* 31 Cal. 4th 363, 370 (2003). The purpose of the doctrine is to "soften the

6    harsh impact of technical rules which might otherwise prevent a good faith litigant from having a

7    day in court." *Jones v. Blanas,* 393 F.3d 918, 928 (9th Cir. 2004). *See, e.g., Stoll v. Runyon,* 165

8    F.3d 1238 (9th Cir. 1999) (equitable tolling applied to sexual abuse where "plaintiff is prevented

9    from asserting a claim by wrongful conduct on the part of the defendant, or when extraordinary

10   circumstances beyond the plaintiffs control made it impossible to file a claim on time").

11       Equitable tolling "requires a balancing of the injustice to the plaintiff occasioned by the bar

12   of his claim against the effect upon the important public interest or policy expressed by the

13   limitations statute." *Lantzy,* 13 Cal. 4th at 371. Here, the injustice to Plaintiffs if they are barred

14   from bringing their claims is clear. Immediately after the abuse occurred, NCAA member UT-

15   Austin conducted an investigation during which it badgered Johnson and Bevins, subjecting them

16   to cross-examination and accusations. UT-Austin told Johnson that Rembao's licking her neck

17   was merely "boorish" and not sexual in nature. The investigation and report gaslighted the

18   student-athletes into believing Rembao did nothing wrong, and that they were overreacting. *See*

19   FAC ¶¶ 331-335. UT-Austin's handling of Johnson's complaint and treatment of those Plaintiffs

20   during the investigation created self-doubt, blame, minimization, and uncertainty regarding

21   Rembao's actions. *See, e.g., id.* ¶ 336. Because UT-Austin took multiple steps to ensure that

22   Plaintiffs did not pursue their claims, the doctrine of equitable tolling suspended their claims until

23

24   [5] Rembao cites California, Arizona, and Texas law. NCAA cites Indiana and Texas law. Because

25   California and Texas apply equitable tolling in the same way, and NCAA has not shown that

26   Indiana law is materially different, there is no conflict and California law should be applied. *See*

27   *Parrish v. Nat'l Football League Players Inc.*, 2007 WL 1624601, at *9 (N.D. Cal. June 4, 2007).

28

October 2019, when Aldrich called Johnson. *Id.* ¶¶ 339-342. *See Stoll,* 165 F.3d at 1242 (applying equitable tolling so that defendant could not benefit from outrageous acts that left plaintiff so broken that she could not protect her own rights).

The NCAA argues that the above facts do not fit the "narrow situations in which the doctrine has been applied in Indiana and Texas." NCAA Mem. 15. Despite the NCAA's narrow parsing of the cases it cites, equitable tolling is available under both Indiana and Texas law where a plaintiff was induced or tricked into allowing the filing deadline to pass. *See Lewallen v. Cross,* 2014 WL 4365081, at * 2 (Tex. Ct. App. Aug. 27, 2017) (citation omitted); *Estate of Decker v. Farm Credit Servs.*, 653 N.E.2d 534, 536 (Ind. Ct. App. 1995).

Rembao claims there are various elements for application of the doctrine that Plaintiffs do not meet, but Rembao provides no case support for these elements. *See* Rembao Mem. 9. In fact, a case on which he relies, *Luna v. Kernan,* 784 F.3d 640 (9th Cir. 2015), supports Plaintiffs' argument. There, the court applied equitable tolling where an attorney misled his client for more than six years that he had filed a petition and litigation was proceeding. Like in *Luna*, equitable tolling applies where the plaintiffs were misled, and such issues cannot be resolved on a motion to dismiss. *Id.* at 943 ("claims for equitable tolling are inherently fact-intensive").

### 2.   Equitable estoppel and fraudulent concealment also apply.

While "equitable tolling applies when plaintiff is unaware of his cause of action . . . equitable estoppel applies when a plaintiff who knows of his cause of action reasonably relies on the defendant's statements or conduct in failing to bring suit." *Estate of Amaro v. City of Oakland*, 653 F.2d 808, 814 (9th Cir. 2011). Equitable estoppel is wholly independent of the limitations period itself and comes into play only after the limitations period has run. *Lantzy,* 31 Cal. 4th at 383. "[A] party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period." *Id.* Fraudulent concealment applies where there is an intentional concealment or suppression of the facts. *Marketing West v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 612-13 (1992); Cal. Evid. Code § 623. Texas also applies equitable estoppel and fraudulent concealment theories to toll the limitations periods (*Borderlon v. Peck,* 661 S.2.2d

907, 908 (Tex. 1996)), and thus, there is no conflict in the laws and California law should apply.[6]

Here, two separate sets of circumstances warrant application of the doctrines of equitable estoppel and fraudulent concealment tolling. First, the NCAA was on notice of the prevalence of coaches who take advantage of their power over student-athletes to subject them to sexual abuse. The NCAA chose to ignore the issue, even though other sports organizations adopted policies to prevent sexual abuse and prohibit sexual relationships between coaches and athletes. Thus, this case is like *Langston v. Mid-America Intercollegiate Athletics Ass'n,* 2020 WL 1445631 (N.D. Ill. Mar. 25, 2020). There, plaintiffs brought suit against the NCAA for football brain injuries that caused the decedent to commit suicide. *Id.* at *1. The court applied the doctrine of equitable estoppel, pointing to plaintiffs' allegations that NCAA knew and concealed the risks of developing degenerative brain diseases. *Id.* at *7. Highlighting allegations that the NCAA remained silent despite knowledge, the court denied the motion to dismiss, holding that whether the allegations "give rise to estoppel is a question of fact…." *Id.* The same is true here. Plaintiffs allege that the NCAA knew of the risk of sexual abuse by coaches but failed to take action.

The UT-Austin investigation of Rembao is a second, independent reason warranting application of equitable estoppel and fraudulent concealment tolling. "Estoppel most commonly results from misleading statements about the need for or advisability of a claim; actual fraud or the intent to mislead is not essential." *John R. v. Oakland Unified Sch. Dist.*, 48 Cal. 3d 438, 445 (1989). UT-Austin intentionally misled Johnson and Bevins and minimized egregious sexual misconduct to forestall them from filing suit and drawing unwanted scrutiny to its athletics program. *See, e.g.*, FAC ¶ 334 (finding that "virtually every athlete interviewed" was uncomfortable with Rembao's "chair hugs" and "bear hugs" but that such conduct did not violate

---

[6] Rembao argues for application of California law, but also contends that it makes no difference if California, Arizona, or Texas law is applied. NCAA argues for the application of Texas or Indiana law. Because California and Texas do not apply equitable estoppel and fraudulent concealment in materially different ways, and NCAA has not shown that Indiana law is different, in the absence of a conflict, California law applies. *See Parrish*, 2007 WL 1624601, at *9.

the University's sexual harassment policy is egregious); ¶¶ 218, 336 (finding that Rembao's

licking Johnsons' neck was not assault, abuse, or harassment is ludicrous, given that such contact

would clearly be assault, abuse, or harassment under any other circumstance); ¶¶ 302, 335, 339.

Johnson and Bevins plausibly allege a knowing or intentional concealment of material facts on

which they relied to their detriment by failing to timely file suit, sufficient to support equitable

estoppel and fraudulent concealment tolling. *See* Cal. Evidence Code § 623.

In *Estate of Amaro v. City of Oakland,* 653 F.3d 808 (9th Cir. 2011), the court applied

equitable estoppel to preserve plaintiff's suit over her son's death after a police beating. While the

decedent told his mother he had been beaten, the police misrepresented the events and

stonewalled providing information to plaintiff. *Id.* at 811. More than eight years after the incident,

the FBI received a tip and opened an investigation, which resulted in plaintiff's late-filed suit. *Id.*

The court noted that "the focus of the equitable estoppel analysis is not whether the plaintiff knew

she had a cause of action . . . but whether the defendant's fraudulent concealment or

misrepresentation deprived the plaintiff of a full understanding of the true facts, and thus,

dissuaded the plaintiff from filing the claim at issue within the limitations period." *Id.* at 813. The

court applied the doctrine because the defendant's misrepresentations and stonewalling prevented

plaintiff "from appreciating the full nature of her claim and dissuaded her from filing [suit]." *Id.*

at 814. *See also Wisniewski v. Diocese of Belleville,* 943 N.E.2d 43, 68 (Ill. App. 2011) (affirming

timeliness of plaintiff's sexual abuse claims, filed 24 years after the abuse, under the doctrine of

fraudulent concealment). The same is true here. Johnson filed her complaint about Rembao with

UT-Austin, and the university investigated. The method of investigation caused both Johnson and

Bevins to doubt themselves, and the final investigative report confirmed those false beliefs. They

were, like the plaintiff in *Amaro,* prevented from appreciating the full nature of their claims.

The NCAA argues that equitable estoppel and fraudulent concealment do not apply because

the NCAA had no role in the UT-Austin investigation. NCAA Mem. 15. However, the doctrines

of equitable estoppel and fraudulent concealment apply when a party *or one of its agents or*

*representatives* engages in some calculated conduct, such as a misrepresentation or concealment

of facts, which induced the plaintiff not to file a claim within the statutory time. *Doe v.*

1  *Bakersfield City School Dist.,* 136 Cal. App. 4th 556 (2006) (collecting cases). As an

2  unincorporated association, the NCAA can be held liable for the acts and omissions of its

3  members, including UT-Austin. *See* Cal. Corp. Code § 18250. Whether the NCAA had control

4  over the actions of those agents or representatives, a fact that the NCAA denies, show the

5  existence of fact questions inappropriate for resolution on a motion to dismiss. *See John R.*, 48

6  Cal. 3d at 446 (fact questions existed where the abusive teacher, not the school district, threatened

7  harm to the victim if he disclosed abuse).

8       Rembao argues that he has not engaged in conduct giving rise to equitable estoppel. Rembao

9  Mem. 11. Plaintiffs counter that he is a serial abuser who caused their profound injuries and he

10  was a party to the UT-Austin investigation. *See* FAC ¶ 333. Rembao's role in that investigation

11  raises fact issues that cannot be resolved on a motion to dismiss. *See John R.*, 48 Cal. 3d at 446.

12  Moreover, the case on which Rembao relies, *Bertrand v. Bertrand*, 449 S.W.3d 856 (Tex. Ct.

13  App. 2014), does not support his position because there, plaintiff failed to present any evidence to

14  support tolling sufficient to counter the defendants' motion for summary judgment after full

15  development of the factual record. Here, Plaintiffs have plausibly pled the facts to support their

16  tolling arguments, and as such, dismissal at this stage is premature.

17       **3.  This Court should apply equitable principles to create a victimization**
                 **exception for Bevins and Johnson's claims.**

18       Johnson and Bevins also contend that this Court should apply equitable principles and toll

19  the limitations period because of the inherent nature of sexual abuse and because their abuser was

20  in a position of power and trust over them. Contrary to Defendants' arguments, Plaintiffs are not

21  asking this Court to forge new ground or rewrite the law. Instead, Plaintiffs argue that this Court

22  should apply well-established equitable principles to sexual abuse claims where the perpetrator is

23  in a position of power and trust.

24       Equity is required because sexual abuse is not an event with a discrete beginning and end to

25  which limitations periods can easily be applied. With some victims, the abnormal events become

26  normalized; with others, the events are suppressed because of shame, fear, or manipulation. FAC

27  ¶ 345. Not only are the events of the sexual abuse viewed through the victim's distorted

28

perceptions, but the victim is not emotionally capable of understanding their victimization and taking meaningful action for her own protection. The California legislature has acknowledged that the facts associated with sexual abuse are complex and often delayed. *See* Cal. Code Civ. Proc. § 340.16 (legislature's recent re-opening of the statute of limitations for college students abused by an on-campus physician); *see also* Assembly Floor Analysis (9/5/19) (Con. in Sen. Amends. to Assem. Bill. No. 1510 (Reyes)), at 2, *available at* https://bit.ly/31lt9eI ("typical statutes of limitation–which require a plaintiff to bring an action within a reasonable period of time–fail to accommodate the complex and delayed process of dealing with, and sometimes even remembering, sexual abuse and assault").

In addition to the complex psychological nature of sexual abuse, Rembao was in a position of power over Plaintiffs. Courts have equated sexual abuse by an authority figure to the sexual abuse of children. *See Ulibarri*, 871 P.2d at 705 (sexual exploitation by those in a position of power "may have factors similar to the sexual exploitation of a child by an adult"). This Court should thus apply equity to preserve Plaintiffs' claims where they were sexually abused by an acknowledged authority figure.

The NCAA argues that a federal court sitting in diversity may not create equitable exceptions to statutes of limitations and cites *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99 (1945). NCAA Mem. 16. That case*,* however, stands for the unremarkable proposition that a diversity court will apply the relevant state's limitations laws, a concept Plaintiffs do not dispute. This Court's application of equitable principles is well within its judicial powers. *See Young,* 535 U.S. at 49-50 (recognizing that tolling might be appropriate in various circumstances). At a minimum, Plaintiffs raise fact issues inappropriate for dismissal at the motion to dismiss stage.

## VI.   Plaintiffs state plausible negligence, breach of contract, and vicarious liability claims.

Fed. R. Civ. P. 12(b)(6) allows for dismissal only if the complaint "fail[s] to state a claim upon which relief can be granted." A complaint must "state a claim to relief that is plausible on its face," by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," accepting all allegations as true and construing them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

1

**A.    The NCAA and its Board owed Plaintiffs a duty of care.**

2

NCAA seeks dismissal of Counts I–IV of Plaintiffs' Complaint (gross negligence,

3

negligence, breach of fiduciary duty, and negligent misrepresentation), claiming it owed no duty

4

to all Plaintiffs. NCAA Mem. 17-21. The NCAA only contests the element of duty. *Id*. at 14-21.

5

Plaintiffs contend that for purposes of this motion to dismiss, there is no conflict in the laws

6

of Indiana or California regarding the existence of a duty to make the issue outcome-

7

determinative. Despite the NCAA pointing to the number of individual factors each state

8

examines (NCAA Mem. 17), both states balance foreseeability, the parties' relationship, and

9

various public policy considerations in the same way. *See Rowland v. Christian*, 69 Cal. 2d 108,

10

112-13 (1968); *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). Without a material conflict, the

11

law of the forum, California, should apply. *See Parrish*, 2007 WL 1624601, at *9.

12

**1.    The NCAA voluntarily assumed its duty.**

13

A duty of care must be imposed because the NCAA expressly undertook a duty to protect its

14

student-athletes. "[O]ne who undertakes to aid another is under a duty to exercise due care in

15

acting and is liable if the failure to do so increases the harm or if the harm is suffered because the

16

other relied on the undertaking." *Paz v. California*, 22 Cal. 4th 550, 558 (2000). The NCAA's

17

undertaking to protect its student-athletes is not something Plaintiffs created; it is based on the

18

NCAA's own words. The NCAA's promise to its student-athletes is contained in its Constitution

19

and Bylaws, where it vows that "athletics programs shall be conducted in a manner designed to

20

protect and enhance the physical and educational well-being of student-athletes." FAC ¶ 89. Its

21

website trumpets this promise to provide a safe environment for student-athletes. *Id.* ¶¶ 91, 124-

22

25, 361. And NCAA President and Board Member Mark Emmert reiterated that promise, telling

23

the Senate that the NCAA has "a clear, moral obligation to make sure that we do everything we

24

can to support and protect student-athletes."  *See* Senate Tr., *supra* note 1. This is clearly

25

"affirmative, deliberative conduct" that the NCAA contends is necessary for it to have voluntarily

26

and gratuitously assumed a duty of care to Plaintiffs. *See* NCAA Mem. 20.

27

**2.    The NCAA owes a duty based on its special relationship with student-athletes.**

28

Under California law, a duty to protect plaintiff from the conduct of third-parties can also be

1    imposed pursuant to the "special relationship" doctrine. *Regents of University of Cal. v. Superior*

2    *Court,* 4 Cal. 5th 607, 627 (2018). "[A] duty to warn or protect may be found if the defendant has

3    a special relationship with the potential victim that gives the victim a right to expect protection."

4    *Id.* at 619. In *Regents,* the court found that universities have a special relationship with their

5    students and a duty to protect them from foreseeable violence during school activities where

6    plaintiff was attacked by a mentally-ill student. *Id.* at 613. In evaluating the question of duty, the

7    court noted that "special" relationships have "an aspect of dependency in which one party relies to

8    some degree on the other for protection." *Id.* at 620. The corollary to this principle is control, *i.e.*

9    where one party is dependent and the other has superior control over the means of protection or

10   over the plaintiff's welfare. *Id.* Another aspect of a special relationship is defined boundaries such

11   that the "duty of care [is] owed to a limited community, not the public at large." *Id.* at 621. The

12   court imposed a special relationship because "[s]tudents are comparatively vulnerable and

13   dependent on their colleges for a safe environment. Colleges have a superior ability to provide

14   that safety with respect to activities they sponsor or facilities they control." *Id.* at 625.

15          These same considerations require imposition of a limited duty on the NCAA to protect its

16   student-athletes. For many student-athletes, "college is the first time they have lived away from

17   home. Although college students may no longer be minors under the law, they may still be

18   learning how to navigate the world as adults." *Id.* Those vulnerable student-athletes are dependent

19   on the NCAA to make their sport a safe environment, and the NCAA is in the best position to

20   ensure that it is. It is reasonable for student-athletes to expect that the NCAA would protect them

21   from harm inflicted by NCAA coaches.

22          Courts have consistently found that resolving whether the NCAA had a duty to protect

23   student-athletes is inappropriate on a motion to dismiss. *See Hill v. Slippery Rock Univ.,* 138 A.3d

24   673, 679 (Pa. Super. 2016) (plaintiffs sufficiently alleged duty on the part of NCAA sufficient to

25   withstand a motion to dismiss); *Greiber v. NCAA,* 2017 WL 6940498, at *1 (N.Y. Sup. Ct. Sept.

26   8, 2017) (denying NCAA's motion to dismiss plaintiff's negligence claim); *Langston v. Mid-Am.*

27   *Intercollegiate Athletics Ass'n,* 2020 WL 1445631 (N.D. Ill. Mar. 25, 2020) (same); *Schmitz v.*

28   *NCAA,* 67 N.E.2d 852, 867 (Ohio Ct. App., Dec. 8, 2016) (same); *Bradley v. NCAA.,* No. 16-346

1    (D.D.C. April 12, 2017) (Dkt #36) (same). The NCAA relies on *Lanni v. NCAA*, 42 N.E.3d 542

2    (Ind. Ct. App. 2015), where the court granted the NCAA's motion for *summary judgment* after

3    development of the factual record. But that case is distinctly different because the injury was an

4    accident—a random but unfortunate event—that occurred while plaintiff was watching a fencing

5    bout. Here, and in the above-cited cases, there are allegations of the NCAA's extensive and long-

6    standing knowledge of the risk of harm to the student-athletes and its failure to respond in light of

7    its knowledge. In the cases cited above, it is the harm from repeated head traumas; here, it is the

8    coaches who exploit vulnerable student-athletes. Plaintiffs plausibly allege the NCAA owed

9    Plaintiffs a duty based on its special relationship with its student-athletes.

10           **3.    The NCAA owes a duty to Plaintiffs based on its special relationship with and
                     control over its coaches.**

11           Plaintiffs next contend that a duty of care exists because the NCAA has a special

12   relationship *with its coaches* and is in the best position to control their conduct as it relates to

13   student-athletes. "A duty to control, warn, or protect may be based on the defendant's relationship

14   with the person whose conduct needs to be controlled…." *Regents,* 4 Cal. 5th at 619.  "[A] duty to

15   control a third-person may arise if the defendant has a special relationship with the foreseeably

16   dangerous person that entails an ability to control that person's conduct." *Id.* The key in such a

17   relationship is that the defendant's relationship with the tortfeasor places the defendant in the

18   superior position to protect the risk of harm. *Brown v. USA Taekwondo,* 40 Cal. App. 5th 1077,

19   1092, *as modified on denial of reh'g,* (2019), *review granted* 257 Cal. Rptr. 3d 188 (2020).

20           In *Brown,* a case with similar theories of liability, the court found USA Taekwondo

21   ("USAT") owed a duty of care to plaintiffs who were sexually abused by a coach under the

22   control of the USAT. *Id.* at 1093. In finding a duty on the part of USAT to its athletes, the court

23   considered that to compete in Olympic games, athletes must be members of USAT and train

24   under USAT-registered coaches; the perpetrator was a USAT coach; and USAT had control over

25   the coach through its policies and procedures. *Id.* at 1094. The court concluded that "USAT was

26   therefore in the best position to protect against the risk of harm." *Id.* The court next analyzed

27   California's *Rowland* factors and found that they "support recognition of USAT's duty to use

28

                                             - 29 -

reasonable care to protect taekwondo youth athletes from foreseeable sexual abuse by their coaches." *Id.* at 1101.

Here, the NCAA is in the best position to protect against the risk of harm to NCAA student-athletes because it can and does regulate the conduct of NCAA coaches in a host of ways. Contrary to its argument that it does not have any ability to control or supervise coaches (NCAA Mem. 19), the NCAA's Bylaws detail prohibited conduct for coaches, proscribing activities such as sports wagering and supplying banned substances. NCAA coaches who violate this code are subject to disciplinary or corrective action. FAC ¶¶ 94-95 (citing NCAA Bylaws). To ensure compliance, the NCAA employs a 60-member enforcement staff, and has sanctioned coaches following investigations that it has conducted. *Id.* ¶ 142. Because the NCAA has the proven ability to control the conduct of coaches, this Court should find that a special relationship exists so as to impose a duty on the NCAA to protect its student-athletes from abusive coaches.

The NCAA points to *Yost v. Wabash College,* 3 N.E.3d 509, 520 (Ind. 2014), where summary judgment was granted under Indiana law after development of the factual record. The court declined to find a fraternity had a duty to a plaintiff who was injured during a hazing incident because "[t]he national fraternity lacked any direct oversight and control of the individual fraternity members." *Id.* at 521. Here, the relationship between the NCAA and its members and coaches is dramatically different: it can and does control the conduct of its coaches. Plaintiffs plausibly allege the NCAA owed Plaintiffs a duty based on its special relationship with NCAA coaches and its ability to legislate their conduct.

### 4. Plaintiffs plausibly allege the NCAA's duty based on the *Rowland* factors.

When deciding whether to impose a duty of care based on either of the special relationships identified above, a court must also consider the *Rowland* foreseeability and public policy factors. Those factors evaluate "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and

prevalence of insurance for the risk involved." *Rowland*, 69 Cal. 2d at 112-13.

Here, the first three *Rowland* foreseeability factors support the imposition of a duty because harm to NCAA student-athletes from predatory coaches is foreseeable. As set forth above, the NCAA was or should have been aware of a student-athlete's vulnerability to sexual abuse and inappropriate sexual relationships by coaches. As early as 1992, years before any Plaintiff attended college, the U.S. Olympic Committee established a code of ethics prohibiting coach-athlete sexual relationships as "exploitative." Other sports organizations followed suit, but not the NCAA. The harms to the Rembao Plaintiffs from sexual abuse by coaches were foreseeable, and the NCAA failed to put in place measures that could have prevented their injuries. *See Brown,* 40 Cal. App. 5th at 1099 (citing cases); *Juarez v. Boy Scouts of Am.,* 81 Cal. App. 4th 377, 404 (2000) (danger that a child who participates in organized youth activities will encounter a sexual predator was foreseeable over 40 years ago). In light of this knowledge, the NCAA should not be able to disavow its duty for litigation purposes.

As for the *Rowland* public policy factors, the first is moral blame attached to the defendant's conduct. "[I]f there were reasonable ameliorative steps the defendant could have taken, there can be moral blame attached to the defendants' failure to take steps to avert the foreseeable harm." *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1091 (2017); *Regents,* 4 Cal. 5th at 631 ("Some measure of *moral blame* does attach to a university's negligent failure to prevent violence against its students"). Here, the NCAA's President confirmed that failure to protect its student-athletes violates a moral code, testifying the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes." *See* Senate Tr., *supra* note 1. This clear expression of NCAA policy supports imposition of a duty.

The next two applicable *Rowland* factors consider the policy of preventing future harm and the burden on defendant to do so and the consequences to the community of imposing a duty to exercise care. Imposing a duty on NCAA to protect student-athletes from coaches is a limited one, encompassing a narrow subset of individuals. Further, it involves regulating the conduct of the coaches who cross inappropriate boundaries. Any burden on NCAA is outweighed by the benefit to NCAA students-athletes as a whole. *See Juarez,* 18 Cal. App. 4th at 407 (recognizing the

1  societal benefit of protecting the vulnerable from sexual predators). These final *Rowland* factors

2  confirm the propriety of imposing a duty on the NCAA.

3  **B.    Plaintiffs adequately allege a fiduciary relationship with the NCAA.**

4  Under California law, "[a] fiduciary relationship is any relation existing between parties to a

5  transaction wherein one of the parties is in duty bound to act with the utmost good faith for the

6  benefit of the other party." *Wolf v. Superior Court*, 107 Cal. App. 4th 25, 29 (2003). In Count III,

7  Plaintiffs allege that NCAA owed them a fiduciary duty based on the special relationship that

8  exists between the NCAA and its student-athletes described above. FAC ¶ 392. This fiduciary

9  duty was formed because NCAA actively promoted itself as providing a safe environment for its

10  student-athletes and intended that student-athletes rely on this promise. *Id. ¶¶* 392-393. Plaintiffs

11  allege this special relationship is fiduciary in nature because the NCAA is in the best position to

12  protect against the risk of harm, and student-athletes depend on it to do so. *Id.* ¶ 394. Because this

13  special relationship is fiduciary in nature, the NCAA is duty bound to act for the benefit of its

14  student athletes to protect them from predatory coaches. *Id.* ¶ 395.

15  NCAA's reliance on *Schmitz v. NCAA*, 67 N.E.3d 852 (Ohio Ct. App. 2016), is misplaced.

16  *Schmitz* found that, under Ohio or Indiana law, plaintiff had not pled facts with the specificity

17  required under Fed. R. Civ. P. 9(b) to support a constructive fraud claim. The court concluded that

18  plaintiff failed to plead a fiduciary duty or other special relationship that would support the claim.

19  *Id.* at 870. Here, Plaintiffs plead facts sufficient to show a fiduciary relationship, including

20  NCAA's promises in its governing documents, its website and its president's own words.

21  **C.    Plaintiffs plausibly plead negligent misrepresentations and omissions.**

22  Under California law, "[o]ne who negligently gives false information to another is subject to

23  liability for physical harm caused by action taken by the other in reasonable reliance upon such

24  information, where such harm results" to the other.  *Garcia v. Superior Court*, 50 Cal. 3d 728,

25  735 (1990). For the reasons set forth above, Plaintiffs sufficiently allege the existence of a duty on

26  the part of NCAA to protect student-athletes. This encompasses "the duty to use reasonable care

27  in giving information." *Id.* Plaintiffs sufficiently allege that NCAA was aware of the risk to

28  student-athletes of sexual abuse from coaches, and concealed this information from Plaintiffs.

The NCAA argues that Indiana law applies and that "Indiana does not recognize a negligent misrepresentation claim outside of the context of professionals" such as attorneys and brokers. NCAA Mem. 23. Indiana courts, however, have indicated a willingness to allow claims for personal injuries beyond direct relationships, so the states' laws do not appear materially different. *See Passmore v. Multi-Management Servs.,* 810 N.E.2d 1022, 1025 (Ind. 2004). But even accepting NCAA's contention that Indiana law only allows recovery for pecuniary losses in the context of such "direct relationships" (NCAA Mem. 23), a conflicts analysis nevertheless warrants application of California law. Indiana has some interest in seeing Indiana law applied to an organization that made certain omissions and misrepresentations from its Indiana headquarters. California, however, unquestionably has the stronger interest in seeing its law applied to protect student-athletes from physical harm caused by negligent misrepresentations and omissions made by an out-of-state organization with significant contacts with California. California courts apply the duty of care "more broadly when physical safety is involved." *Garcia*, 50 Cal. 3d at 735. Accordingly, California law should be applied, and NCAA's motion to dismiss must be denied.

### D.   Plaintiffs plausibly allege claims for breach of express and implied contract.

The FAC plausibly alleges the existence of a valid express contract under California law. Plaintiffs allege that, prior to participation as an NCAA athlete, each student, including each Plaintiff, was required to affirm in writing that she had read the NCAA regulations and/or bylaws governing substantially all aspects of student-athlete conduct, and agreed to be bound by them. FAC ¶ 408-09 (discussing the contract for Division I athletes, Form 19-1a). This attestation was not limited to eligibility requirements, as NCAA incorrectly claims (NCAA Mem. 24), but explicitly covered "NCAA Division I bylaws related to eligibility, recruitment, financial aid, amateur status and involvement in sports wagering activities." FAC, Ex. A at 2. In return, the NCAA agreed, among other things, to conduct intercollegiate athletics in a manner designed to protect and enhance the physical well-being of Plaintiffs and other student-athletes, and to require that each member institution protect the well-being of, and provide a safe environment for, Plaintiffs and all student-athletes. *Id.* ¶ 410-12. The NCAA breached this agreement by failing to ensure that student-athletes were protected from predatory coaches.

1      The NCAA's efforts to deny the existence of an implied contract fare no better. Plaintiffs, in

2  the alternative,  allege the existence of an implied contract wherein student-athletes, in return for

3  participation and being bound by NCAA policies, expected the NCAA to provide appropriate

4  rules and regulations to protect their safety to the extent possible. Specifically, each Plaintiff

5  expressed her intent to contract by agreeing to participate in track and field or rowing, accepting a

6  position on the team, signing an agreement to be bound by the NCAA regulations, and waiving

7  certain rights. FAC ¶ 412, 417. In exchange, the NCAA conveyed its intent to abide by its own

8  Constitution and Bylaws to protect the safety of student athletes. *Id.* ¶ 417. But the NCAA

9  breached those contractual duties owed to Plaintiffs by failing to protect them from sexual

10  predators like Rembao. *Id.* ¶ 418.

11      It is irrelevant to the analysis that "the Manual divides responsibility [for student well-being]

12  between the NCAA and member institutions." The sole question is whether the NCAA's actions

13  reflect an intent to enter into a contract with student-athletes – not who maintains day-to-day

14  responsibility for enforcing and interpreting those promises. *See Binder v. Aetna Life Ins. Co.*, 75

15  Cal. App. 4th 832, 850 (1999). Accordingly, Plaintiffs have stated a claim for breach of express

16  and implied contract. *See, e.g.*, *Weston v. Big Sky Conf.*, 2020 WL 3129548, at *8 (N.D. Ill. June

17  12, 2020) (denying NCAA's motion to dismiss contract claims based on student's "written

18  agreement with the NCAA that he would comply with the NCAA's Constitution, bylaws, and

19  regulations"); *Richardson v. NCAA,* No. 1:16-cv-09980 (N.D. Ill. Feb. 14, 2018) (Dkt # 48)

20  (denying NCAA's motion to dismiss student's breach of express and implied contract claims).

21      **E.   Plaintiffs plausibly allege that they are third-party beneficiaries.**

22      The NCAA does not dispute that the Manual constitutes a valid contract between each

23  University and the NCAA, but claims that Plaintiffs do not allege they were third-party

24  beneficiaries of that contract. Not so. Under both Arizona and Texas law, which apply to these

25  claims, a third party can state a claim for breach of contract by showing that the contracting

26  parties intended to benefit him or her. *See City of Houston v. Williams*, 353 S.W.3d 128, 145

27  (Tex. 2011); *Araiza v. U.S. W. Bus. Res.*, 183 Ariz. 448, 454 (Ct. App. 1995). The intent to benefit

28  student-athletes is clear and unambiguous in the NCAA Manual. The NCAA promises to

"enact[]" legislation "designed to advance" the "Principle of Student-Athlete Well-Being," which states that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational welfare of student-athletes." FAC ¶ 89 (quoting Manual). It repeats this commitment to student-athlete well-being throughout its Constitution and Bylaws. For example, it commits to, *inter alia*, "initiate, stimulate and improve intercollegiate athletics programs for student athletes," to conduct intercollegiate athletics programs "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes", and to require "each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes." *Id.* ¶ 423 (quoting Manual). Even if the Manual attempts to allocate responsibility for student welfare between the NCAA and its member institutions (NCAA Mem. 25), that would have no bearing on the clearly expressed intent of the contract: to oversee the athletics program to the direct benefit of student-athletes.

This view is supported by the overwhelming weight of case law, in which courts have recognized a student-athlete plaintiff's intended third-party beneficiary status based upon the contract between a member institution and the NCAA. *See, e.g.*, *Bloom v. NCAA*, 93 P.3d 621, 623-24 (Colo. App. 2004) (finding third-party beneficiary standing because "the NCAA's constitution, bylaws, and regulations evidence a clear intent to benefit student-athletes"); *Oliver v. NCAA*, 155 Ohio Misc. 2d 8, 13-14 (2008) ("[t]he [student-athlete] plaintiff, who is not a party to the contract between NCAA and [the student's university], stands to benefit from the contract's performance, and thus he acquires rights under the contract"); *Rose v. NCAA*, 346 F. Supp. 3d 1212 (N.D. Ill. 2018) ("by its very nature—the exchange of mutual promises to protect the health of student athletes engaged in intercollegiate athletics—the NCAA/Purdue contract intended to benefit an identified class of individuals to which Plaintiffs belonged"); *Weston*, 2020 WL 3129548, at *9 (same). By contrast, the NCAA has failed to point to a single case holding otherwise. *Knelman v. Middlebury Coll.* was decided on a motion for summary judgment, and the court did "not decide the issue" of whether the student filing suit constituted a third-party beneficiary. 898 F. Supp. 2d 697, 715 (D. Vt. 2012), *aff'd*, 570 F. App'x 66 (2d Cir. 2014). And in *Hairston v. Pac-10 Conf.,* the court found a third-party beneficiary relationship could not be

inferred from "vague, hortatory pronouncements" in an athletic conference's governing documents. 101 F.3d 1315, 1320 (9th Cir. 1996). Here, by contrast, the NCAA made specific commitments to its student-athletes. The motion to dismiss should be denied.

### F.  Plaintiffs plausibly allege vicarious liability against the NCAA.

"It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Under California law, "[t]he principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control." *Secci v. United Independant Taxi Drivers*, 8 Cal. App. 5th 846, 855 (2017). An agency relationship "is proved by evidence that the person for whom the work was performed had the right to control the activities of the alleged agent." *Id.*

The "question of whether there exists an agency relationship is one of fact." *McCollum v. Friendly Hills Travel Ctr.*, 172 Cal. App. 3d 83 (Ct. App. 1985). Even if this question were fit for resolution on a motion to dismiss, however, Plaintiffs plausibly allege an agency relationship between Rembao and the NCAA. The NCAA exercised substantial control over material terms of Rembao's employment—including the fact of his employment. The NCAA promulgates and enforces extensive policies governing the conduct of college coaches, including salary limitations; outside employment; promotion or endorsement of NCAA competitors; contact with prospective college student-athletes; use of tobacco products; and reimbursement policies. FAC ¶ 95. Further, an agency relationship can be established on the basis of "[t]he power of the principal to terminate the services of the agent," which "[gave] him the means of controlling the agent's activities." *Malloy v. Fong*, 37 Cal. 2d 356, 370 (1951). The NCAA bylaws provide not only that coaches may be suspended or terminated if they violate NCAA regulations, but also that any "contractual agreement or appointments between" a member institution and a coach stipulate that "[a]n individual who is found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA infractions process . . . including suspension without pay or termination of employment." FAC ¶ 94.

Moreover, Plaintiffs adequately allege that, as a matter of law, Rembao acted within his

scope of employment or agency relationship with the NCAA when he sexually abused Plaintiffs. Under the doctrine of *respondeat superior*, an employer or principle may be held vicariously liable for torts committed by an employee or agent acting within the scope of the employment or agency relationship. *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 208 (1991). The "scope of employment has been interpreted broadly under the *respondeat superior* doctrine in California," *Myers v. Trendwest Resorts*, 148 Cal. App. 4th 1403, 1429 (2007): tortious conduct that disregards the employer's orders or does not benefit the employer may nonetheless fall "within the scope of employment" for purposes of *respondeat superior*, as may willful, malicious, or even criminal conduct. *Mary M.*, 54 Cal. 3d at 208.

In *Mary M.*, the California Supreme Court held the city of Los Angeles liable when a police officer detained a woman after a traffic stop, then followed her home and raped her. *Id.* at 207. Although *Mary M.* involved an on-duty police officer, the *Mary M.* court did not limit its analysis to tortious conduct by police alone. Instead, it focused on the authority and control exercised by the tortfeasor generally as being fundamental to the imposition of vicarious liability, recognizing that such authority and control "carries with it the risk of abuse." It also analyzed the policy justifications underlying *respondeat superior*, and concluded that they weighed in favor of application of the doctrine. Thus, the NCAA Defendants' statement of California law—that "except where sexual misconduct by on-duty police officers against members of the public is involved . . . , the employer is not vicariously liable to the third party for such misconduct," NCAA Mem. 28—taken from a 25-year old case, no longer holds true. *See Morin v. Henry Mayo Newhall Mem. Hosp.*, 29 Cal. App. 4th 473 (1994) (hospital could be liable under *respondeat superior* for the sexual battery committed by its ultrasound technician on a patient based on "indicia of authority" he possessed and foreseeability of abuse); *Beliveau v. Caras*, 873 F. Supp. 1393 (C.D. Cal. 1995) (denying building owner's motion to dismiss *respondeat superior* claims where the plaintiff alleged that a resident manager employed by building owner sexually assaulted her while in her apartment to repair a faucet); *Lu v. Powell*, 621 F.3d 944 (9th Cir. 2010) (asylum officer acted within the course and scope of his employment when he sexually assaulted two asylum seekers); *Doe v. Uber*, 184 F. Supp. 3d 774 (N.D. Cal. 2016) ("foreseeability and policy

rationales weigh[ed] in favor of allowing the complaint to move forward on the scope of employment question," where plaintiff plausibly alleged that Uber driver acted within the scope of his employment when he sexually assaulted plaintiff during a ride).

Here, Rembao's sexual abuse of Plaintiffs was not, as the NCAA charges, "entirely unrelated to his coaching duties." NCAA Mem. 29. To the contrary, Plaintiffs have alleged that they were assaulted, *inter alia*, on the way to track meets, while working out, and in Rembao's office. *See, e.g.*, FAC ¶¶ 160-62, 165, 175-76, 215, 217-19, 220, 279-80. Several of the assaults occurred while Rembao was ostensibly providing "coaching" or physical therapy. *Id.* ¶¶ 207-09, 267-70, 279-80. *See Mary M.*, 54 Cal. 3d at 219 ("[T]he proper inquiry is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal."). Additionally, "[i]n view of the considerable power and authority" that college coaches possess over student-athletes, "it is neither startling nor unexpected that on occasion [a coach] will misuse that authority by engaging in assaultive conduct." *Id.* at 208. Indeed, the risk of sexual abuse inherent in the coach-student-athlete relationship had been widely acknowledged by sporting organizations, including by the NCAA itself. *See, e.g.*, FAC ¶¶ 37-57, 62-76.

Holding the NCAA liable here would also advance the policy goals underlying *respondeat superior*: preventing future injuries, assuring compensation to victims, and spreading losses caused by an enterprise equitably. *See Mary M*, 54 Cal.3d at 214-17. "Assaults of this nature are exactly why" student-athletes would expect the NCAA to promulgate rules protecting them from sexual abuse by coaches. *Uber*, 184 F. Supp. 3d at 778. Additionally, vicarious liability is the only legal mechanism to ensure that victims are adequately compensated, *see* FAC ¶ 434, and that losses are spread equally amongst NCAA members that failed to enact rules protecting student-athletes. The policy rationale underlying vicarious liability further supports its application here.

**VII. Plaintiffs plausibly allege the NCAA ratified Rembao's actions.[7]**

Even if Rembao's actions were outside the scope of employment or agency, Plaintiffs

---

[7] Plaintiffs do not contest that their ratification claim applies solely to NCAA. Rembao Mem. 15.

adequately plead that they were ratified by the NCAA. A principal is liable to a third party harmed by an agent's conduct when the principal later ratifies the agent's conduct, including an originally unauthorized tort. *Murillo v. Rite Stuff Foods*, 65 Cal. App. 4th 833, 852 (1998). Such ratification may occur expressly or "by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred[.]" *Id.* "The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery."). *C.R. v. Tenet Healthcare*, 169 Cal. App. 4th 1094, 1110 (2009), *as modified on denial of reh'g* (Feb. 3, 2009). "Whether an employer has ratified an employee's conduct is generally a factual question." *Id.*

　　*First*, as discussed above, Rembao acted as an agent of the NCAA during all relevant times. *Second*, the NCAA's failure to investigate, or ultimately discharge, Rembao evidences its ratification. *See id*. *See also Murillo*, 65 Cal. App. 4th at 852 (plaintiff stated a ratification claim where she complained to a supervisor about another employee's sexual harassment, but the employer did nothing to further investigate or remedy the situation); *S.G. v. San Francisco Unified Sch. Dist.*, 2018 WL 1876875, at *4 (N.D. Cal. Apr. 19, 2018) (denying school district's motion to dismiss where plaintiff alleged she had been subject to a teacher's "undue attention, stalking, and sexual abuse in plain view" of district personnel). Here, Plaintiffs allege that Rembao had a widespread reputation for sexual abuse, yet no action was taken. FAC ¶¶ 167, 238. Student-athlete complaints, including Johnson's formal complaint to UT-Austin, provided further notice to the NCAA regarding Rembao's sexual misconduct. *Id.* ¶¶ 218, 236, 334, 336. Yet despite the severity of the conduct discovered by UT-Austin, the UT-Austin Report nonetheless concluded that Rembao's conduct did not constitute sexual misconduct. *Id.* No disciplinary proceedings were initiated, and Rembao was still allowed to be alone with student-athletes while on NCAA business. *Id.* Based on those allegations, the Court may draw a plausible inference that the NCAA "hid" information about Rembao's sexual misconduct so he could continue to work for the association and its member institutions. *See C.R.*, 169 Cal. App. 4th at 1112 ("sufficient allegations defendant ratified Mr. Gaspar's alleged sexual misconduct" where "managing agents and supervisors knew Mr. Gaspar was sexually abusing patients" but still allowed him to be alone

with female patients and "hid" the information "so he could work for it"). At minimum, Plaintiffs plausibly allege that the NCAA was on notice as to Rembao's misconduct due to its agency relationship with its members–Plaintiffs need not demonstrate specific knowledge by the NCAA.

**VIII. Plaintiffs State a Claim for False Imprisonment Against Rembao.**

Rembao's argument—that Plaintiffs were not falsely imprisoned because they physically could have left the track meets, schools, and dinners where they were sexually assaulted—relies on an inappropriately narrow definition of "confinement." False imprisonment consists of the "nonconsensual, intentional confinement of a person," without lawful privilege, "for an appreciable length of time, however brief." *Morales v. Paredes*, 2001 WL 1203418, at *3 (Cal. Ct. App. Oct. 11, 2001). Importantly, confinement may be effectuated not only by physical force or barriers, but also by "fear" or any other form of "unreasonable duress." *Id.*

In *People v. Ghipriel*, the court upheld three felony false imprisonment convictions where the defendant, the owner of a restaurant, sexually assaulted the victim, a 19-year-old hostess, in his office. 1 Cal. App. 5th 828, 834-35 (2016). On several occasions, defendant pulled plaintiff into the office and locked the door; on others, he pinned her against a wall and masturbated. *Id.* "Given the character of the acts and Doe's vulnerability on so many levels, Ghipriel's sexual conduct no doubt played a material role in maintaining control over her." *Id.* (noting "Doe was vulnerable in a number of respects: she was less than half his age, she weighed less than half . . . she was trapped in his small office, and he was her employer at a job she was afraid of losing.").

At the time of the events detailed here, the Rembao Plaintiffs were high school- and college-aged athletes; Rembao was a significantly older and larger man with immense power over their scholarship money and future success in the sport. Thus, as in *Ghirpriel*, the Rembao Plaintiffs were in positions of vulnerability. Rembao used his position of power to violate the Plaintiffs in ways that were "profoundly degrading and demeaning," often in small, enclosed spaces. *See, e.g.*, FAC ¶¶ 165, 215, 217-18, 267-73. These allegations, at a minimum, permit a "plausible inference" that Plaintiffs were willfully detained by Rembao, without their consent.

**<u>CONCLUSION</u>**

Plaintiffs respectfully request that this Court deny Defendants' motions to dismiss.

1

2          Dated: August 11, 2020                    Respectfully submitted,

3

4                                                    */s/ Elizabeth A. Fegan*
                                                     ELIZABETH A. FEGAN (*admitted pro hac vice*)
5                                                    beth@feganscott.com
                                                     FEGAN SCOTT, LLC
6                                                    150 S. Wacker Dr., 24th Floor
                                                     Chicago, IL 60606
7                                                    Telephone: (312) 741-1019
                                                     Facsimile: (312) 264-0100

8                                                    */s/ Jonathan D. Selbin*
                                                     JONATHAN D. SELBIN (Cal. Bar No. 17022)
9                                                    jdselbin@lchb.com
                                                     LIEFF CABRASER HEIMANN & BERNSTEIN
10                                                   275 Battery Street, 29th Floor
                                                     San Francisco, CA  94111-3339
11                                                   Telephone: (415) 956-1000
                                                     Facsimile: (415) 956-1008

12
                                                     LYNN A. ELLENBERGER (*admitted pro hac vice*)
13                                                   lynn@feganscott.com
                                                     FEGAN SCOTT, LLC
14                                                   500 Grant St., Suite 2900
                                                     Pittsburgh, PA 15219
15                                                   Telephone: (412) 346-4104
                                                     Facsimile: (412) 785-2400

16
                                                     ANNIKA K. MARTIN (*admitted pro hac vice*)
17                                                   akmartin@lchb.com
                                                     RHEA GHOSH (*admitted pro hac vice*)
18                                                   rghosh@lchb.com
                                                     LIEFF CABRASER HEIMANN & BERNSTEIN
19                                                   250 Hudson Street, 8th Floor
                                                     New York, NY 10013
20                                                   Telephone: (212) 355-9500
                                                     Facsimile: (212) 355-9592

21
                                                     *Attorneys for Plaintiffs and the Proposed Class*
22

23

24

25

26

27

28