1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6 SAN JOSE DIVISION

7

| | |
|---|---|
| ERIN ALDRICH, et al., | Case No. 5:20-cv-01733-EJD |
| Plaintiffs, | **ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING DEFENDANT REMBAO'S MOTION TO DISMISS** |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., | Re: Dkt. Nos. 55, 58 |
| Defendants. | |

The seriousness of the issue before the Court cannot be overstated.  In recent years, it has become clear that sexual assault on college campuses is a pervasive problem.  Of course, as Larry Nassar demonstrated, sexual assault on college campuses is not limited to peer-to-peer assault; it also occurs between coaches and their athletes.  This case focuses on that latter type of sexual assault and addresses the National Collegiate Athletic Association's ("NCAA") responsibility (if any) to prevent sexual misconduct by collegiate coaches.  Defendants NCAA and the Board of Governors argue that this Court lacks personal jurisdiction over them and thus cannot determine the scope of the NCAA's responsibility.  Defendant John Rembao maintains that Plaintiffs claims are time-barred by the relevant statutes of limitation.  Having considered the Parties' papers and having had the benefit of oral argument on September 3, 2020, the Court agrees with Defendants NCAA and the Board of Governors that personal jurisdiction cannot be established in this district. However, the Court disagrees with Defendant Rembao—various tolling doctrines prevent the Court from finding that Plaintiffs' claims are time-barred.  For these reasons, the Court **GRANTS** Defendants NCAA and the Board of Governors' motion to dismiss, but **TRANSFERS** the action

to the Southern District of Indiana, and **DENIES** Defendant Rembao's motion to dismiss.

## I.     BACKGROUND

### A.  Factual Background

#### 1.  Plaintiff Erin Aldrich

Plaintiff Erin Aldrich was a gifted high-jumper and volleyball player who dreamed of becoming an Olympian.  *See* First Amended Complaint ("FAC") ¶¶ 147–49, Dkt. 54.  Because of her skill, Plaintiff Aldrich was invited to attend the Junior Elite Development Camps in Colorado Springs.  *Id.* ¶ 149.  It was there that she met Defendant Rembao, who was known as the "high jump guru."  *Id.* ¶¶ 149–50.  At first, their relationship was normal; Defendant Rembao would counsel Plaintiff Aldrich about training and they would discuss her dreams and aspirations.  *See id.* ¶ 151.  But, as time passed, their relationship became more sinister.  After Plaintiff Aldrich committed to the University of Arizona—where Defendant Rembao coached track and field—on a volleyball scholarship (with a plan to also train for the high jump), Defendant Rembao began calling Plaintiff Aldrich nightly and would ask her non-sports related questions.  *Id.* ¶ 153.  Defendant Rembao would also send Plaintiff Aldridge unsolicited gifts and would comment on her senior pictures, telling her which one was his favorite and why, and telling her she looked "super sexy."  *Id.* ¶¶ 152, 154–55.

Eventually, Defendant Rembao physically forced himself onto Plaintiff Aldrich.  Plaintiff Aldrich qualified for a spot to compete for Team USA Track and Field at the World Junior Championships in August 1996.  *Id.* ¶ 159.  The competition was in Sydney, Australia.  *Id.* Because Plaintiff Aldrich's high school coach could not attend, her parents paid for Coach Rembao to accompany her.  *Id.*  On the plane ride to Australia, Defendant Rembao covered Plaintiff Aldrich with a blanket and fondled her under the blanket.  *Id.* ¶ 160.  He then penetrated Plaintiff Aldrich with his fingers and joked that they were members of the "mile high club."  *Id.* ¶ 162.  Because she trusted Defendant Rembao, she submitted to the touching.  *Id.* ¶ 161. Defendant Rembao vowed to leave his wife and treated Plaintiff Aldrich as if she were his

1    girlfriend.  *Id.* ¶¶ 162–63.

2         A physical relationship between Defendant Rembao and Plaintiff Aldrich ensued.

3    Defendant Rembao would have Plaintiff Aldrich over for dinner, where his wife would prepare

4    dinner.  *Id.* ¶ 164.  After dinner, Defendant Rembao would give Plaintiff Aldrich massages.  *Id.*

5    He would also perform oral sex on Plaintiff Aldrich at his home (and during road trips for

6    competitions and camps).  *Id.* ¶ 165.  In the fall of 1996, during Plaintiff Aldrich's freshman year

7    at Arizona, Aldrich's roommate discovered Coach Rembao in their room with Aldrich.  *Id.* ¶ 170.

8    The roommate reported the incident to University of Arizona officials.  *Id.* ¶ 172.  In 1997,

9    Arizona's Athletic Director had a meeting with Plaintiff Aldrich and her parents.  The director

10   informed Plaintiff Aldrich and her parents that Defendant Rembao would be moving to University

11   of Texas at Austin ("UT Austin") and asked Plaintiff Aldrich to stay at Arizona for another year.

12   *Id.* ¶ 173.  Ultimately, Plaintiff Aldrich transferred to the University of Texas in the spring of

13   1998.  *Id.* ¶ 179.  Once there, Defendant Rembao again pursued a physical relationship with

14   Plaintiff Aldrich.  *Id.* ¶¶ 180–81.  Plaintiff Aldrich ignored Defendant Rembao's advances and

15   kept her distance.  *Id.* ¶ 181.  Defendant Rembao then retaliated against Plaintiff Aldrich, which

16   caused her high-jumping performance to suffer.  *Id.* ¶¶ 181–85.

17        Plaintiff Aldrich maintains that she did not recognize that she had been sexually abused by

18   Defendant Rembao until the end of March or early April 2019.  *Id.* ¶ 186.  Plaintiff Aldrich was

19   watching *Leaving Neverland*, the documentary about young boys who were sexually abused by

20   Michael Jackson under the guise of love, when she realized that she too had been a victim of

21   sexual abuse.  *Id.* ¶¶ 186–87.  This realization caused her great stress and pressure and ultimately

22   lead to hospitalization.  *Id.* ¶ 187.

23                          **2.  Plaintiff Jessica Johnson**

24        Defendant Rembao's alleged abuse did not end with Aldrich.  Next came Plaintiff Jessica

25   Johnson, another gifted high jumper.  *Id.* ¶¶ 189–92.  Defendant Rembao took an interest in

26   Plaintiff Johnson; he would regularly call her and send her emails.  *Id.* ¶ 195.  He would also

27

28   Case No.: 5:20-cv-01733-EJD
     ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
     DEFENDANT REMBAO'S MOTION TO DISMISS

1  comment on Plaintiff Johnson's appearance, telling her she had "Miss America looks." *Id.*

2  ¶¶ 196–97, 199.  The conversations also turned to more uncomfortable topics, like Plaintiff

3  Johnson's sexual experiences with other young men. *Id.* ¶ 201.

4       Throughout high school, Plaintiff Johnson excelled at track and field and volleyball.  UT

5  Austin expressed interest in offering Plaintiff Johnson a volleyball scholarship.  Defendant

6  Rembao assured Plaintiff Johnson that she could play both volleyball and track and field at UT

7  Austin. *Id.* ¶ 202.  During Plaintiff Johnson's senior year, she suffered from mononucleosis and

8  dropped from first in state to second. *Id.* ¶ 203.  Because of the mononucleosis, she gained some

9  weight. *Id.*  Defendant Rembao gained Plaintiff Johnson's trust by remaining supportive of and

10  personal with Plaintiff Johnson during this time. *Id.*  Ultimately, Plaintiff Johnson committed to

11  UT Austin and was set to start as a freshman in the fall of 1999. *Id.* ¶¶ 204–05.

12       Before the semester started, Defendant Rembao invited Plaintiff Johnson to his home for

13  dinner. *Id.* ¶ 206.  During dinner, they discussed her work-outs and she explained that she had

14  been lifting heavy weights that made her legs sore. *Id.*  After dinner, Defendant Rembao told

15  Plaintiff Johnson to go into the living room and lay down on the floor so he could work on her

16  legs. *Id.* ¶ 207.  She complied. *Id.* ¶ 208.  He pushed Plaintiff Johnson's running shorts and the

17  built-in underwear inside the shorts up so that her buttocks were fully exposed. *Id.* ¶ 209.  He then

18  massaged her inner thighs and buttocks. *Id.*  In another incident at his home, she complained of a

19  stomachache. *Id.* ¶ 210.  Defendant Rembao proceeded to rub Plaintiff Johnson's stomach under

20  her shirt with his wife present. *Id.*

21       Defendant Rembao would keep track of Plaintiff Johnson's whereabouts by calling her

22  dorm room most nights. *Id.* ¶ 212.  On one occasion, Plaintiff Johnson went out on a date, which

23  Defendant Rembao discovered when he called Johnson's room. *Id.* ¶ 213.  Defendant Rembao

24  refused to speak to or give Plaintiff Johnson workouts for a week. *Id.*  Defendant Rembao told her

25  he was jealous and ostracized her from the team. *Id.*

26

27

28  Case No.: 5:20-cv-01733-EJD
    ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
    DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California

1    Defendant Rembao would sometimes call Plaintiff Johnson into his office, where he would

2    give her long and uncomfortable hugs. *Id.* ¶ 215. At other times, he would give her long and

3    intimate back rubs or would cup her face and rub his thumbs over her cheeks and jaw. *Id.* For

4    example, on January 21, 2000, Defendant Rembao called Plaintiff Johnson into his office. *Id.*

5    ¶ 217. He gave her a full hug, licked her neck, and told her she tasted "salty." *Id.* ¶ 218.

6    In February 19, 2000, during the Oklahoma Invitational, Defendant Rembao called

7    Plaintiff Johnson into his hotel room. *Id.* ¶ 220. He had her sit on the bed; he pushed her

8    backwards so that she was laying down. *Id.* He then reached under her shirt and under her shorts.

9    *Id.* She panicked, feigned sleep, and then left the room. *Id.*

10    During the indoor track season, Plaintiff Johnson suffered an ankle injury and could not

11    participate in the remainder of the season. *Id.* ¶ 222. On March 5, 2020, she told Defendant

12    Rembao that she was resigning from team and that she planned to transfer schools. *Id.* ¶¶ 224,

13    227. Fifteen days later, on March 20, 2020, she awoke to find Defendant Rembao in her dorm

14    room. *Id.* ¶ 227. He allegedly pulled back the blankets to look at her injured foot. *Id.* Defendant

15    Rembao then proceeded to tell Plaintiff Johnson that he missed her. *Id.* ¶ 229. He began kissing

16    her ankle and hugged her and rubbed her back. *Id.*

17    Plaintiff Johnson transferred to University of Arkansas. *Id.* ¶ 236. In the Spring of 2003,

18    during an indoor track meet in Oklahoma, Plaintiff saw Defendant Rembao, who was then

19    coaching at Southern Methodist University. *Id.* ¶ 240. She saw Defendant Rembao again in June

20    2003 at the NCAA championships in Sacramento, California. *Id.* ¶ 242. He filmed her while she

21    competed and later sent her a binder containing an analysis of her jumps. *Id.* ¶¶ 242, 244.

22    Before transferring, Plaintiff Johnson filed a formal complaint with UT Austin regarding

23    Defendant Rembao on August 9, 2000. *Id.* ¶¶ 300, 330. Plaintiff Johnson identified Plaintiff

24    Bevins as a witness who could support the allegations. *Id.* While Plaintiff Bevins was at the

25    University of Arkansas, see *infra*, a lawyer for UT Austin interviewed her. *Id.* ¶ 301. During this

26    interview, Plaintiff Bevins had a hard time explaining the abuse she suffered. *Id.* ¶ 302. The

27

28    Case No.: 5:20-cv-01733-EJD
    ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
    DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California

attorney attempted to cast doubt on her claims and led her to believe that she did not have a claim and that Defendant Rembao's conduct was not abusive.  *Id.*

On November 21, 2000, UT Austin issued its final report regarding Plaintiff Johnson's allegations ("UT Austin Report").  *Id.* ¶ 331.  The Report dismissed Plaintiff Johnsons' allegations.  For example, Plaintiff Johnson complained about Defendant Rembao giving her a massage on her upper thighs and gluteus.  *Id.* ¶ 333.  Defendant Rembao did not deny doing this. In fact, he admitted to giving Plaintiff Johnson massages even though such massages were not allowed.  *Id.*  This report, which exonerated Defendant Rembao, communicated to Plaintiffs Johnson and Bevins that their allegations were not believable and that they did not have a claim. *Id.* ¶ 339.

In October 2019, after realizing that Defendant Rembao had sexually abused her, Plaintiff Aldrich called Plaintiff Johnson.  *Id.* ¶ 340.  At this point, Plaintiff Johnson learned that Defendant Rembao had abused other women.  *Id.* ¶ 341.  Plaintiff Johnson then called Plaintiff Bevins to advise her of Plaintiff Aldrich's call.  *Id.* ¶ 342.

### 3.  Plaintiff Londa Bevins

The last plaintiff alleged to have been assaulted by Defendant Rembao is Plaintiff Londa Bevins.  During her sophomore year in high school, Defendant Rembao began calling Plaintiff Bevins' to recruit her for the cross-country and track and field teams at UT Austin.  *Id.* ¶ 248. Plaintiff Bevins committed to UT Austin in November 1998 on a full scholarship for cross-country, indoor track, and outdoor track.  *Id.* ¶ 250.

Almost immediately, Defendant Rembao began psychologically abusing Plaintiff Bevins. He would tell her she "wasted her summer," that she should leave UT Austin, and that he was going to take away her scholarship.  *Id.* ¶¶ 261–62.  He would yell at and belittle Plaintiff Bevins in front of others.  *Id.* ¶ 266.  Because of her "poor performance," Plaintiff Bevins had to have meetings with Defendant Rembao in his office.  *Id.* ¶ 267.  Defendant Rembao would move his chair with his legs spread apart toward Plaintiff Bevins.  He would wrap his arms around her in a

United States District Court
Northern District of California

1    long embrace and rub his erection on her.  *Id.* ¶ 269.  Sometimes he would touch her hair, kiss her

2    head, hair, and neck, and tell her she had nice legs, while touching and rubbing them

3    inappropriately.  *Id.* ¶ 270.  He would then rub her shoulders and ask her, "What was going on?"

4    and tell her that he liked her very much and that she was special.  *Id.* ¶ 271.  These meetings

5    spanned nearly the entire academic year that Plaintiff Bevins attended UT Austin.  *Id.* ¶ 273.

6          In January 2000, Plaintiff Bevins had to take the Texas Academic Skills Program test.  *Id.*

7    ¶ 277.  Defendant Rembao insisted on driving her.  Through the 30-minute car ride, Rembao put

8    his hand on Plaintiff Bevins' thigh and attempted to touch her genitals.  *Id.* ¶ 278.  He commented

9    on her legs, telling her they were "really sexy," and told Plaintiff Bevins that if she were younger,

10   he would "definitely date" someone like her.  *Id.*

11         Due to the constant belittling and ongoing sexual abuse, Plaintiff Bevins quit the track and

12   field team.  *Id.* ¶ 295.  Around this time, Plaintiff Bevins and Plaintiff Johnson ran into each other.

13   *Id.* ¶ 223.  Plaintiff Bevins was crying.  The two began to talk and they realized that Defendant

14   Rembao was abusing them and others on the team.  *Id.*  The decided that they both needed to

15   transfer.

16         Plaintiff Bevins transferred to the University of Arkansas.  *Id.* ¶ 298.  She routinely saw

17   Defendant Rembao at meets.  *Id.* ¶ 303.  For example, she saw him at the NCAA DI Outdoor

18   Track and Field Championships in Sacramento, California.  *Id.* ¶ 304.  At this meet, Defendant

19   Rembao told her that he was the reason for her success.  *Id.*

20              **4.   Common Allegations Among Plaintiffs Aldrich, Johnson, and Bevins**

21         Plaintiffs Aldrich, Johnson, and Bevins maintain that Defendant Rembao first gained their

22   trust by acting as a confidant or support system during a difficult time.  *See, e.g.*, *id.* ¶ 252.  Once

23   he gained their trust, he began controlling their diets and dating lives.  *See, e.g.*, *id.* ¶ 182.  He

24   would then began initiating inappropriate interactions with Plaintiffs.  Defendant Rembao would

25   tell Plaintiffs that they could not talk about their interactions with him since "trust [was] important

26   to [him]."  *See, e.g.*, *id.* ¶ 199.

27   Case No.: 5:20-cv-01733-EJD

28   ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
     DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California

### 5. Plaintiff Beata Corcoran

Plaintiff Beata Corcoran is a citizen of Washington, D.C., a resident of Princeton, New Jersey, and a citizen of the United States. *Id.* ¶25. Plaintiff Corcoran is a sophomore at Princeton University, where she is a member of the NCAA Division I Women's Rowing team. *Id.* There is no allegation that Defendant Rembao coached or abused Plaintiff Corcoran.

### 6. Defendants

Defendant NCAA is an unincorporated association that is headquartered in Indiana. *Id.* ¶ 26. Nearly 1,100 schools are NCAA members. *Id.* ¶ 86. The member institutions adopted the NCAA Constitution which defines the "NCAA's purposes and fundamental policies." *Id.* ¶ 88. Of importance, the NCAA Constitution provides that the NCAA shall legislate upon "any subject of general concern to the members" and that athletic programs shall be conducted in a manner "designed to protect and enhance the physical and educational wellbeing of student-athletes." *Id.* ¶¶ 88–89.

Defendant Rembao is a resident of Santa Cruz, California. From 1984 to 1994, Defendant Rembao worked at California Polytechnic State University ("Cal Poly") as the Women's Assistant Track and Field Coach, Men's Assistant Track and Field Coach, and Men's Head Cross-Country Coach. *Id.* ¶ 30. Defendant Rembao graduated from Cal Poly and was a student-athlete there. While a student-athlete at Cal Poly, he met Sue McNeal.[1] *Id.* ¶ 31. McNeal was a three-time NCAA All-American in the high jump. *Id.* Defendant Rembao coached McNeal in the high jump while she trained for the Olympics. He later married McNeal. *Id.*

---

[1] Plaintiffs rely on a news article for this information. *See* FAC ¶ 31 (citing Albert Caruana, *Catching up with Santa Cruz High School Coach, John Rembao*, CROSS COUNTRY EXPRESS (Feb. 1, 2016), http://www.crosscountryexpress.com/2016/02/catching-up-with-santa-cruz-high-school.html). Plaintiffs misstate the information contained in this news article. The article states that while *a student* at Cal Poly, Defendant Rembao began dating Sue McNeal. Plaintiffs omit this detail and instead paint the picture that Defendant Rembao began dating McNeal while he was a coach at Cal Poly. The article does not say this; in fact, it says the opposite. Defendant Rembao and McNeal had already begun dating before she graduated. And, only *after* graduation did Defendant Rembao become McNeal's coach.

Case No.: 5:20-cv-01733-EJD
ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING DEFENDANT REMBAO'S MOTION TO DISMISS

8

United States District Court
Northern District of California

1

### B.  Procedural History

On July 13, 2020, Plaintiffs filed their First Amended Complaint.  *See generally* FAC.

Thereafter, on July 27, 2020, Defendants NCCA and the Board of Governors ("NCAA

Defendants") filed a motion to dismiss the FAC.[2]  NCAA & Board's Motion to Dismiss ("NCAA

MTD"), Dkt. 55.  Defendant Rembao also filed a motion to dismiss the FAC.  Defendant John

Rembao's Notice of Motion and Motion to Dismiss First Amended Complaint ("Rembao MTD"),

Dkt. 58.  Plaintiffs filed a joint opposition brief to these two motions to dismiss.  Plaintiffs'

Response to NCAA and Rembao's Motion to Dismiss the First Amended Complaint ("Opp."),

Dkt. 64.  On August 17, 2020, NCAA Defendants filed a reply.  Defendants NCAA and the

Board's Reply Brief ("NCAA Reply"), Dkt. 65.  Defendant Rembao also filed a reply brief.

Defendant John Rembao's Reply Brief ("Rembao Reply"), Dkt. 67.

## II.    LEGAL STANDARD

### 1.  Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

On a motion to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the

burden of establishing personal jurisdiction.  *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins.

Co.*, 907 F.2d 911, 912 (9th Cir. 1990).  Where the motion to dismiss is based on written

materials, rather than an evidentiary hearing, the plaintiff need only make a prima facie showing

of jurisdictional facts to satisfy their burden.  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th

Cir. 2002).  While the plaintiff cannot "simply rest on the bare allegations of its complaint,"

---

[2] NCAA Defendants also filed a request for judicial notice.  They want the Court to take notice or incorporate by reference excerpts of the NCAA Constitution, Operating Bylaws, and Administrative Bylaws ("Exhibit 1").  Defendants NCAA & Board's Request for Application of the Incorporation by Reference Doctrine or Judicial Notice, Dkt. 56.  Plaintiffs filed an opposition to this request.  *See* Plaintiffs' Opposition to the NCAA's Request for Incorporation by Reference ("RJN"), Dkt. 62.  The Court understands Exhibit 1 to support NCAA Defendants' claim that it has no duty to protect student-athletes' health and safety because that role is retained by member organizations.  *See* RJN at 3 ("Because the Manual is referenced extensively in the Complaint and forms the basis of several causes of action, this Court should treat it as incorporated by reference.").  The Court does not reach the merits of Plaintiffs' duty claims.  *See supra* III.A. Accordingly, the Court need not decide whether to incorporate by reference or take notice of Exhibit 1.

Case No.: 5:20-cv-01733-EJD

ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING DEFENDANT REMBAO'S MOTION TO DISMISS

9

1   uncontroverted allegations in the complaint must be taken as true.  *Amba Mktg. Sys., Inc. v. Jobar*

2   *Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977); *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d

3   586, 588 (9th Cir. 1996).  Conflicts between parties over statements contained in affidavits must

4   be resolved in the plaintiff's favor.  *Id.*  If a plaintiff's proof is "limited to written materials," the

5   materials must only contain facts that "support a finding of jurisdiction."  *Data Disc, Inc. v. Sys.*

6   *Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).

7           The exercise of personal jurisdiction over a nonresident defendant must be authorized

8   under the state's long-arm statute and must satisfy the due process clause of the United States

9   Constitution.  *Perez v. United States*, 103 F. Supp. 3d 1180, 1197 (S.D. Cal. 2015).  California's

10  long-arm statute permits the exercise of personal jurisdiction "on any basis not inconsistent with

11  the Constitution of this state or the United States."  Cal. Code Civ. Proc. § 410.10.  Under the due

12  process analysis, a defendant may be subject to either general or specific personal jurisdiction.

13  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

14                      **2.  Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

15          A district court properly dismisses a complaint for failure to state a claim if the complaint

16  lacks (1) a cognizable legal theory or (2) fails to include sufficient facts.  *Balisteri v. Pacifica*

17  *Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *see also* Fed. R. Civ. P. 12(b)(6).  Thus, to

18  survive a motion to dismiss, a plaintiff's complaint must have sufficient facts alleged under a

19  cognizable legal theory to "state a facially plausible claim to relief."  *Shroyer v. New Cingular*

20  *Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).  A complaint must include something

21  more than "an unadorned, the defendant-unlawfully-harmed-me accusation" or "'labels and

22  conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Ashcroft v. Iqbal*,

23  556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

24  Determining whether a complaint will survive a motion to dismiss for failure to state a claim is a

25  "context-specific task that requires the reviewing court to draw on its judicial experience and

26  common sense."  *Id.* at 679.  In making this context-specific evaluation, the court must construe

27

28

United States District Court
Northern District of California

1   the complaint in the light most favorable to the plaintiff and accept as true the factual allegations

2   of the complaint.  *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).  Of course, the court need not

3   accept "a legal conclusion couched as a factual allegation" as true.  *Papasan v. Allain*, 478 U.S.

4   265, 286 (1986).

5          A party may raise a statute of limitations argument in a motion to dismiss if it is apparent

6   from the face of the complaint that the complaint was not timely filed and that the plaintiff will be

7   unable to prove facts that will establish the timeliness of the claim.  *Von Saher v. Norton Simon*

8   *Museum*, 592 F.3d 954, 969 (9th Cir. 2010).

9   **III.     DISCUSSION**

10          **A.  NCAA Defendants Motion to Dismiss for Lack of Personal Jurisdiction**

11          Plaintiffs allege that NCAA Defendants have a duty to protect student-athletes from sexual

12   abuse and sexual predators like Defendant Rembao and that NCAA Defendants are vicariously

13   liable for the torts of coaches like Defendant Rembao.  *See* FAC Counts I–IV (alleging gross

14   negligence, negligence, breach of fiduciary duty, and negligent misrepresentation); Counts VII–

15   XII; Count XIII (alleging that the NCAA ratified Defendant Rembao's misconduct).  Plaintiffs

16   maintain that NCAA Defendants had an obligation to require its member institutions to employ

17   ethical coaches and trainers and had an obligation to implement and enforce rules and bylaws

18   prohibiting sexual harassment and/or sexual abuse by athletic department personnel.  *See* ¶ 356.

19   Plaintiffs premise their NCAA-allegations on NCAA Defendants failure to

20   (1) create and implement rules targeting sexual misconduct, (2) protect student-athletes from

21   athletic personnel like Defendant Rembao, and (3) protect Plaintiffs from Defendant Rembao.  In

22   order to establish personal jurisdiction, Plaintiffs must either show that NCAA Defendants are "at

23   home" in California or have sufficient contacts with California that are connected to these three

24   categories of allegations.  Plaintiffs have not met this burden.

25

26

27   Case No.: 5:20-cv-01733-EJD

28   ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
     DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California

### 1. General Personal Jurisdiction

To exercise general personal jurisdiction over a non-resident defendant, the defendant must have contacts with the forum that are so "continuous and systematic" as to render the defendant "essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quotation marks and citation omitted). In contrast to specific personal jurisdiction, general personal jurisdiction is "all purpose." It allows a court to exercise jurisdiction over a defendant for any claim, even those not connected to the forum. In this scenario, due process is at its height. If the goal of personal jurisdiction is to ensure that a defendant can foreseeably be "hailed into a court" in a forum, that goal is most vulnerable when a defendant is subject to jurisdiction on grounds unconnected to the forum. *See id.* at 132 ("[W]e have declined to stretch general jurisdiction beyond limits traditionally recognized."). Perhaps for this reason, there is a long history of courts "train[ing] on the 'relationship among the defendant, the forum, and the litigation,' *i.e.*, specific jurisdiction." *Id.* (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

In *Daimler AG*, the Supreme Court further tightened general jurisdiction's reach. The Supreme Court confirmed "that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Id.* at 137. Paradigm affiliations for a corporation include its place of incorporation and its principal place of business. *Id.* These places are "unique" and "easily ascertainable." *Id.* Outside these paradigms, the Court limited general jurisdiction to instances where the defendant's relationship with the forum is *so* continuous, regular, and systematic that the defendant can be fairly regarded "at home" there.

The Supreme Court clarified the scope of "fairly at home" in *Daimler AG*. The Court focused on how unique the contact with the forum must be to support general jurisdiction. It is this discussion that is relevant to the case at hand. In *Daimler AG*, the plaintiffs wanted the Supreme Court to find that general jurisdiction is appropriate in every State in which a corporation "engages in a substantial, continuous, and systematic course of business." *Id.* at 138. The Court declined that invitation after reasoning that such a broad application of jurisdiction would render

United States District Court
Northern District of California

the defendant "at home" in too many forums.  *See id.* at 139 ("If Daimler's California activities suffced to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which MBUSA's sales are sizable.").  This "exorbitant exercise" of general jurisdiction would "scarcely permit out-of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'"  *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Implicit in this discussion is the idea that a defendant cannot be "at home" in all fifty states.  Rather, a defendant can only be "at home" in the forum if its ties to the forum are so strong and significant (as compared to its other non-forum connections) as to render its connection with the forum unique.

Before *Daimler AG* (and the Supreme Court's *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011) opinion), the simple formulation "continuous and systematic" was much less stringent.  To support general jurisdiction, a defendant need only have "continuous and systematic general business contacts" with the forum.  *See, e.g.*, *Gator.com Corp. v. L.L. Bean, Inc.*, 341 F.3d 1072 (9th Cir. 2003).  *Goodyear* and *Daimler AG* changed this; general jurisdiction no longer can be supported by mere business contacts.  Instead, there must be some type of unique contact with a forum.

This is to say, general jurisdiction is not meant to provide *many* districts with jurisdiction over the same defendant.  If general jurisdiction in one forum would subject the defendant to jurisdiction in many other forums, the exercise of such jurisdiction is likely improper.  Indeed, there is only *one* case where the Supreme Court upheld beyond-paradigm general jurisdiction: *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952).  There, a Philippine corporation was unable to operate in the Philippines due to Japanese occupation during World War II.  *Perkins*, 342 U.S. at 448.  During that period, the president, who was also the general manager and principal stockholder of the company, returned to his home in Clermont County, Ohio. *Id.* The president maintained an office in Ohio where he conducted his personal affairs and did many

United States District Court
Northern District of California

1   things on behalf of the company.  *Id.* at 448.  He kept company office files in the office and

2   carried on correspondence relating to the business of the company and its employees from the

3   office (like drawing and distributing salary checks on behalf of the company).  *Id.*  This contact

4   sufficed to establish "continuous and systematic" contact with Ohio such that the company could

5   be subject to general jurisdiction there.[3]  *Id.* at 438.

6       Plaintiffs ignore the impact of *Daimler AG* and rely exclusively on pre-*Daimler AG*

7   precedent to establish general jurisdiction.  *See, e.g.*, Opp. at 6 (citing a 1990 First Circuit case);

8   *but see Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 980–81 (N.D. Cal. 2016) ("Other

9   post-*Daimler* plaintiffs have attempted similarly ill-fated arguments for general jurisdiction based

10   on the old standard.")  Plaintiffs advance three arguments which, they argue, "taken together"

11   show jurisdiction.  Opp. at 4.  The Court disagrees; neither of these arguments, together or

12   separate, support general jurisdiction.

13       *First*, Plaintiffs argue that because the NCAA has sued in the forum and has been sued in

14   the forum, general jurisdiction is appropriate.  *See* Opp. at 4 (citing *NCAA v. Ken Grody Mgmt.*,

15   No. 8:18-cv-00153 (C.D. Cal.); *George v. NCAA*, 2008 WL 5422882, at *3 (C.D. Cal. Dec. 17,

16   2008) (conceding that venue [and thus personal jurisdiction] lies in the Central District of

17   California)).  But, that a nonresident defendant previously litigated in the forum surely does not

18   constitute "continuous and systematic contact with the forum."  On this theory, a nonresident

19   defendant would be subject to general jurisdiction *anywhere it had previously sued or been sued*,

20   even if a prior suit was based on specific jurisdiction.  This would improperly transmute specific

21   jurisdiction into general jurisdiction.

---

[3] While the *Perkins* opinion did not classify it as such, in effect, because the company could no longer operate in Japan, the Ohio office had become the company's "principal place of business." *See Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010) (discussing the "nerve center" standard and noting that in order to determine a company's principal place of business, the court must assess where the "overall direction, control, and coordination" of the company is centered).  The question of whether *Perkins* was a non-paradigm-affiliation case is thus worthy of discussion.

Case No.: 5:20-cv-01733-EJD
ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
DEFENDANT REMBAO'S MOTION TO DISMISS

14

1      Plaintiffs next argue that because the NCAA conceded personal jurisdiction in *George*,

2    personal jurisdiction can be presumed.  However, a personal jurisdiction defense must

3    affirmatively be asserted by a defendant.  The defense exists for the benefit of the litigant.  A

4    defendant may strategically choose to be sued in a forum.  But, that is a choice for the defendant

5    (who holds the due process protection) and not the court.  That a defendant did not previously

6    assert its due process rights does not eradicate those rights altogether.

7      More damning to this theory of jurisdiction is the fact that the cases Plaintiffs rely on are

8    specific personal jurisdiction cases.  *See* Opp. at 4 (citing *Threlkeld v. Tucker*, 496 F.2d 1101 (9th

9    Cir. 1974); *Pro Sports v. West*, 639 F. Supp. 2d 475 (D.N.J. 2009)).  In each, the defendants were

10   subject to specific jurisdiction because the federal actions arose out of prior state-court actions.

11   *See Threlkeld*, 496 F.2d at 1103–04 ("Where, as here, the action upon the judgment is brought

12   within a reasonable time after the judgment was entered . . . and where the conduct underlying the

13   judgment clearly evidenced a pattern of continued, deliberate contact with California, there is

14   nothing unreasonable or contrary to traditional notions of fair play and substantial justice . . . ."

15   (quotation marks and citations omitted)); *Pro Sports*, 639 F. Supp. 2d at 482 (finding that because

16   second suit arose from the same subject as the first, specific jurisdiction was appropriate).  Further,

17   the *Threlkeld* court specifically cautioned that it was not holding that a "valid state-court judgment

18   by itself is sufficient basis" for the exercise of jurisdiction over a nonresident defendant.  496 F.2d

19   at 1104.  Rather, there "must be a history of relevant contacts between the nonresident defendant

20   and the state." *Id.*

21      In contrast to both *Threlkeld* and *Pro Sports*, there is no underlying state court action that

22   would support specific—much less general—jurisdiction.  Moreover, as the *Threlkeld* court

23   cautioned, it is not enough that there is some prior action involving the defendant in the forum.

24   The plaintiff must still show that the defendant has sufficient contacts with the forum.  Two prior

25   (and unrelated) actions in the forum do not establish such contact.

26

27

28

Case No.: 5:20-cv-01733-EJD
ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
DEFENDANT REMBAO'S MOTION TO DISMISS
15

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Second*, Plaintiffs argue that "NCAA members are [so] heavily concentrated in California,"

2    that NCAA Defendants can be fairly regarded as at home in the forum.  Opp. at 5.  Fifty-eight

3    members are in California.  But, NCAA has 1,100 NCAA members across the United States.  *See*

4    Affidavit of Jacqueline Campbell in Support of NCAA's Motion to Dismiss ("Campbell Decl.")

5    ¶ 5, Dkt. 57.  If NCAA Defendants were regarded as "fairly at home" in California, wouldn't they

6    be "fairly at home" in any state where 5% or more of their members reside?  *Daimler AG* is clear

7    that any theory that would apply general jurisdiction in "every State" is "unacceptably grasping."

8    *See* 571 U.S. at 138; *see also supra* III.A.1 (discussing the history of general jurisdiction).

9    Plaintiffs do not answer this question which is fatal to their general jurisdiction theory.[4]

10   To the extent Plaintiffs could answer this question, it is plain that the NCAA's contact with

11   California is insufficient to confer general jurisdiction.  Plaintiffs have not shown that the NCAA's

12   contact with California is comparatively unique.  *See Dallas Texans Soccer Club v. Major League*

13   *Soccer Players Union*, 247 F. Supp. 3d 784, 788–89 (E.D. Tex. 2017) (finding a player's union

14   that represented 588 players from twenty teams nationwide was not "at home" in the forum

15   despite having 59 members and two representatives from two teams within the forum); *In re Nat'l*

16   *Hockey League Players' Concussion Injury Litig.*, 2019 WL 5079980, at *4 (D. Minn. Oct. 10,

17   2019) (finding NHL's franchise club and team in Minnesota insufficient to confer general

18   jurisdiction because NHL has clubs and teams in several other states).

19   Plaintiffs next argue that because (for subject-matter jurisdiction purposes) an

20   unincorporated entity's citizenship turns on where its members reside, NCAA can be regarded "at

21

22   [4] Instead, Plaintiffs rely on an outdated "control" test.  *See* Opp. at 6 (citing *Donatelli v. Nat'l Hockey League*, 893 F.2d 459 (1st Cir. 1990)).  They argue that the NCAA exercised "significant

23   control" over its California members and that this "independently" confers general jurisdiction. *Id.*  Some contrast is helpful.  In *Daimler AG*, the Court explained that a corporation's

24   "substantial[] control" over a subsidiary did not provide reasonable limits to an otherwise overbroad general jurisdiction theory.  In other words, a showing of control (even one that is

25   substantial) does not justify the exercise of general jurisdiction.  The Court need not define the parameters of control here.  If the type of control at issue in *Daimler AG* was insufficient, the

26   control at issue here is also insufficient.  As in *Daimler AG*, Plaintiffs theory would subject an out-of-state entity to jurisdiction "whenever they have an in-state subsidiary or affiliate."  571 U.S. at

27   136 & n.15.
     Case No.: 5:20-cv-01733-EJD

28   ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
     DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California

home" in California.  *See* Opp. at 5.  This is a red herring.  Citizenship for purposes of subject-matter jurisdiction is different from citizenship for personal jurisdiction.  *See Satmarean v. Philips Consumer Luminaries, N.A.*, 2013 WL 5425339, at *2 (N.D. Cal. Sept. 27, 2013) ("The concepts of subject-matter and personal jurisdiction . . . serve different purposes, and these purposes affect the legal character of the two requirements." (quoting *Ins. Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982))); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 332 (2d Cir. 2016) ("*Daimler*'s reasoning was based on an analogy to general jurisdiction over individuals, and there is no reason to invent a different test for general personal jurisdiction depending on whether the defendant is an individual, a corporation, or another entity.").  Subject-matter jurisdiction evaluates the court's ability to hear a case, while personal jurisdiction evaluates whether a defendant has sufficient contact with a forum to make jurisdiction fair.  Thus, depending on the jurisdictional inquiry, the citizenship inquiry changes.  Pursuant to *Daimler AG*, it is insufficient that a defendant has members or subsidiaries in a forum.  The relevant inquiry is what contact the defendant has with the forum.  Hence, in order for NCAA California member institutions to matter, Plaintiffs must show that these contacts render NCAA Defendants "at home" in California.  Plaintiffs have not met this burden.  *See supra*.

Plaintiffs further suggest that the actions of member institutions can be imputed to the NCAA for jurisdiction because the institutions are "mutual agent[s]" of the NCAA.  Opp. at 5.  Again, after *Daimler AG*, the relevant contacts with a forum are an entity's contacts.  Agent's contacts are irrelevant.  *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1071 (9th Cir. 2015) ("Before the Supreme Court's *Daimler* decision, this circuit permitted a plaintiff to pierce the corporate veil for jurisdictional purposes and attribute a local entity's contacts to its out-of-state affiliate under one of two separate tests: the 'agency' test and the 'alter ego' test. . . . The Supreme Court invalidated [the agency] test.").[5]  Such a theory, sweeps too broadly to comport with the requirements of due process.  *Daimler AG*, 571 U.S. at 135–36.  Indeed, applying it here would permit the NCAA to

---

[5] Plaintiffs do not argue that members are the "alter egos" of the NCAA.

not only be sued in California, but in every other state it has an "agent."

Third, Plaintiffs argue that the NCAA's physical and economic presence in California establishes general jurisdiction. Pre-*Daimler*, this may have been sufficient. Post-*Daimler*, this one contact (in a vacuum) is insufficient. The Court must assess the forum contact in context. It must appraise the entity's activities in their entirety. That the NCAA hosts large tournaments like the Rose Bowl in California is irrelevant—Plaintiffs fail to show why this tournament, as compared to the many others[6] held across the United States, makes NCAA's contact with the forum distinct. Likewise, Plaintiffs fail to show that the revenue generated from California is "outsized" or significantly "more than" any other state such that general jurisdiction would be appropriate. *See* Dkt. 63-1 (discussing the NCAA's revenue, but failing to show what revenue came from California). Because Plaintiffs have not shown that the NCAA's contact with California is "special" as compared to its contact with other States, the NCAA can "scarcely be deemed at home in [California]." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017).

### 2. Specific Personal Jurisdiction

When considering specific jurisdiction, the Court examines the nature, quality, and quantity of NCAA's contacts with California and those contacts' relation to Plaintiffs' suit. In contrast to general jurisdiction, specific jurisdiction requires the plaintiff's claims to "arise out of or relate to" the defendant's forum contacts. *See Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1786 (2017). Plaintiffs must show that the NCAA's contacts—and not those of its "agents"—gave rise to the claims. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024 (9th Cir. 2017) ("To the contrary, the *Daimler* Court's criticism of the [agency test] found fault with the standard's own internal logic, and therefore applies with equal force regardless of whether the standard is used to establish general or specific jurisdiction."). The Ninth Circuit uses a three-prong test to determine whether specific jurisdiction is appropriate: (1) the defendant must either

---

[6] To name a few of the most popular football bowl games (none of which are held in California): the "Iron Bowl," "Orange Bowl," "Sugar Bowl," "Cotton Bowl Classic," "Peach Bowl," and "Fiesta Bowl."

1   purposefully direct its activities toward the forum or purposefully avail itself of the privileges of

2   conducting activities in the forum; (2) the claim must be one which arises out of or relates to the

3   defendant's forum-related activities; and (3) the exercise of jurisdiction would be reasonable.

4   *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017).

5        Where, as here, Plaintiffs allege both contract and tort claims, the first prong of the test can

6   be satisfied by showing either purposeful direction of activities toward the State or purposeful

7   availment of the benefit of doing business there.  *See Schwarzenegger v. Fred Martin Motor Co.*,

8   374 F.3d 797, 802 (9th Cir. 2004) ("A purposeful availment analysis is most often used in suits

9   sounding in contract.  A purposeful direction analysis, on the other hand, is most often used in

10  suits sounding in tort." (citation omitted)).  "A single forum state contact can support jurisdiction

11  if the cause of action arises out of that particular purposeful contact of the defendant with the

12  forum state."  *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007).

13       Plaintiffs assert three categories of claims against NCAA Defendants.  Plaintiffs first argue

14  that NCAA Defendants have a duty to legislate in ways that prevent sexual abuse and that the

15  failure to legislate in this way caused inadequate policies to be adopted and implemented in

16  California, which allowed predators like Rembao to move among NCAA schools.  FAC ¶ 145.  It

17  was this failure to prevent coaches, like Rembao, from entering into inappropriate relationships

18  that allegedly caused Plaintiffs harm.  Plaintiffs next argue that NCAA Defendants failed to

19  protect them from Defendant Rembao.  These three categories of claims are related: but-for the

20  NCAA's failure to legislate appropriately, Plaintiffs (and their putative class) would not have been

21  harmed by coaches like Defendant Rembao.  *See* Opp. at 10–11 ("A clear nexus exists between

22  California and Plaintiffs' claims: the NCAA's inadequate policies, implemented in California

23  through the input of California members, shielded Rembao from accountability for his abusive

24  behavior as a coach at Cal Poly, and gave him license to move from California to other schools.

25  Put differently, but for the NCAA's failure to prevent coaches involved in inappropriate student

26  relationships from transferring schools, Plaintiffs would not have been harmed.").

27

28  ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
    DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

There is a problem with Plaintiffs' theory of specific jurisdiction. The NCAA legislates in Indiana, where it is headquartered. Thus, the harm caused by the NCAA's failure to enact particular legislation arises out of Indiana. A contrary finding would improperly subject the NCAA to jurisdiction anywhere because the NCAA failed to implement legislation in all 50 states.

As for Plaintiffs' claim that the NCAA failed to protect them from Defendant Rembao, there is no allegation that the abuse occurred in California. Plaintiffs attempt to connect the abuse to the forum by pointing out Defendant Rembao's time at Cal Poly. Again, there are problems with this theory of jurisdiction. First, to the extent the NCAA had a duty to legislate in ways to prevent alleged abusers from transferring schools, that duty arose in Indiana, not California. Second, even assuming the NCAA is vicariously liable for Defendant Rembao's torts, there is no showing that any torts occurred in California or are connected to California. It is true that Defendant Rembao had a relationship with Sue McNeal in the late 1980s at Cal Poly in California. But, this relationship occurred when Defendant Rembao and McNeal were both student-athletes at Cal Poly. *See supra* n.1. And, Defendant Rembao did not become McNeal's coach until *after* she graduated. Thus, the McNeal-Rembao relationship is completely different from the complained of conduct—there is no showing that Defendant Rembao coached McNeal when she was a student *and* had a relationship with her during such a time. Hence, it is too attenuated to form the "but-for" cause of Plaintiff's abuse claims.

To summarize, Plaintiffs were not abused in California. The only link connecting Rembao to California is his relationship with McNeal. Plaintiffs use this relationship to establish a causal chain. Plaintiffs argue that if the NCAA had stopped Defendant Rembao during this first relationship with McNeal, they would not have been abused by Rembao. But, there is no showing that Defendant Rembao's relationship with McNeal (his now wife) was improper. As mentioned, they met as fellow student-athletes and he did not coach McNeal until after she graduated. That relationship is completely different from the improper alleged-relationships in this case. Plaintiffs would have suffered the same injuries (in Arizona and Texas) even if none of the California

1   contacts (*i.e.*, Rembao's time at Cal Poly) had taken place.  Plaintiffs' claims therefore are not

2   ones that arose out of or resulted from Defendant Rembao's forum-related activities.  Therefore,

3   Defendant Rembao's contact with the forum cannot support jurisdiction over Plaintiffs' claims

4   that (1) the NCAA improperly allowed Rembao to transfer schools and (2) failed to protect them

5   from Rembao.[7]  *See Bristol-Myers*, 137 S. Ct. at 1781 ("For specific jurisdiction, a defendant's

6   general connections with the forum are not enough.").

7        Because Plaintiffs have not established that NCAA Defendants' contact with California

8   gave rise to the claims at hand or that NCAA Defendants' are "fairly regarded as at home" in

9   California, the Court **GRANTS** NCAA Defendants' motion to dismiss on personal jurisdiction

10  grounds.  Since the Court lacks personal jurisdiction over NCAA Defendants, venue is improper

11  in this district.  *See* 28 U.S.C. § 1391(c)(2) ("For all venue purposes an entity with the capacity to

12  sue and be sued in its common name under applicable law, whether or not incorporated, shall be

13  deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the

14  court's personal jurisdiction . . . .").  28 U.S.C. § 1406 provides that the Court "shall" dismiss an

15  action for improper venue or, in the "interests of justice" may transfer such case to any district or

16  division in which it could have been brought.  NCAA Defendants concede that venue is proper in

17  the Southern District of Indiana (relatedly, there is no dispute that personal jurisdiction over

18  NCAA Defendants exists in Indiana).  "In the interests of justice," the Court **TRANSFERS** the

19  claims asserted against the NCAA and its Board of Governors to the Southern District of Indiana.

20        **B.  Defendant Rembao's Motion to Dismiss for Failure to State a Claim**

21        Defendant Rembao first argues that Plaintiffs' claims are time-barred under the relevant

22  statutes of limitations.  A statute of limitations defense can require dismissal under Rule 12(b)(6)

23  if it is apparent from the face of the complaint that the claims are time-barred.  *Lopes v. Vieriai*,

24  488 F. Supp. 2d 1000, 1043 (E.D. Cal. 2007).  However, "[w]hen a motion to dismiss is based on

25

26  _____

27  [7] To the contrary, this situation seemingly occurred when Defendant Rembao was able to move to
    UT Austin after he was discovered in Plaintiff Aldrich's closet at the University of Arizona.
    Case No.: 5:20-cv-01733-EJD

28  ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
    DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California

the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).  It is not apparent from the face of the FAC that Plaintiffs' claims against Defendant Rembao are time-barred.

### 1.  Statute of Limitations Defense[8]

#### a.  Plaintiff Aldrich's Claims

The first step in the analysis is to determine which law applies to Plaintiff Aldrich's claims.  Plaintiff Aldrich argues that Arizona law applies to her claims.  Defendant Rembao maintains that California law applies.[9]

The California Supreme Court requires a choice of law analysis to determine the law to be applied to issues like accrual and tolling.  *See McCann v. Foster Wheeler*, 225 P.3d 516, 526–27 (Cal. 2010); *see also Klaxon Co. v. Stentor Elect Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that when sitting in diversity, federal court applies the forum state's choice of law rules).  California applies the "governmental interest" test to resolve choice of law questions.  *McCann*, 225 P.3d at 387.  The governmental interest approach involves three steps.  First, the court determines whether the two laws at issue differ.  Second, if there is a difference between the laws, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.  Third, if the court finds that there is a

---

[8] There is no dispute that Plaintiffs' claims (without tolling) are time-barred under the relevant statutes of limitations.

[9] Defendant Rembao argues that California's borrowing statute (California Code of Civil Procedure § 361) applies and requires the Court to apply California statute of limitations law. This is a perplexing argument.  The borrowing statute applies to prevent non-residents with expired claims from filing in California and using the more-favorable California statute of limitations to revive their claims.  That is not the case here.  First, Plaintiff Aldrich is a resident of California.  Second, she is not looking to avail herself of a more favorable statute of limitations in California.  Instead, she contends that Arizona law applies to the issues of tolling and accrual.  Thus, California's borrowing statute is irrelevant.  *See G&G Prods. LLC v. Rusic*, 902 F.3d 940, 948 n.6 (9th Cir. 2018) ("The California Supreme Court does not appear to have decided whether, for purposes of the borrowing statute, accrual is a question of California law or the law of the state or foreign country in which the claim arose.").

1   true conflict, it carefully evaluates and compares the nature and strength of the interests of each

2   jurisdiction and then applies the law of the state whose interests would be more impaired if its

3   laws were not applied.  *Id.* at 391 (citations omitted).

4        As to the first question, Arizona and California have different tolling statutes.  Arizona's

5   tolling statute is more expansive; it includes an "unsound mind" tolling provision.  *See* A.R.S.

6   §12-502 ("If a person entitled to bring an action other than those set forth in article 2 of this

7   chapter is at the time the cause of action accrues either under eighteen years of age *or of unsound*

8   *mind, the period of such disability shall not be deemed a portion of the period limited for*

9   *commencement of the action*.  Such person shall have the same time after removal of the disability

10  which is allowed to others." (emphasis added)).  A person can be of "unsound mind" if they are

11  unable to "understand [their] legal rights or liabilities."  *Doe v. Roe*, 955 P.2d 951, 964 (Ariz.

12  1998).  California has a similar, but narrower, tolling provision.  California allows tolling for

13  juveniles or legally incapacitated persons.  Cal. Code Civ. Proc. § 352.  Unsound mind is broader

14  than legally incapacitated.  Someone who is legally incapacitated would have an unsound mind,

15  but someone who has an unsound mind might not be legally incapacitated.  Because the Court

16  finds that Plaintiff Aldrich has pled sufficient facts to show that she had an "unsound mind," her

17  claim is timely under Arizona, but not California, law.  Thus, there can be no dispute that the two

18  laws materially differ.

19       Further, there is no "true conflict" between the laws.  Here, Arizona has a greater interest

20  in seeing its law applied.  Plaintiff Aldrich was abused in Arizona, not California.  Arizona also

21  disfavors the statute of limitations defense and has an interest in seeing potentially meritorious

22  claims survive the defense.  *Ulibarri v. Gerstenberger*, 871 P.2d 698, 706 (Ariz. Ct. App. 1993)

23  ("Arizona does not look with favor on the statute of limitations defense.").  Indeed, this is why

24  Arizona "provides for the tolling of the statute of limitations during periods of minority,

25  imprisonment, or insanity." *Id.* (citing A.R.S. § 12-502).  In contrast, California's interest is

26  minor.  The actions giving rise to the claim did not occur in California and thus California's

27

28

United States District Court
Northern District of California

interest in seeing its statute of limitations enforced is de minimis.  Therefore, there is not a "true conflict" between the two laws—Arizona's interest is greater than California's and thus Arizona law applies.

Plaintiff Aldrich's claims may be timely under A.R.S. § 12-502.  Some comparison is helpful.  In *Doe*, a 34-year-old plaintiff filed suit after she experienced a flashback memory of her father sexually abusing her when she was a child while watching a television program on incest.  955 P.2d at 953.  After watching the program, she "developed feelings of hysteria, even panic, and immediately sought counseling," and was hospitalized for psychiatric care.  *Id.*  The court held that the repression created a genuine dispute of fact as to the plaintiff's ability to understand her legal rights.  *Id.* at 967.  Importantly, the court noted that "unsound mind" does not require evidence that the alleged victim is totally incapacitated or unable to manage her daily affairs.  *Id.* at 965.  ("[T]he court of appeals has misread *Florez* for the harsh proposition that as a matter of law 'the disabling psychological effects of child abuse do not constitute an 'unsound mind' under section 12–502(A) where the victims were able to function on a day-to-day basis and manage their ordinary affairs.").

Here, the allegations create a dispute as to whether Plaintiff Aldrich was able to understand her legal rights.  *Cf.* Rembao MTD at 12 (arguing that Plaintiff Aldrich does not allege that she was unable to understand her legal rights).  Plaintiff Aldrich repressed her memories of the abuse and was in denial that any abuse took place.  Because of this denial, she did not understand her legal rights.  Indeed, if one is to accept that events occurred and is unable to articulate them, they likely do not understand their legal rights.  This is confirmed by Plaintiff Aldrich's feelings of complicity, guilt and shame, which further evidences that she did not understand that a wrong occurred.  *See* FAC ¶¶ 161, 163, 316, 319–20, 322–23.  While Plaintiff Aldrich was able to recall some of the events, she did not realize that they qualified as abuse until *Leaving Neverland* "triggered" her realization.  *See Doe*, 955 P.2d at 953.  There is no requirement that a victim become an amnesiac.  To the contrary, "[a]s people are being traumatized, this narrowing of

United States District Court
Northern District of California

1    consciousness sometimes evolves into amnesia for parts of the event, or for the entire experience."

2    *Id.* at 957 n.4.

3        Like the plaintiff in *Doe*, Plaintiff Aldrich did not understand her legal rights until she was

4    "triggered."  Again, like the plaintiff in *Doe*, this realization had a physical effect on Plaintiff

5    Aldrich.  FAC ¶ 187.  The allegations of repression are thus analogous to those in *Doe*.  Therefore,

6    it is not apparent from the face of the complaint that the relevant statutes of limitations bar the

7    action.  For this reason, Defendant Rembao's motion to dismiss Plaintiff Aldrich's claims is

8    **DENIED.**[10]

9                    **b.  Plaintiffs Johnson & Bevins' Claims**

10       Plaintiffs Johnson and Bevins argue that they are entitled to equitable tolling.  Federal

11   courts apply the forum state's statute of limitations for personal injury actions and the state's law

12   regarding tolling, including equitable tolling.  *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004).

13   In contrast to Plaintiff Aldrich's tolling argument, there is no choice of law issue as to Plaintiffs

14   Johnson and Bevins' claims.  The laws of Texas (where the events are concentrated) and

15   California (the forum) both recognize equitable tolling.  *See In re United Servs. Auto. Ass'n*, 307

16   S.W.3d 299, 311 (Tex. 2010); *Addison v. California*, 578 P.2d 941 (Cal. 1978).  There is thus no

17   conflict of laws and California law applies.  *Parrish v. Nat'l Football League Players, Inc.*, 2007

18   WL 1624601, at *3 (N.D. Cal. June 4, 2007) ("When there is no true conflict of laws, the forum

19   may apply its own laws.").

20       Equitable tolling under California law "operates independently of the literal wording of the

21   Code of Civil Procedure to suspend or extend a statute of limitations as necessary to ensure

22   fundamental practicality and fairness."  *Lantzy v. Centex Homes*, 73 P.3d 517, 523 (Cal. 2003)

23

24   ───────────────

       [10] Defendant Rembao argues that A.R.S. § 12-502 is intended to apply only to minor victims of
25   abuse.  This argument is nonsensical.  First, Defendant Rembao's reliance on *Scarborough v.
       Altstatt*, 140 A.3d 497 (Md. Ct. App. 2016) is misplaced.  *Scarborough* did not address Section
26   12-502.  It addressed the Maryland discovery rule.  *See* 140 A.3d at 508.  Second, the text of the
       statute indicates that tolling is meant to apply to minors *or* those of unsound mind.  Thus, the plain
27   text of the statute contradicts Defendant Rembao's argument.
       Case No.: 5:20-cv-01733-EJD
28   ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
       DEFENDANT REMBAO'S MOTION TO DISMISS
                                        25

United States District Court
Northern District of California

1    (quotation marks and citation omitted).  The purpose of California's equitable tolling doctrine "'is

2    to soften the harsh impact of technical rules which might otherwise prevent a good faith litigant

3    from having a day in court.'"  *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131, 1137

4    (9th Cir 2001) (quoting *Addison v. State*, 578 P.2d 941, 942 (Cal. 1978)).  California courts thus

5    apply equitable tolling to "prevent the unjust technical forfeiture of causes of action, where the

6    defendant would suffer no prejudice."  *Lantzy*, 73 P.3d at 523.  Application of the doctrine

7    "requires a balancing of the injustice to the plaintiff occasioned by the bar of his claim against the

8    effect upon the important public interest or policy expressed by the . . . limitations statute."  *Id.* at

9    524.

10   On one side of the balance is the general public policy interest in ensuring prompt

11   resolution of legal claims.  *See Addison*, 578 P.2d at 942–43.  The statute of limitations operates to

12   ensure that cases are brought when memories have not been affected by time, when all pertinent

13   witnesses can still be called, and when physical evidence has not been destroyed or dispersed.

14   Paramount to our judicial system is the idea that a trial (civil or criminal) should be fair.

15   Timeliness helps ensure fairness.  Indeed, "the public has an interest in avoiding the cultivation of

16   stale grievances and grudges."  *Jones*, 393 F.3d at 928.  Thus, statutes of limitations, while at

17   times seemingly unfair, actually attempt to promote fairness.  But, if some obstacle unanticipated

18   by the legislature has prevented the plaintiff from pursuing his claim, equity may find a way

19   around the statute (again to promote fairness).  *See Lantzy*, 73 P.3d at 524.

20   Here, fairness may dictate that the relevant statutes of limitations should be tolled.  The

21   injustice arising from a refusal to toll the statutes of limitations would be great.  As discussed,

22   after the abuse occurred, Plaintiff Johnson filed a report with UT Austin.  UT Austin conducted an

23   investigation during which it allegedly "badgered Johnson and Bevins [and] subject[ed] them to

24   cross-examination and accusations."  Opp. at 21.  UT Austin told Plaintiff Johnson her accusation

25   that Defendant Rembao licked her neck was "boorish" and not sexual in nature.  The investigation

26   and report made Plaintiffs Johnson and Bevins believe that Defendant Rembao did nothing wrong

1    and that they were overreacting.  FAC ¶¶ 331–35.  The investigation created self-doubt, blame,

2    minimization, and uncertainty regarding Defendant Rembao's actions (and this is on top of the

3    shame and blame that victims of sexual abuse already suffer).  *Id.* ¶ 336.  This report led them to

4    believe that they did not have a claim.  As soon as they realized they did have a claim (*i.e.* after

5    Plaintiff Aldrich's phone call), they filed the case at hand.

6           Plaintiffs' Complaint pleads facts which may present cause to toll the statutes of

7    limitations.  While there are no allegations that Defendant Rembao was involved in UT Austin's

8    "whitewashing," an obvious inference exists that Defendant Rembao knew about and maybe even

9    participated in the manipulation.  Indeed, Defendant Rembao admitted to inappropriate touching

10   (the massages) but was still "cleared" in the UT Austin report.  He was thus a participant, whether

11   active or inactive, in the whitewashing.  Moreover, without equitable tolling to protect sexual

12   abuse survivors' access to justice, the intimidation tactics allegedly used by UT Austin would be

13   condoned.  This is another interest to consider.  As society progresses and the acts of the past are

14   condoned, it seems unjust to deprive a plaintiff of her day in court.  For these reasons, it is not

15   "apparent" from the face of the complaint that Plaintiffs Johnson and Bevins' claims are time-

16   barred.  *Jablon*, 614 F.2d at 682.  Equitable tolling may provide cause to toll the relevant statutes

17   of limitations.  The Court thus **DENIES** Defendant Rembao's motion to dismiss Plaintiffs

18   Johnson and Bevins' claims on statute of limitations grounds.[11]  *See id.* ("If the [statute of

19   limitations] defense is not apparent on the face of the complaint and the motion to dismiss is not

20   accompanied by acceptable affidavits, an appropriate summary judgment motion may be

21   employed.").

22

23

24

25

26   ─────────────────────────

[11] Because it is unnecessary, the Court declines Plaintiffs' invitation to create a victimization

27   exception.  *See* Opp. at 25.

28   ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
     DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California

1

### 2.   Failure to State a Claim[12]

2        Defendant Rembao's last argument—that Plaintiffs have failed to state a claim for false

3   imprisonment—relies on too narrow a definition of "confinement."  He argues that Plaintiffs were

4   not falsely imprisoned because they could have left the track meets, schools, and dinners were

5   they were sexually assaulted.  Rembao MTD at 15.  He points out that "Plaintiffs Aldrich and

6   Johnson repeatedly and willingly went to [Defendant] Rembao's home for dinner."  *Id.*  He also

7   notes that Plaintiffs were able to transfer.  All of this shows, in Defendant Rembao's view, that

8   Plaintiffs were not held against their will.  *Id.*

9        The tort of false imprisonment consists of the "nonconsensual, intentional confinement of a

10   person, without lawful privilege, for an appreciable length of time, however short."  *Scofield v.*

11   *Critical Air Med., Inc.*, 45 Cal. App. 4th 990, 1001 (Ct. App. 1996).  That length of time can be as

12   brief as 15 minutes.  *Id.*  Restraint can be effectuated by means of physical force, threat of force or

13   of arrest, confinement by physical barriers, or by means of any other form of unreasonable duress.

14   *Id.* (collecting cases).

15        Plaintiffs allege that they were confined to Defendant Rembao's office and home on

16   multiple occasions, often in small, enclosed spaces.  FAC ¶¶165, 215, 217–18, 267–73.  Defendant

17   Rembao was much older than them and held immense power over them—he controlled their

18   access to scholarship money and access to workouts.  Plaintiffs maintain that they felt they had no

19   choice but to go into (and stay in) Defendant Rembao's home and office.  Indeed, on some

20   occasions, Defendant Rembao would obstruct their access to the door.  *See, e.g.*, *id.* ¶¶ 214, 217–

21   18, 219–20, 267, 273 ("Bevins felt alone, trapped, threatened, and scared.").  There are enough

22   plausible facts, taken as true, in the FAC to show that Plaintiffs were confined to areas (like

23   Defendant Rembao's office or home) by means of duress.

24

25

26

27

28

---

[12] In his motion to dismiss, Defendant Rembao argued that Count XIII (clam for ratification) should be dismissed.  Rembao MTD at 15.  Plaintiffs conceded in their opposition that this claim is inapplicable to Defendant Rembao.  Opp. at 38 n.7 ("Plaintiffs do not contest that their ratification claim applies solely to NCAA.").  This count is thus dismissed.

Case No.: 5:20-cv-01733-EJD
ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California

1

2     That Plaintiffs were able to transfer to other schools is irrelevant (as is the fact that Plaintiff

3  Aldrich transferred to UT Austin).  At the Rule 12(b)(6) phase, the question at hand is whether the

4  plaintiff has pled sufficient facts to state a claim.  As the discussion above demonstrates, Plaintiffs

5  have pled facts tending to show that they were confined to particular areas and were under such

6  duress that they did not feel they could leave the confined space.  Accordingly, Plaintiffs have pled

7  a cognizable false imprisonment claim and the Court **DENIES** Defendant Rembao's motion to

8  dismiss this claim.

9     **IV.     CONCLUSION**

10     For the foregoing reasons, the Court **GRANTS** NCAA Defendants' motion to dismiss for

11  lack of personal jurisdiction and **TRANSFERS** the NCAA action to the Southern District of

12  Indiana.  The Court **DENIES** Defendant Rembao's motion to dismiss.  In the interests of clarity,

13  Plaintiffs are ordered to file a second amended complaint by **September 30, 2020** excising their

14  claims as to NCAA Defendants.  The Case Management Conference scheduled for September 24,

15  2020 is **VACATED** and will be reset after Plaintiffs file their second amended complaint.

16     **IT IS SO ORDERED.**

17  Dated: September 3, 2020

18

19                                            EDWARD J. DAVILA
                                             United States District Judge

20

21

22

23

24

25

26

27

28  Case No.: 5:20-cv-01733-EJD
ORDER GRANTING NCAA DEFENDANTS' MOTION TO DISMISS; DENYING
DEFENDANT REMBAO'S MOTION TO DISMISS

United States District Court
Northern District of California