1   JONATHAN D. SELBIN (Cal. Bar No. 170222)
    jselbin@lchb.com
2   ANNIKA K. MARTIN (*admitted pro hac vice*)
    akmartin@lchb.com
3   RHEA GHOSH (*admitted pro hac vice*)
    rghosh@lchb.com
4   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, CA  94111
6   Telephone: (415) 956-1000
    Facsimile: (415) 956-1008
7

8   ELIZABETH A. FEGAN (*admitted pro hac vice*)
    beth@feganscott.com
9   FEGAN SCOTT, LLC
    150 S. Wacker Dr., 24th Floor
10  Chicago, IL 60606
    Telephone: (312) 741-1019
11  Facsimile: (312) 264-0100

12  LYNN A. ELLENBERGER (*admitted pro hac vice*)
    lynn@feganscott.com
13  FEGAN SCOTT, LLC
    500 Grant St., Suite 2900
14  Pittsburgh, PA 15219
    Telephone: (412) 515-1529
15  Facsimile: (412) 785-2400

16  *Attorneys for Plaintiffs and the Proposed Class*

17              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
18                    **SAN JOSE DIVISION**

19  ERIN ALDRICH, LONDA BEVINS, and
    JESSICA JOHNSON, individually and on
20  behalf of all others similarly situated,

21            Plaintiffs,              Case No.: 5:20-cv-01733-EJD

22  v.                                 **SECOND AMENDED CLASS ACTION**
                                       **COMPLAINT**
23  JOHN REMBAO,
                                       **JURY TRIAL DEMANDED**
24            Defendant

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. JURISDICTION AND VENUE ............................................................................... 2

III. INTRA-DISTRICT ASSIGNMENT ....................................................................... 3

IV. PARTIES ................................................................................................................. 3

    A. Plaintiffs ....................................................................................................... 3

    B. Defendant ..................................................................................................... 4

V. FACTS ...................................................................................................................... 5

    A. Student-athletes are at risk for sexual exploitation by coaches............................ 5

    B. Sexual relationships are forbidden in analogous professional settings where a power disparity exists between the professional and his client......................... 10

    C. The prevalence of coach/athlete sexual abuse has been documented by the media. .............................................................................................................. 11

    D. The NCAA admits the prevalence of sexual abuse between coaches and student-athletes but never imposes a prohibition on such relationships. .............. 13

    E. Coach John Rembao moved among schools without recrimination despite multiple schools' knowledge of his sexual abuse of student-athletes, including Plaintiffs. ......................................................................................... 17

        1. Coach John Rembao groomed and sexually abused NCAA student-athlete Erin Aldrich at the University of Arizona and retaliated against her at the University of Texas-Austin........................................... 17

        2. Coach John Rembao groomed, sexually harassed and abused, and retaliated against student-athlete Jessica Johnson at the University of Texas-Austin. ...................................................................................... 23

        3. Coach John Rembao groomed, sexually harassed and abused, and retaliated against student-athlete Londa Bevins at the University of Texas-Austin. ...................................................................................... 32

        4. Plaintiffs and the Class were damaged...................................................... 43

        5. SafeSport finds that Rembao abused Plaintiffs. ........................................ 44

VI. TOLLING OF THE STATUTE OF LIMITATIONS FOR PLAINTIFFS' CLAIMS ..... 45

    A. The statute of limitations should be tolled by A.R.S. § 12-502 and the discovery rule. ............................................................................................... 45

    B. The statutes of limitations should be tolled based on equitable estoppel, fraudulent concealment, and/or equitable tolling.................................................. 49

    C. Because Ms. Johnson and Ms. Bevins filed this lawsuit promptly after understanding their legal rights, their claims are timely. A new rule must be created to toll the statute of limitations favoring victims sexually abused by a person in a position of authority over them..................................................... 52

VII. CLASS ALLEGATIONS ....................................................................................... 53

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VIII.   CAUSES OF ACTION .................................................................................................. 55

        COUNT I CIVIL BATTERY.............................................................................. 55

        COUNT II ASSAULT ......................................................................................... 56

        COUNT III FALSE IMPRISONMENT ............................................................ 57

        COUNT IV INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ................. 57

        COUNT V NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS....................... 58

IX.     PRAYER FOR RELIEF.................................................................................................. 59

X.      DEMAND FOR TRIAL BY JURY ................................................................................ 59

Plaintiffs Erin Aldrich, Jessica Johnson, and Londa Bevins, on behalf of themselves and all others similarly situated, by and through their attorneys, for their Complaint against Defendant John Rembao, allege as follows:

## I.  **INTRODUCTION**

1.     The National Collegiate Athletic Association ("NCAA") admits that "[s]exual relationships between coaches and student-athletes have become a serious problem."[1] The NCAA acknowledges that any sexual contact between a coach and student-athlete, regardless of age or seeming consent, is sexual abuse because a coach holds all the power and the student-athlete holds none:

> [I]n the context of sports programs within institutions of higher learning, sexual abuse can occur regardless of the minor/adult status of the student-athlete, and regardless of the age difference between the perpetrator and victims. Whether the student-athlete is 17, 18, 19, 20, 21, or older, she or he is significantly less powerful than a head coach, assistant coach, athletics trainer, sport psychologist, athletics director, or other athletics department staff with supervisory control or authority over student-athletes. It is this power differential that makes such relationships inherently unequal, and when relationships are unequal, the concept of "mutual consent" becomes problematic.

> Because of this power differential, any amorous or sexual relationship between coaches and student-athletes constitutes sexual abuse. In other words, the dynamics of the coach-athlete relationship in intercollegiate sport make any sexual contact between a coach and an athlete abusive, regardless of whether it was wanted by the athlete and regardless of whether the athlete is over the age of consent.[2]

2.     Student-athletes – chasing aspirations that may include Olympic participation or a professional career, mandated to meet certain standards both athletically and academically, and typically experiencing living away from home for the first time – include some of the most vulnerable individuals regardless of gender in our society.

3.     Student-athletes arrive at college with the expectation that they will become the

---

[1] Deborah L. Brake, J.D. and Mariah Burton Nelson, MPH, CAE, "Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel," at 4 (NCAA 2010) ("Staying in Bounds"),  available at https://www.ncaa.org/sites/default/files/Staying+in+Bounds+Final.pdf (last accessed 9/24/20) at 4.
[2] *Id.* at 6.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

best athlete they possibly can be under the supervision of educated, skilled, and fully vetted coaches looking out for their best interests. The student-athletes trust and believe in their coaches because they are taught to do so from a young age, and accord their coaches deference, respect, and unquestionable loyalty.

4.      This unquestionable trust, together with the disparity in power, has allowed predators in coaching roles to sexually abuse student-athletes without impunity.

5.      Student-athletes who are sexually abused by their coaches are "'likely to adapt to the victim role, … repeating it in other relationships, each time losing more of her self-respect and enthusiasm for life.' Too afraid of the authority figures to become angry, she instead suffers from depression, fear, anxiety, shame, and overwhelming guilt."[3] A victim of a coach's abuse may quit the team, give up her scholarship, or transfer schools, losing valuable time and engagement in her education and social development. She may engage in self-harm, self-medicate with drugs and alcohol, and self-destruct through eating disorders, cutting, burning, or attempting suicide.

6.      By this lawsuit, Plaintiffs Erin Aldrich, Jessica Johnson, and Londa Bevins seek to hold their former coach and abuser, Defendant John Rembao, accountable for the injuries he inflicted on them and to prevent him from ever coaching again.

7.      Pursuant to Fed. R. Civ. P. 23(a), (b)(3), and/or (c)(4), Plaintiffs bring this class action for battery, assault, false imprisonment, and intentional and negligent infliction of emotional distress against John Rembao.

## II.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) there are at least 40 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; (c) at least one Plaintiff is a citizen of a different state than Defendant; and (d)

---

[3] *Id.* at 8 (*quoting* Peter Rutter, Sex in the Forbidden Zone: When Men in Power – Therapists, Doctors, Clergy, Teachers, and Others – Betray Women's Trust (Los Angeles: Jeremy Tarcher, Inc., 1986)).

members of the class, including Plaintiffs, are citizens of a state and Defendant is a citizen or subject of a foreign state.

9. This Court has personal jurisdiction over John Rembao because he resides in this District.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Rembao resides in this district.

## III. <u>INTRA-DISTRICT ASSIGNMENT</u>

11. Assignment in the San Jose Division is appropriate because Defendant John Rembao resides in Santa Cruz County in this division.

## IV. <u>PARTIES</u>

### A. <u>Plaintiffs</u>

12. Plaintiff Erin Aldrich is a citizen and resident of Cardiff, California and citizen of the United States. As a freshman during the 1996-97 school year, Ms. Aldrich was a member of the University of Arizona volleyball team and track and field team, where she competed in the high jump. Ms. Aldrich transferred to the University of Texas at Austin, where she also competed in the high jump as a member of the track and field team from 1997 to 2000. She was coached at both universities by John Rembao, who sexually abused her at the University of Arizona and harassed her at the University of Texas. As a result of the abuse, Ms. Aldrich has been damaged.

13. Plaintiff Jessica Johnson is a citizen and resident of Grapevine, Texas and citizen of the United States. As a freshman during the 1999-2000 school year, Ms. Johnson was a high jump competitor for the University of Texas track and field team. At the University of Texas, she was coached and sexually harassed and abused by John Rembao. As a result, she gave up her scholarship and transferred to the University of Arkansas. As a result of the abuse, Ms. Johnson has been damaged.

14. Plaintiff Londa Bevins is a citizen and resident of Boulder, Colorado and citizen of the United States. As a freshman during the 1999-2000 school year, Ms. Bevins was a cross-country, indoor track, and outdoor track competitor at the University of Texas where she was

1    coached and sexually harassed and abused by John Rembao. As a result, Ms. Bevins gave up her

2    scholarship and transferred to the University of Arkansas. As a result of the abuse, Ms. Bevins

3    has been damaged.

4        **B.    Defendant**

5        15.    Defendant John Rembao is an individual residing in Santa Cruz, California.

6    Rembao was the Women's and Men's Assistant Track and Field Coach at the University of

7    Arizona from 1994 to 1997.  From 1997 to 2001, he was the head Women's Cross-Country

8    Coach and coach of the high jumpers in Women's Track and Field.

9        16.    Rembao worked at several other NCAA schools throughout his career.

10       17.    From 1984 to 1994, Rembao worked at Cal Poly,[4] including as the Women's

11   Assistant Track and Field Coach (1984-1994), Men's Assistant Track and Field Coach (1989-

12   1994), and Men's Head Cross-Country Coach (1992-1994).

13       18.    When Rembao was at Cal Poly, he met student-athlete Sue McNeal, "while she

14   was icing her shins in the ice whirlpool in the training room."[5]  Rembao began dating McNeal,

15   who was a three-time NCAA All-American in the high jump.  Rembao also began coaching her in

16   the high jump while she trained for the Olympics.[6] Rembao eventually married Ms. McNeal.

17       19.    From 2001 to 2005, Rembao worked at Southern Methodist University (SMU) as

18   its Women's and Men's Head Cross-Country Coach and Assistant Track and Field Coach.

19       20.    From 2005 to 2007, Rembao worked at Stanford as the Men's and Women's

20   Assistant Track and Field Coach.

21       21.    In September 2007, Rembao began at the University of California at Berkley as its

22   Director of Operations and Assistant Track and Field Coach. While at University of California at

23   Berkley, Rembao was responsible for "[c]ounsel[ing] and guid[ing] student-athletes on academic,

24   personal, and athletic issues."  When this lawsuit was initiated, Rembao was still on the

25

26   _____

[4] https://calbears.com/sports/track-and-field/roster/coaches/john-rembao/498 (last visited
27   9/24/20).
[5] http://www.crosscountryexpress.com/2016/02/catching-up-with-santa-cruz-high-school.html
28   (last visited 9/24/20).
[6] *Id.*

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

University of California at Berkeley's website.[7]

22.     Rembao has held other positions connected to track and field while he was employed by NCAA member institutions. He served as the USA Track and Field's Women's High Jump Development Coordinator for 10 years,[8] from 1996 through 2006.

23.     Rembao also held multiple Olympic training positions. From 1995 through 1999 and from 2001 through 2004, Rembao was an Olympic Training Center Clinician. In 1997, Rembao was part of the Team USA World Championship Indoor Staff in Paris, France, and in 2001, Team USA World Championship Staff in Edmonton, Alberta, Canada.[9]

## V.     FACTS

### A.     Student-athletes are at risk for sexual exploitation by coaches.

24.     All college students are encouraged to engage in self-exploration to develop a clear sense of self, commitment, and direction. Emerging adults are engaged in a variety of developmental tasks such as identity formation, becoming personally competent, developing interpersonal relationships, and planning for the future.[10]

25.     Student-athletes must balance a unique set of circumstances, such as athletic and academic endeavors, social activities with the isolation of athletic pursuits, athletic success or shortcomings with maintenance of mental equilibrium, physical health and injuries with the need to keep playing, the demands of various relationships, and reconciling the termination of an athletic career with setting goals for the future.[11]

26.     As such, the degree to which one exclusively identifies with the athletic role, also known as athletic identity, can have a variety of implications. Specifically, over-identification

---

[7] https://calbears.com/sports/track-and-field/roster/coaches/john-rembao/498.
[8] *Id.*
[9] https://www.santacruztrackclub.com/john-rembao.html (last visited 12/23/19) (page not available as of 9/24/20).
[10] E.M. Heird  & J. Steinfeldt, "An interpersonal psychotherapy approach to Counseling student-athletes: Clinical implications of athletic identity," Journal of College Counseling, 16, pp. 143-157 (2013).
[11] J.G. Gayles, "Engaging student athletes," Student Engagement in Higher Education: Theoretical Perspectives and Approaches for Diverse Populations (2nd ed.), pp. 209-221 (2015).

with the athletic role has been tied to harmful outcomes, such as decreased college success and lower rates of completion.[12]

27.     The NCAA has explained that self-identity is important for NCAA student-athletes because "NCAA research has shown academic outcomes (grades, graduation and eventual graduate degree attainment) are strongly related to identity as a student while in college, even after taking prior academic performance into account."[13]

28.     When other college students might be testing their emerging identity in school-based and friendship networks, the college athlete is spending significant time separated from these networks while they train and compete.

29.     Student-athletes often spend hours a day with their coaches on the practice field, in the training room, and in meetings. Researchers suggest that "the culture of sport, specifically the power invested in the coach, facilitates an environment conducive to, and tolerant of, sexual exploitation."[14]

30.     One author explained that a student-athlete's susceptibility to the influence of her coach is even greater for athletes close to the upper echelon of their sport:

> Athletes are more susceptible to the grooming process which precedes actual sexual abuse when they have most at stake in terms of their sporting careers, that is when they have reached a high standard of performance but are just below the elite level. We call this the 'stage of imminent achievement' (SIA) (see Fig. 1). This stage might include athletes on national squads who have not yet been selected for the national/ international honours, those who occupy rankings just outside the top echelon for their sport and those for whom junior or age phase representative honours have been achieved. For these athletes, the personal costs of dropping out of their sport might be deemed to be higher than for others. The

---

[12] P.C. Harris, "The sports participation effect on educational attainment of Black males," Education and Urban Society (2014); Comeaux, E., "Rethinking academic reform and encouraging organizational innovation: Implications for stakeholder management in college sports," Innovative Higher Education, 38, 281-293 (2013); Kelly, D. D. & Dixon, M. A., "Successfully navigating life transitions among African American male student-athletes: A review and examination of constellation mentoring as a promising strategy, Journal of Sport Management, 28, 498-514 (2014).

[13] http://www.ncaa.org/about/resources/research/do-ncaa-student-athletes-view-themselves-students-or-athletes (last visited 9/24/20).

[14] Joy D. Bringer, Celia H. Brackenridge, and Lynn H. Johnston, "Defining appropriateness in coach-athlete sexual relationships: The voice of coaches," The Journal of Sexual Aggression 8(2) (2002), at 83.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

novice athlete can drop out without loss of face, can leave to find another coach or another sport without loss of reputation and has invested least, in terms of time, effort, money and family sacrifices. The top athlete, on the other hand, has a proven record, has already attained some of the rewards of success, and may be less dependent upon his or her coach for continued achievement at that level. In other words, they may have less to prove.

\*               \*               \*

The elite young athlete treads a fine line between success and failure. Physical injuries or illness can occur at any time, destroying years of training. Psychological damage can be caused by the withdrawal of the coach's attention of interest. In short, the young athlete often needs the attention of the coach in order to maintain form and the chance to succeed. In these circumstances it is not difficult for a coach with sexual motives to groom and gain compliance from the athlete.[15]

31.     A coach with sexual motives is able to groom and gain his athlete's compliance because of the power differential between a coach and the student-athlete, which makes consent even between adults impossible. From a very young age, young athletes are taught to look up to and respect their coaches, to view them as upstanding adults who serve in the roles that can include mentor, trainer, counselor, and sometimes even surrogate parent, and to accord them unquestioning authority.

32.     Moreover, "[t]he style of coaching that is most conducive to forming coach-athlete sexual relationships is more closely associated with male coaches: authoritarian, requiring unquestioning submission to the coach's authority, and exercising near total control over athletes' lives."[16] Commentators have noted that having a male coach with an authoritarian coaching style is a high risk factor for coach-athlete sexual abuse.[17]

33.     In 2010, the NCAA acknowledged the coach's ability to wield tremendous emotional control and power over their student-athletes:

In the most tangible terms, the student-athlete depends on the coach

---

[15]Celia Brackenridge, "Playing safe: Assessing the risk of sexual abuse to elite child athletes," International Review for the Sociology of Sport: Special Issue on Youth Sport (1997) at 13, available at https://pdfs.semanticscholar.org/a1fe/585a19259091d9598e0f5ac63523e0ba0211.pdf?_ga=2.242843141.625218843.1581428881-2058641848.1581428881 (last visited 9/24/20)

[16] Deborah L. Brake, JD, "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," 22 MARQUETTE SPORTS L. REV. at 403 (Jan 1, 2012) (citation omitted).

[17] Id. & n.35 (citations omitted).

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

for: a place on the roster; playing time; training and skills-building opportunities; visibility and references that can lead to professional opportunities; and, in Division I and II programs, scholarships that can mean the difference between being able to afford a college education or not. In exercising this power, the coach commonly exerts broad control over a student-athlete's life, including in such areas as physical fitness, diet, weight, sleep patterns, academic habits, and social life. For intercollegiate athletes, the magnitude of the coach's control will likely exceed that of any other single individual at that student-athlete's institution. For many, it will exceed the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents.[18]

34.     Nancy Hogshead-Makar, a 1984 Olympic gold medalist in swimming and the CEO of the non-profit Champion Women which provides legal advocacy for girls and women in sport, has explained that the coach holds all the power in a relationship with the athlete, stating: "There is no balance of power, there's power one way, which is the coach has all the power and the athlete does not…. [The coach] has her scholarship, her ability to continue her education."[19]

35.     This power imbalance is especially prevalent at the highest level of intercollegiate athletics:

coaches have power over athletes' lives far exceeding the mechanics of practicing and competing in a sport. A coach's power over athletes can extend to virtually all aspects of the athlete's life in such ways that clear boundaries are hard to delineate. This near-total control is rarely questioned. [20]

36.     "The athlete's dependence on the coach makes it enormously difficult for the athlete to control the boundaries of the relationship or speak up to a coach who oversteps."[21] It is this dependence and power differential created by the coach-athlete relationship which enables predators who work with student-athletes (like Jerry Sandusky, Larry Nassar, and John Rembao) to thrive.

37.     Historically, the NCAA and other sporting organizations looked the other way

---

[18] Staying in Bounds, at 16 (citation omitted).

[19] J. Barr & N. Noren, "Track & Fear," *ESPN, Outside the Lines,* found at http://www.espn.com/espn/feature/story/_/id/18900659/university-arizona-coach-threatened-one-athletes-blackmail-violence-death-school-stopped-him (quoting Nancy Hogshead-Makar) (last visited 1/20/20).

[20] Brake, "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," at 405 (footnotes omitted).

[21] *Id.* at 406.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

when coaches became sexually involved with their athletes. Karen Morrison, the NCAA director of gender inclusion, explained: "'I think there is some hesitancy to prescribe what people consider to be the personal lives of their coaches,' Morrison said. 'A lot of times there's a fallback to, 'Well, they're consenting adults.'"[22]

38.      The fact that college athletes are over the age of 18 does not indicate that any sexual relationship or sexual activity is consensual, however. According to many experts, the implicit power in the coach-athlete relationship negates consent.[23] "The distinctive features of the coach-athlete relationship should call into question whether it is possible for an athlete to freely consent to a sexual relationship with the coach."[24]

39.      By the 1990s, multiple studies challenged organizations that denied the existence of sexual abuse in sport.[25]

40.      A 1996 study of retired and Olympic athletes reported that 21.8% of the respondents had sexual intercourse with persons in positions of authority, "which, by whatever standard, is a startling figure."[26]

41.      In 1997, a scholar noted that it is "increasingly clear that these issues [of sexual relations between coaches and athletes] constitute a problem which demands responses from sport organisations at the level of both policy and practice."[27]

42.      A 1998 study reported that 20% of responding athletes in the United States

---

[22] Allis Grasgreen, "Out-of-Bounds Relationships," Inside Higher Ed. (May 1, 2012), available at https://www.insidehighered.com/news/2012/05/01/ncaa-asks-colleges-prohibit-romantic-relationships-between-athletes-coaches (quoting Karen Morrison) (last visited 9/24/20).

[23] *See, e.g.,* Brake, "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," at 399.

[24] Staying in Bounds, at 16.

[25] Brackenridge, "Playing safe: Assessing the risk of sexual abuse to elite child athletes," at 9 (citing studies in the United States, including Pike-Masteralexis, L., "Sexual harassment and athletics: Legal and policy implications for athletic departments,  Journal of Sport and Social Issues, 19 (2) May:141-156 (1995); Volkwein, K., "Sexual harassment in sport - perceptions and experiences of female student-athletes, (paper presented at the Pre-Olympic Scientific Congress, Dallas, USA, July 11-14) (1996)).

[26] Brackenridge, "Playing safe: Assessing the risk of sexual abuse to elite child athletes," at 10 (*citing* Kirby and Greaves, "Foul play: Sexual harassment and abuse in sport," (paper presented to the Pre-Olympic Scientific Congress, Dallas, USA, July 11-14) (1996)).

[27] Brackenridge, "Playing safe: Assessing the risk of sexual abuse to elite child athletes," at 10 (emphasis added).

experienced behavior from a coach that was characterized as noninstructional and potentially intimate.[28] This is the precise behavior that transforms a personal relationship into a sexual one.[29]

43.     The results "speak to the intensity of the coach-athlete bond, and the difficulty of setting boundaries in the relationship."[30] This also explains why, when confronted with sexual abuse, athletes do not recognize harassing or abusive behavior when they experience it.[31]

44.     Although late and without imposing mandates that would protect its student-athletes, in 2010, the NCAA itself acknowledged: "Sexual relationships between coaches and student-athletes have become a serious problem."[32]

**B.     Sexual relationships are forbidden in analogous professional settings where a power disparity exists between the professional and his client.**

45.     It is widely understood and accepted that, in many professional settings involving asymmetrical relationships, sexual relationships are forbidden as a matter of professional ethics. The prohibition on sex applies, regardless of facial consent, because professional ethics recognize the inability by the vulnerable party in the professional relationship to refuse sexual advances without fear of professional consequence.

46.     Examples include:

a.     lawyers are forbidden from entering into sexual relationships with clients;

b.     doctors and therapists are forbidden from having sex with their patients;

c.     judges are forbidden from entering into any kind of relationship with a party or lawyer appearing before them that would create an actual or perceived conflict of interest, including any kind of sexual relationship; and

d.     clergy may not use their position in the church to enter into a sexual relationship with a parishioner.

---

[28] Brake, "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," at 405 (footnotes omitted) at 400-401 (*citing* Volkwein, Karin A.E., *et al.,* "Sexual Harassment in Sport: Perceptions and Experiences of American Female Student-Athletes," 32 INT'L REV. FOR SOC. SPORT 283, 284 (1997) (referring to an invitation to diner alone or having a pet name).

[29] Brake, "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," at 401 (*citing* Volkwein, "Sexual Harassment in Sport").

[30] *Id.* at 400.

[31] *Id*.

[32] Staying in Bounds, at 4.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

47.     In the NCAA's 2010 publication, two experts explained that these same rules should apply to coaches:

> All of these examples involve relationships that are too fraught with power imbalances for consent to be meaningfully and reliably given. While being a coach is, in many respects, different from other professions, it shares the defining features that make consent to enter into a sexual relationship inherently problematic. At the core of the coach-athlete relationship is a duty of care and an imbalance of power. In many respects, the relationship of dependence is even more acute here than it is in these other settings due to the breadth of control that the coach has over the life and education of the student-athlete.[33]

48.     Thus, many sports organizations have adopted rules to prohibit coaches from engaging in sexual relationships with athletes, and to protect the safety and preserve the well-being of the athlete.

**C.     The prevalence of coach/athlete sexual abuse has been documented by the media.**

49.     Over the years, the number of incidences of coach/athlete sexual abuse has been staggering.  A non-exhaustive sampling of such reports follow.

50.     In 1993, University of Florida women's swim coach Mitch Ivey, then 44, was fired after ESPN reported that he had been sexually involved with his athletes – some under the legal age for consent – and verbally abused others to the point of constituting sexual harassment.

51.     In 1998, a lawsuit was filed against University of North Carolina soccer coach Anbson Dorrance by two players who accused Dorrance of inappropriate behavior that included uninvited sexual comments and retaliation. As one court opinion characterized the allegations, Dorrance regularly "bombarded players with crude questions and comments about their sexual activities and made comments about players' bodies that portrayed them as sexual objects. In addition, Dorrance expressed (once within earshot of [plaintiff Melissa] Jennings) his sexual fantasies about certain players, and he made, in plain view, inappropriate advances to another."

52.     One of the players settled in 2004.  The second, Melissa Jennings, settled for $385,000 in 2006 with an admission by the coach that he had "participated with members of the UNC-Chapel Hill women's soccer team in group discussions of those team members' sexual

---

[33] Staying in Bounds, at 26.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

activities or relationships with men."[34]

53.     Also in 1998, a lawsuit was filed against Jesse Dwire, the women's tennis coach at Syracuse University, alleging that Dwire massaged, fondled, and propositioned two scholarship tennis players, and that Dwire and the university retaliated against the players after they pursued a complaint through the school's grievance system.

54.     According to one report: "William Dealy, the lawyer for [the plaintiffs], said Syracuse officials, aware that the National Collegiate Athletic Association has no policy on sexual harassment, had ignored complaints about Dwire's sexual improprieties for years."[35]

55.     In 2002, Penn State became aware Jerry Sandusky had committed sexual acts on a young boy in a shower. In all, Sandusky abused ten young football players over a 15-year period of time. Despite the knowledge of Penn State officials, they did nothing about it for years.

56.     In 2007, Boston College women's ice hockey coach Tom Mutch stepped down amid allegations of improper behavior with one of his players.

57.     Also in 2007, Louisiana State basketball coach Pokey Chatman resigned before the NCAA tournament amid allegations of sexual relationships with players.

58.     In 2008, Florida Gulf Coast University fired its head volleyball coach for showing "an interest in an amorous relationship" with a student team manager.

59.     In 2011, a former University of South Carolina women's soccer player sued the university, alleging she received unwanted sexual advances by the assistant coach – and that her academic advisor admitted that the coach had sexually harassed other students. She also alleged that the university failed to renew her scholarship in retaliation for her complaint.

60.     In June 2012, Sandusky was convicted on 45 counts of relating to the sexual abuse of minors, and was sentenced to 30 to 60 years in prison.  Several top Penn State University officials, including its president and athletic director, were sentenced to prison for their roles in covering up the crimes.

---

[34] Doug Lederman, "North Carolina and Coach Settlement Sexual Harassment Suit," Inside Higher Ed (Jan. 15, 2008), available at https://www.insidehighered.com/news/2008/01/15/north-carolina-and-coach-settle-sexual-harassment-suit (last accessed 2/12/20).
[35] Id.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

61.     Larry Nassar is also serving a prison sentence for the sexual abuse he inflicted over years.  Under the guise of medical treatment, the long-time USA Gymnastics national team doctor and physician at Michigan State University sexually abused hundreds of athletes under his care. Over 350 athletes, including Olympic champions Simone Biles, Gabby Douglas, Aly Raisman, and McKayla Maroney, publicly accused Nassar of sexually abusing them. After numerous emotional testimonies from victims, the disgraced physician was sentenced up to 175 years in prison on sexual assault charges.[36]

62.     Complaints were reportedly made to Michigan State University about Larry Nassar as far back as 1988, but Michigan State did not take any appropriate action, and instead, chose to protect its reputation (and endowments) to the detriment of the victims, thereby allowing Nassar to thrive unchecked at the expense of his victims for decades.

63.     At least 14 individuals at Michigan State, including its President Lou Anna Simon, athletic trainers, and assistant coaches, had known about complaints regarding Nassar, yet allowed the abuse to continue unabated for 20 years.[37]

64.     Indeed, in its "Staying in Bounds" publication, the NCAA itself set out examples from newspaper accounts and personal interviews of how damaging sexual relationships between coaches and student-athletes can be to the student-athlete, citing among other examples, a molested swimmer who committed suicide and a coach who spent the night with an athlete, calling it "an all-night counselling session."[38]

**D.     The NCAA admits the prevalence of sexual abuse between coaches and student-athletes but never imposes a prohibition on such relationships.**

65.     The NCAA distributed its 2010 publication, entitled "Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel," to all of its member institutions, recommending that athletic

---

[36] In February 2019, Nassar was sentenced to 40-175 years after pleading guilty to seven counts of criminal sexual misconduct in Ingham County, Michigan.  Two weeks later, he was sentenced to 40-125 years for pleading guilty to three counts of criminal sexual conduct in Eaton County, Michigan.

[37] https://www.detroitnews.com/story/tech/2018/01/18/msu-president-told-nassar-complaint-2014/1042071001/ (last visited 1/2/20).

[38] Staying in Bounds at 7.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

departments create policies that "unambiguously and effectively" prohibit relationships between coaches and student-athletes.[39]

66.     Yet at the time the NCAA published the guidelines, Erin Buzuvis, a law professor at Western New England University, commented that it was suggested, not required:

> The NCAA is offering this as a resource, not a mandate, and in that sense **there is no consequence for a school that ignores the issue**. Nevertheless, I think this is the appropriate first step,' Buzuvis said. 'I believe that culture, not policy, is going to drive change on this issue. A tactic of providing resources and encouragement to change expectations within individual athletic departments will more effectively foster this change of culture, where a mandate is more likely to evoke backlash.[40]

67.     The NCAA publication confirmed what researchers have been saying for decades and what Plaintiffs and the Class know all too well: "Sexual relationships between coaches and student-athletes **have become a serious problem**. NCAA member institutions must unambiguously and effectively prohibit such relationships to ensure that sport programs offer a safe and empowering experience for all student-athletes."[41]

68.     The NCAA acknowledged that the power differential between coaches and student-athletes allows student-athletes to be exploited:

> In the context of sports programs within institutions of higher learning, sexual abuse can occur regardless of the minor/adult status of the student-athlete, and regardless of the age difference between the perpetrator and victims. Whether the student-athlete is 17, 18, 19, 20, 21, or older, she or he is significantly less powerful than a head coach, assistant coach, athletics trainer, sport psychologist, athletics director, or other athletics department staff with supervisory control or authority over student-athletes. It is this power differential that makes such relationships inherently unequal, and when relationships are unequal, the concept of "mutual consent" becomes problematic.

> Because of this power differential, any amorous or sexual relationship between coaches and student-athletes constitutes sexual abuse. In other words, the dynamics of the coach-athlete

---

[39] *Id.* at 4.
[40] Grasgreen, "Out-of-Bounds Relationships" (*quoting* Erin Buzuvis) (emphasis added).
[41] Staying in Bounds, at 4 (emphasis added).

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

relationship in intercollegiate sport make any sexual contact between a coach and an athlete abusive, regardless of whether it was wanted by the athlete and regardless of whether the athlete is over the age of consent.[42]

69.    According to the NCAA's publication, "Historically, most universities have not definitively prohibited such behavior. That lack of institutional boundary-setting has allowed coaches with bad boundaries to continue taking advantage of young, vulnerable student-athletes."[43]

70.    Thus, the NCAA defined sexual abuse as including, but not limited to:

conduct that is sexual harassment (as where the athlete did not welcome a sexual relationship with the coach). Sexual abuse includes amorous or sexual relationships between a coach or other supervisory staff and student-athletes, even when these relationships are perceived by both parties to be consensual. Amorous or sexual relationships can be defined as any relationship that includes sexual touching, talking, or flirting; engaging in any form of sex; or otherwise developing a private, personal relationship that goes beyond the context of a staff and student professional relationship.

Unlike sexual harassment, which is demonstrably unwelcome, sexual abuse often involves a slow seduction (or "grooming") whereby one person gradually prepares another to accept "special" attention, and then proceeds with sexual activity. The term sexual abuse is often used in reference to sexual activity between an adult and a minor, but adults can also sexually abuse other adults in contexts where one adult holds power over another.[44]

71.    The NCAA's publication recommended a "model policy" which was based on the NCAA's admitted duty to protect student-athletes, stating:

The model policy is a natural extension of the purpose of the NCAA: **to protect student-athletes**. In the early 1900s, college football players were being injured and even killed as a result of the sport's popular offense, called "the flying wedge." A public outcry put pressure on universities to abolish or reform football. President Theodore Roosevelt urged college athletics leaders to work together

---

[42] *Id.* at 6.
[43] *Id.*
[44] *Id.*

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

to protect young people from dangerous and exploitive practices. This resulted in the formation of the NCAA in 1906. Since then, the NCAA has enacted many bylaws to curb harmful practices and to promote the educational mission of athletics, including instituting minimum educational standards for recruits, ensuring the academic progress of student-athletes, and instituting maximum practice and competitive limits. Today, the NCAA's stated purpose is to "govern competition in a fair, safe, equitable and sportsmanlike manner, and to integrate intercollegiate athletics into higher education so that the educational experience of the student-athlete is paramount."

This model policy and supporting best practice recommendations are fully in accord with the NCAA's stated purpose. This resource is designed to ensure that student-athletes are safe from sexual advances by coaches or other athletics department employees, and that sexual or romantic relationships do not distract student-athletes or their teams from the educational experience.[45]

72.     At the time, NCAA's Karen Morrison, Director of Gender Inclusion, stated that "[These relationships] had been going on forever," yet "Staying in Bounds" was the first time NCAA had made a statement on the topic.[46]

73.     Morrison, however, added, "'I think there is some hesitancy to prescribe what people consider to be the personal lives of their coaches,' Morrison said. 'A lot of times there's fallback to, 'Well, they're consenting adults.'''"[47]

74.     The hesitancy expressed by the NCAA has kept the NCAA from adopting minimum standards for coaches. Nevertheless, "Staying in Bounds," provides that sexual or romantic relationships between a student-athlete and coach or other athletics staff with supervisory responsibility over the student-athlete constitutes sexual abuse even where the student-athlete claims consent or where the student is over the age of 18.[48]

75.     Knowing that the NCAA had not acted and that the schools at which he coached would cover up any alleged wrongdoing by him, Rembao took advantage of the system and abused his power to abuse student-athletes.

---

[45] *Id.* at 4 (emphasis added).
[46] Grasgreen, "Out-of-Bounds Relationships" (quoting NCAA's Karen Morrison).
[47] *Id.*
[48] Staying in Bounds, at 4-5.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

1

2

    **E.**      **Coach John Rembao moved among schools without recrimination despite multiple schools' knowledge of his sexual abuse of student-athletes, including Plaintiffs.**

3

    76.     John Rembao moved unfettered among NCAA schools, preying on female track

4

and field student-athletes. Rembao's sexual and emotional abuse physically and emotionally

5

damaged multiple student-athletes, including Plaintiffs.

6

    77.     Yet at the time this lawsuit was filed, Rembao was heralded as an icon in track and

7

field.  In a biography on the University of California at Berkeley website, Rembao was lauded as

8

a skilled, winning coach who has coached at the University of California, Cal Poly, Arizona,

9

Texas, SMU, and Stanford, and has a career spanning decades.[49]

10

11

    **1.**      **Coach John Rembao groomed and sexually abused NCAA student-athlete Erin Aldrich at the University of Arizona and retaliated against her at the University of Texas-Austin.**

12

    78.     While watching the 1984 Olympics on television when she was six years old,

13

Plaintiff Erin Aldrich told her parents she was going to be an Olympian.

14

    79.     In junior high school, she was first exposed to track and field, and fell in love with

15

the sport.  Because of her height and athleticism, she was immediately successful in the high

16

jump event and was also successful at volleyball.

17

    80.     By high school, Ms. Aldrich was receiving invitations to Junior Elite Development

18

Camps in Colorado Springs, which she attended each summer accompanied by her female high

19

school coach.  There, she met Coach John Rembao, who began running the camps her sophomore

20

or junior year of high school.

21

    81.     Coach Rembao was known as the high jump guru – and Ms. Aldrich was excited

22

to train with him.

23

    82.     Coach Rembao began regularly calling Ms. Aldrich while she was in high school,

24

frequently talking to her on the phone sometimes up to two hours a night.  They would talk about

25

her dreams, aspirations, training, and life in general.  At the time, Coach Rembao coached at

26

University of Arizona, so they would also discuss her college plans.

27

    83.     Coach Rembao also began regularly sending Ms. Aldrich and her parents gifts,

28

[49] https://calbears.com/sports/track-and-field/roster/coaches/john-rembao/498.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

such as University of Arizona gear and fresh tortillas made by his mother.

84.     By her senior year, Ms. Aldrich had committed to Arizona on a volleyball scholarship with a plan to also train for the high jump.  At that time, their relationship became more sinister.  Coach Rembao started directing his nightly phone calls to more personal topics and conversations that had nothing to do with sports.

85.     He commented on Ms. Aldrich's senior pictures, telling her which one was his favorite and why.  In the picture, Ms. Aldrich was wearing a black dress and jean jacket:



86.     Commenting on the picture, Coach Rembao told her that he loved the muscle that showed on the side of her leg, calling it "super sexy."

87.     Coach Rembao asked about Ms. Aldrich's dating life.  He knew she didn't date in high school because she was so focused on making an Olympic team.  Coach Rembao supported her laser focus on training.

88.     While Ms. Aldrich was going to attend Arizona on a volleyball scholarship, Coach Rembao told her that he planned to oversee all of her workouts and help to manage her nutrition

1    and physique.

2         89.    By June 1996, the summer after Ms. Aldrich's senior year, Coach Rembao

3    regularly attended competitions with Ms. Aldrich.  For example, below is a picture of Coach

4    Rembao and Ms. Aldrich together at the 1996 United States Olympic Trials for track and field

5    held at Centennial Olympic Stadium in Atlanta, Georgia from June 14-23, 1996.  She did not

6    make the Olympic Team.  By this time, Coach Rembao had effectively groomed and gained Ms.

7    Aldrich's trust.

8

9

10

11

12

13                      

14

15

16

17

18

19

20        90.    Ms. Aldrich gained a spot to compete for Team USA for USA Track and Field at

21   the World Junior Championships in Sydney, Australia.  Because Ms. Aldrich's high school coach

22   was unable to attend, her parents paid for Coach Rembao to accompany her to the August 20-25,

23   1996 event.

24        91.    On the plane ride to Australia, Rembao physically forced himself on Ms. Aldrich.

25   Ms. Aldrich was sitting in a middle seat and Coach Rembao was sitting in the aisle seat.  On the

26   overnight flight, he covered Ms. Aldrich with a blanket and proceeded to fondle her under the

27   blanket.

28        92.    Ms. Aldrich trusted Coach Rembao implicitly.  She had never had any sexual

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

experiences before but he had groomed her to a place where she submitted.

93.     Coach Rembao penetrated Ms. Aldrich with his fingers, and joked with her that they were now members of the "mile high club."  He also told her he was going to divorce his wife and move with Ms. Aldrich to Australia.

94.     Because of Ms. Aldrich's repressed memories of the events, this incident may or may not have been the first time that Rembao sexually assaulted her.  During Ms. Aldrich's freshman year at Arizona, Coach Rembao acted as though she was his girlfriend even while he was married.  He would even have Ms. Aldrich over to his house once a week, where his wife would cook them dinner.

95.     Coach Rembao would give Ms. Aldrich massages in his home; Ms. Aldrich would not know where his wife would disappear to.

96.     Coach Rembao would perform oral sex on Ms. Aldrich in his office, at his house, in the car, and on road trips for competitions and camps.

97.     Coach Rembao kept Ms. Aldrich on a strict nutritional plan. He emphasized calorie-counting and having her thin so much that it became an obsession for him, as well as an obsession for Ms. Aldrich to be in the shape he wanted her to be.  Coach Rembao made Ms. Aldrich feel that he knew where every fat cell was on her body; he would tell her she could always be leaner.  He required that she write down everything she ate.  His criticisms traumatized Ms. Aldrich, causing her to be in starvation mode a lot.

98.     Based on the amount of time and attention that Coach Rembao would give Ms. Aldrich, Arizona coaches of both the volleyball and track and field teams knew or should have known that Coach Rembao was acting inappropriately. As an example, Coach Rembao would come watch Ms. Aldrich's volleyball practices under the guise of counting how many times she jumped during practice so that he could monitor her training for the high jump and help her "recover."

99.     Indeed, fellow track and field student-athletes believed that Rembao was inappropriate with Ms. Aldrich because it was obvious that Rembao spent all of his time with her because he was neglecting his coaching duties.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

100.    Coach Rembao's actions were caught in the fall of Ms. Aldrich's freshman year (1996) by her roommate, a fellow volleyball teammate.

101.    Coach Rembao was in Ms. Aldrich's dorm room, when Ms. Aldrich's roommate came home. They were not expecting her roommate to come home. When the door handle jiggled, he quickly jumped into the closest closet – which was her roommate's closet.

102.    Ms. Aldrich's roommate opened the door to her closet and discovered Coach Rembao hiding.

103.    On information and belief, Ms. Aldrich's roommate reported the incident to the University of Arizona.

104.    In May 1997, Arizona's Athletic Director pulled Ms. Aldrich into a conference room with her parents. He told her that Coach Rembao was leaving Arizona and going to the University of Texas at Austin.  The Athletic Director asked that Ms. Aldrich stay at Arizona and play her sophomore year of volleyball.  He told her that, if she was unhappy, Arizona would then release her with full eligibility.

105.    In 1997, the summer between her freshman and sophomore year, Ms. Aldrich qualified for the World Championship team. With Coach Rembao, Ms. Aldrich traveled between multiple European cities to attend track meets in preparation for the championships.

106.    At one stop at a training camp between meets, Coach Rembao came to Ms. Aldrich's room and told her he needed to take her upstairs. He told her that he suspected that his wife had herpes, and that he needed to check her.

107.    Rembao took Ms. Aldrich to a vacant room in the hotel, laid her on the bed, and began to probe and physically inspect her vaginal area.

108.    Ms. Aldrich was scared, ashamed, and concerned that Coach Rembao thought she would have herpes.

109.    Ms. Aldrich stayed at Arizona to play her sophomore year of volleyball in the fall of 1997. With Coach Rembao gone, she started dating boys on the track team, her own age, for the first time ever.

110.    After her volleyball season ended in December 1997, Ms. Aldrich transferred to

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

the University of Texas. She started at Texas in January 1998.

111.   There, Coach Rembao continued to attempt to engage Ms. Aldrich in sexual relations.

112.   Coach Rembao would sit down next to her on the bench during weight training, and say "Je t'aime," *i.e.,* "I love you" in French.  Ms. Aldrich, however, would say thank you and walk away. He would tell her he missed her, but Ms. Aldrich maintained her distance. Eventually, Coach Rembao stopped trying and the retaliation began.

113.   Coach Rembao continued to heavily monitor her calorie intake in such a way that she began to lose her energy and ability to train at her full potential. If she didn't jump well, he made her feel unqualified, insignificant, and a loser.

114.   By 1999, Ms. Aldrich was beaten down by Coach Rembao.  She was mentally, emotionally, and physically depleted.  She started performing very poorly in the high jump. Coach Rembao was livid, constantly berating her.  He retaliated against her for putting distance between them and not engaging in a sexual relationship.

115.   While at a track meet in Disney World for spring break, Coach Rembao was particularly critical of Ms. Aldrich.  She called her parents out of desperation, and her dad jumped on the next plane to support her.  He showed up at the hotel that evening and comforted her.  The next day, she jumped a personal record, which she now believes was the result of realizing she had loving support.

116.   Ms. Aldrich made the Olympic team the following year in 2000.  Under such a microscope for food and with the constant criticism from Coach Rembao, Ms. Aldrich was on fumes by the time she got to the Olympics.  She gained 15 pounds between the Olympic trials and the Olympics, because she could not sustain the caloric restrictions Coach Rembao had imposed on her.  She was emotionally, mentally, and physically exhausted, and did not perform well.

117.   Ms. Aldrich did not recognize she had been sexually abused by Coach Rembao until the end of March or early April 2019, when she watched *Leaving Neverland*, the documentary about the young boys who were sexually abused by Michael Jackson under the guise of love.

118.     The realization of her abuse manifested itself in physical injury.  Shortly after watching *Leaving Neverland,* with the pressure and stress of the past triggered and realized, Ms. Aldrich was hospitalized with sepsis from bacterial pneumonia for eight days.  Her body had shut down, and during those eight days, she believed that she was going to die with the secret of the events that had occurred.

119.     Rembao's sexual abuse has had a devastating effect on Ms. Aldrich's life.  She has experienced extreme distress, depression, and anxiety.  She feels guilt and shame.  Feelings of self-doubt overshadow her relationships and cause her to question the validity of her feelings.  She has sought and continues to seek counseling and psychiatric care.  She also believes that Rembao's training demands and dietary restrictions caused lifelong issues with her hypothalmus, leading to fertility issues.

**2.     Coach John Rembao groomed, sexually harassed and abused, and retaliated against student-athlete Jessica Johnson at the University of Texas-Austin.**

120.     When Jessica Johnson was nine, she started competing in track and field.  At competitions, she would pick the events in which she knew she could win a medal.  By age 11, she was competing in the high jump.  By middle school, she was regularly winning every event in which she competed.

121.     During her freshman year of high school, she won the high jump event at the Texas state track meet.  Her success caught the attention of multiple colleges and Olympic trainers.

122. After her freshman year of track, Ms. Johnson was invited to the Olympic Training Center of Chula Vista in San Diego, California. There, in 1996 when she was 15 years old, Ms. Johnson met John Rembao, who was a coach and clinician at the center from 1995-1999 (and again from 2001-2004).



123. As Ms. Johnson flourished in the high jump (and in volleyball), her parents hired her a private coach who was recommended by Rembao. Rembao took a keen interest in Ms. Johnson and her track career, regularly providing advice to her and her parents.

124. Over winter break her sophomore year of high school, Ms. Johnson was invited to attend a track camp at the University of Arizona where Rembao was then coaching. Rembao invited Ms. Johnson to stay at his house. During the break, Rembao and his wife Sue regularly took Ms. Johnson on outings.

125. Between Ms. Johnson's sophomore and junior year, Rembao left Arizona and began coaching at the University of Texas-Austin.

126. By her junior year, Rembao regularly called, emailed (from his University of Texas email address: jrembao@mail.utexas.edu), and wrote letters to Ms. Johnson, and the topics of conversation became more and more personal. Examples follow.

127. On October 16, 1997, Rembao mailed Ms. Johnson a handwritten letter on official

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

1  UT letterhead, noting on the envelope: "ONLY OPEN IF YOU ARE MISS AMERICA! (AT

2  LEAST IN THE FUTURE!).



16      128.  In the letter, Rembao laments that he doesn't "miss Arizona all that much," but

17  that "I miss Erin from time to time, but she is creating her own life in Arizona."  He tells Ms.

18  Johnson: "There aren't too many young ladies who have to offer your wit, charm, athletisism[sic],

19  and Miss America looks!"

20      129.  In a December 16, 1997 email exchange, Ms. Johnson and Rembao talked about

21  her dating life. Rembao stated: "How old are you? You have lots of time to find a boy, husband,

22  whatever….. *** So, are you saying I'm going to get old to you sometime? Thanks a lot!"

23      130.  On December 17, 1997, Rembao sent Ms. Johnson an email, stating:

25  …when I tell you things, I expect them to stay between me and you,
or I just won't tell you things anymore. Trust is important to me.

26  Loyalty too. And I will return it the way I receive it.

27           *         *         *

28  Sometimes you can be so wierd[sic] and I love it! Good luck on

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

your English and Spanish exams. You multilingual, long legged, Miss America looking, sincere, young, gorgeous looking young lady (I guess that was covered under Miss America looking), high jump/heptathlete STUD-ette!

131.   On December 31, 1997, Rembao emailed Ms. Johnson: "…I appreciate your friendship and the conversations that we have. We could be really, really good friends." He also said: "That will be your nickname, "Princess". You look like one anyways! I like it better than Miss America because it still describes beauty and is less obnoxious."

132.   On January 13, 1998, Rembao emailed Ms. Johnson, stating: "I meant what I said. You are special, and are becoming more so the better I get to know you." After telling him she got a speeding ticket that day, he wrote back: "Was your first time special? Like your first kiss, boyfriend……."

133.   Throughout this time, Ms. Johnson was excelling at track and field and in volleyball. By January 1998, the University of Texas had told Ms. Johnson they were interested in offering her a volleyball scholarship based on her test results at the Olympic training center. However, Ms. Johnson's first love was track and field, and Rembao reassured her and her parents that she could play both sports.

134.   During Ms. Johnson's senior year, she suffered from mononucleosis and dropped from first in state to second.  She gained some weight that she wanted to drop to be more successful in the high jump.  During this time, Rembao continued to be supportive of and personal with Ms. Johnson.



135.    Based on Rembao's grooming and the fact that the University of Texas-Austin had won the national championships in track and field, Ms. Johnson committed to attending Texas.

136.    Ms. Johnson started at Texas as a freshman in the fall of 1999.



137.    Before the semester started, Rembao invited Ms. Johnson to dinner at his home with his wife.  During dinner, they discussed her work-outs, and she explained that she had been lifting heavy weights which caused her legs to be sore.

138.    After dinner, Rembao told Ms. Johnson to go into the living room and lay down on the floor so he could work on her legs.

139.    Thinking she was safe because Rembao's wife was home, Ms. Johnson went into the living room and laid down face down.  Rembao's wife disappeared.

140.    Rembao came into the living room, sat down and pushed Ms. Johnson's running shorts and the built-in underwear inside the shorts up so that her buttocks were fully exposed.  He massaged her inner thighs and buttocks, which made Ms. Johnson extremely uncomfortable. Distressed, she frantically tried to figure out how to escape without offending her new coach.  As soon as he stopped, she excused herself and left.

141.    In another incident at his home, she complained of a stomachache and Rembao proceeded to rub her stomach under her shirt with his wife present.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

142.     On another occasion that fall, he invited her and another athlete to his house, and they watched the movie "American Pie."  During the sexual parts and when sexual comments were made, Rembao would watch Ms. Johnson to gauge her reaction.  Uncomfortable, Ms. Johnson avoided Rembao's gaze.

143.     Ms. Johnson lived in an all-girls' dormitory with the track and cross-country team. From the beginning of freshman year, Rembao would call Ms. Johnson's dorm room most nights, trying to keep track of her whereabouts.

144.     In fact, Ms. Johnson did go on one date, which Rembao discovered when he called her room and talked to her roommate when she was not there.  For the next week, Rembao refused to speak with Ms. Johnson or give her workouts.  Rembao told her he was "jealous," and ostracized her from the team.  In fear of the punishment, Ms. Johnson did not go out on another date.

145.     Rembao started controlling what Ms. Johnson ate, requiring her to keep detailed food diaries, telling her to eat a sardine if she got hungry, and telling her he knew where every ounce of fat was on her body.  Rembao would make Ms. Johnson weigh in weekly in front of other athletic teams and shame her if he didn't like the numbers.  He would say things like, "I've never seen so much subcutaneous fat on the side of your leg," for everyone to hear.

146.     He would sometimes call Ms. Johnson into his office, under the guise of official meetings, but instead use the time as an excuse to give her uncomfortably-long hugs.  At other times and in other places away from the track, he would give her long and intimate back rubs.  He would cup her face and rub his thumbs on her cheeks and jaw.  Ms. Johnson would try to find excuses to get away from him.

147.     Rembao regularly commented on Ms. Johnson's looks and his feelings for her, including that she had a sexy haircut, her legs were good-looking, her butt was getting smaller, she was beautiful, he was jealous of her boyfriends, he had feelings for her that he didn't understand, and that their conversations should remain confidential.

148.     On January 21, 2000, Rembao called and told Ms. Johnson to meet him in his office. Ms. Johnson told him she had just finished a workout and needed to go back to her dorm

room to shower.  Rembao insisted that she come to his office first.

149.    When Ms. Johnson arrived in Rembao's office, he shut the door.  He walked toward her and she put both hands up to maintain her personal space.  Rembao pushed forward, grabbed her in a full hug, and licked her neck.  He told her she tasted "salty."  She was horrified.

150.    Ms. Johnson thought she was to blame for Rembao's actions.  She didn't know how to get him to stop.  She avoided him when she could, but he controlled her eating, her athletic career, and her scholarship.  She was dependent on Rembao for her workouts and training, so she could not afford to offend him.

151.    On February 19, 2000, while at the Oklahoma Invitational, Rembao told Ms. Johnson that he needed to talk to her and to come to his hotel room.  He told her to sit on the bed, and she had a sick feeling.  She complied, and he pushed her backwards so that she was laying down, and told her to relax.  He reached under her shirt, and she felt his hand slipping underneath the waistband of her shorts.  Ms. Johnson panicked and feigned sleep.  She then got up and left the room.

152.    Rembao's comments and actions caused Ms. Johnson severe physical and emotional distress.  She became increasingly depressed, had a hard time getting out of bed, developed an eating disorder (alternating between starving herself and bingeing), and developed panic attacks.  She went to the University of Texas student health center, which prescribed her an anti-depressant and sleeping pills.  She could not effectively compete due to her mental and physical state.

153.    During her indoor track season, Ms. Johnson suffered an ankle injury and could not participate in the spring outdoor season.  She was relieved that it happened so that she could avoid Rembao.

154.    About this time, Ms. Johnson ran into a teammate, Londa Bevins, who was crying.  As they began talking, they realized that Rembao was abusing both of them and others on the team.  They concluded that they needed to transfer.  Ultimately, nine freshmen from the track and field and cross-country teams quit that year.  Ms. Johnson was both horrified and relieved that she was not alone.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

155.    Shortly thereafter, Ms. Johnson told her parents she needed to leave Texas. Severely depressed and anxious, she told them she had to transfer to a new school.

156.    When her parents saw the severely depressed state she was in, they encouraged her to withdraw from school.  However, she was determined to finish the semester.

157.    She submitted her resignation to Rembao on March 5, 2000.

158.    On Saturday, March 20, 2000, she awoke to a distressing sight.  Rembao was in her dorm room, pulling back the blankets to look at her injured foot.

159.    Ms. Johnson was in bed in her dorm room, sleeping in a nightgown without a bra. Her injured ankle was propped up on a pillow.  The dormitory required a key to access the building and her room, so she did not expect anyone to be in or have access to her room (other than her roommate).

160.    When she awoke, she saw Rembao next to her bed.  She was not only surprised, but immediately felt freaked out.  Rembao began to examine her foot, telling her that he missed her.  He began kissing her ankle.  He hugged her and rubbed her back.  She became extremely upset and felt violated.

161.    Thereafter, Ms. Johnson took steps so that she wouldn't have to encounter Rembao.  However, on June 15, 2000, her last day at Texas, she went to get her car in the parking garage to go home. As she began backing out of the stall, she saw a four-door sedan blocking her car in.

162.    She looked in her sideview mirror and saw Rembao standing there.  He told her that he was not going to let her go until she got out and gave him a hug.  She was trapped.  She could not move her car without doing as he demanded.

163.    She got out of the car, and he gave her a full-body hug.  He told her "I just want you to know I don't hold hard feelings against you."  She said whatever she needed to say to escape.

164.    When she came home that summer, Ms. Johnson was severely depressed, a shell of her former self.  She experienced a sadness that was deep and painful.  She began cutting her wrists and attempting to hide the cuts with a bandanna (her mom discovered the cutting).  The

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

physical pain of the cutting, repeated over and over, with just enough pressure to break the skin to cause bleeding, would overwhelm her emotional pain and would provide a measure of momentary relief.

165. She was ashamed and felt dirty. She found that she couldn't look people in the eyes. That summer she would lie in her bed and cry and hurt herself. She went to counseling and was on anti-depressants and anti-anxiety medication.

166. Ms. Johnson did not return to Texas; she transferred to the University of Arkansas and joined the track and field team. That summer however, she submitted a formal complaint to the University of Texas-Austin.

167. During the course of Texas' investigation, Rembao admitted to the majority of the conduct about which Ms. Johnson complained. Nonetheless, Texas attacked Ms. Johnson, found that Rembao's conduct did not constitute sexual misconduct, and led Ms. Johnson to believe she could not sue and/or did not have a claim against Texas or Rembao.

168. Ms. Johnson was only offered a 50% scholarship to be a member of the Arkansas track team. She chose the University of Arkansas because she felt it was a safe place for her, because a friend told her she would not be abused by the coaching staff.

169. When Ms. Johnson arrived at Arkansas and one of her new coaches heard what had happened, he did not act surprised but instead acknowledged that Rembao had a reputation with female student-athletes.

170. In the Spring of 2003, while competing for Arkansas, Ms. Johnson attended an indoor track meet in Oklahoma. At the high jump area, Ms. Johnson had bent down to put her things away in her bag. She saw a hand extended to give her a handshake and grabbed it before she looked up. When she looked up, she froze. It was Rembao, who was then coaching at Southern Methodist University.

171. She pulled away, grabbed her things, and ran to her parents. Her heart was pounding as she replayed the abuse in her head.

172. Ms. Johnson's parents spoke with SMU, which agreed that Rembao was not permitted any further contact with Ms. Johnson. During the conversation, the school

1   acknowledged that coaches hire their buddies and there was no vetting or checks and balances

2   among schools to track wrongdoing.

3       173.   In June 2003, Ms. Johnson attended the NCAA championships in Sacramento

4   California.  While lined up to compete, she saw Rembao speaking with her coach.  Rembao

5   proceeded to film her while she competed.

6       174.   Ms. Johnson felt sick and violated, because Rembao would not leave her alone.

7       175.   Rembao subsequently sent her a binder containing an analysis of her jumps under

8   the guise of Olympic training development.

9       176.   As a result of Rembao's abuse, Ms. Johnson forfeited a full scholarship at the

10  University of Texas; as a result, she was required to pay one-half of tuition at the University of

11  Arkansas her sophomore year, as well as during a fifth year of college, prior to the 2004 Olympic

12  Trials, due to missing out on her first outdoor season because of injury.

13      177.   Rembao's abuse of Ms. Johnson has had a profound and traumatic effect on her

14  life and her relationships.  Ms. Johnson has continued to seek psychiatric and counseling

15  treatment for depression and anxiety.  She has struggled with eating disorders.  She regularly has

16  nightmares about Rembao's sexual misconduct.

17          **3.    Coach John Rembao groomed, sexually harassed and abused, and**
               **retaliated against student-athlete Londa Bevins at the University of**
18             **Texas-Austin.**

19      178.   Londa Bevins grew up in a Dallas, Texas suburb and attended Mesquite High

20  School.  Running was the most important thing during her high school days.  She lived it,

21  breathed it, ate it, and slept it.  Success in running came very easily to Ms. Bevins, who was 5' 6"

22  and weighed 120 pounds.

23      179.   As a sophomore in high school, Ms. Bevins came in second in the mile at the 5A

24  state meet in Austin, Texas in 1997.  The next year, Ms. Bevins came in seventh in the 1500m at

25  the USA Track and Field Championships/Junior Championships at Southern Illinois University,

26  where she competed against some college athletes.  Coach John Rembao from the University of

27  Texas, the head cross-country coach, began calling Ms. Bevins's home to recruit her for the

28  cross-country and track and field teams at University of Texas at Austin.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

180.    In July 1998, prior to her senior year in high school, Ms. Bevins orally committed to attend University of Texas at Austin.  She visited Texas in October 1998, and her first college visit was her last.  She told her parents, who were supportive of her running career, that UT-Austin was the place for her.  She was excited to join the University of Texas women's track team, which won the NCAA Division I championships in 1988 and 1989 in both indoor and outdoor track.

181.    Ms. Bevins formalized her commitment to UT-Austin in November 1998, when she signed a contract to attend in exchange for a full scholarship as a three-sport athlete:  cross-country, indoor track, and outdoor track.  Below is a photograph of the day she signed her contract to attend University of Texas at Austin:



182.    A week later, Ms. Bevins participated in a state cross-country track meet where she was slated to win or place second in the 5A Division.  Instead, she tripped and was gashed in the leg with other runners' spikes and developed complications from her injury.  She did not run for ten weeks.

183.    During that time she regularly received telephone calls from Coach Rembao, who would offer words of encouragement such as, "You don't have to impress me – I already know what you can do."

- 33 -

184.     After Ms. Bevins' injuries healed, she redoubled her training, knowing that her injury had put her behind the other competitors.

185.     During that time, Coach Rembao would continue to telephone Ms. Bevins once a week. Some of those telephone calls lasted over an hour. He began to ask her personal questions about the boys she liked and the high school events she attended.  He also complimented her appearance, saying that she was "pretty."  Several times he would call to say he was having a bad day, and that just talking to Ms. Bevins cheered him up.  This made her feel special.

186.     Ms. Bevins's intense training paid off, and in she won the mile in the 5A state track meet in May 1999, prior to her high school graduation.

187.     Through Coach John Rembao, Ms. Bevins was invited to attend the United States Olympic Committee's high altitude training camp in Dallas and Utah the summer prior to her freshman year of college.  She was thrilled to be among college students and excited to share a dorm room with a UT-Austin star athlete.

188.     A few times Ms. Bevins stayed out late. When Rembao learned of these incidents, he telephoned Ms. Bevins and told her she had lost his trust, making her feel miserable.

189.     Ms. Bevins started at the University of Texas in the fall of 1999.

190.     Immediately, Coach John Rembao's psychological abuse began to take hold and his sexual abuse of Ms. Bevins began.

191.     One day he made her feel accomplished and talented, and the next he would make her feel like a despicable failure, so that she began to mistrust her own feelings.  He wielded immense power over her:  not only was he an adult and male, but he was her track coach who held Ms. Bevins' scholarship in his hands.  Rembao was keenly aware of the power differential, and he used it to his benefit.

192.     The psychological abuse began in August 1999 at the University of Texas's first official cross-country practice.  There, Rembao began bullying Ms. Bevins, saying, "You wasted your summer."  He said words to the effect of, "Just tell me and I can send you to any school you want," suggesting that she was unqualified for the University of Texas team and that he did not want her on the team.

193.    He repeatedly threatened to take away her scholarship, suggesting that she was not qualified.  Another of his oft-repeated phrases was, "Stop wasting our time and yours," again suggesting that she was not qualified for the teams.

194.    In the fall of 1999, Ms. Bevins participated in a Big 12 Conference cross-country meet at Texas A&M.  After the meet, Rembao gathered the team around him and picked out those who performed well and those who performed poorly.  Ms. Bevins had had a bad race and he told her, in front of her teammates and within earshot of the Texas A&M cross-country team, that she did a crappy job and that she should just save everyone the trouble and give her scholarship back. This was one of the most mortifying and humiliating experiences that Ms. Bevins suffered up to that point in her life because she had always prided herself on hard work and diligence.  She began sobbing and cried during the two-hour bus ride back to Austin.

195.    Ms. Bevins' parents attended that cross-country meet, and Rembao told them certain things that Ms. Bevins was supposedly doing wrong that made her perform poorly.  Her parents were so concerned, because again, she had always worked and trained hard, that they drove from College Station to Austin, and sat with Ms. Bevins in the lobby of her dormitory and questioned her behavior.  She just cried.  She was giving track her all during two, exhausting workouts a day, and yet Rembao's bullying and the words he used had reduced her to thinking that she was fat and lazy.  She did not tell her parents about Rembao's behavior because she had always been taught to be respectful, and he had by that time skillfully manipulated her into thinking that there was indeed something wrong with her.

196.    In early 1999, someone complained to University of Texas officials about Rembao telling his track and field athletes that they were fat.  Rembao then grilled Ms. Bevins as to whether she had told anyone what they talked about.

197.    Rembao would often yell at Ms. Bevins in front of others and say cruel, hurtful things.  One day he came in the weight room, menacingly approached her and said, "Come with me."  He took her into the weight trainer's lounge and closed the door and put his face close to hers and screamed at her for ignoring another teammate.  He said that he did not like her attitude and was not going to take her to the next track meet, making her cry.  Rembao told Ms. Bevins

that another teammate had told him that Ms. Bevins did not say hello.  Ms. Bevins was dazed because of the intensity of his rage and because she was utterly unaware of this supposed encounter with her teammate.

198.    All during this time, Rembao would claim that Ms. Bevins' poor performance warranted meetings in his office.  The meetings, however, were a ruse for sexual assaults.  Ms. Bevins would sit in a stationary chair backed against the wall of Rembao's office, and Rembao would sit in a desk chair on wheels. The door was always closed; sometimes it was locked.  She was trapped and felt paralyzed.

199.    Rembao would cunningly use a carrot and stick, criticizing Ms. Bevins's drive, skill, and performance, and always threatening her scholarship, but at the same time seemingly offering care and concern for her track career and well-being.

200.    Rembao would move his chair with his legs spread apart to where Ms. Bevins was sitting.  Rembao would wrap his arms around her in an embrace that would last for minutes at a time. He would hold his body against hers and rub his erection on her.

201.    At times he would touch her hair.  He kissed her head, hair and neck.  He would tell her she had nice legs, while touching and rubbing them inappropriately.

202.    He would rub her shoulders and ask, "Tell me what's going on?" or "What can I do?"  He would tell her that he liked her so very much, and that she was special.

203.    Rembao would tell Ms. Bevins that she was one of his favorite people, and she believed him.  She believed everything he said because he was an adult and he was her coach, people whom she was taught to respect.  Rembao would often tell Ms. Bevins that if she didn't want to be great, he would start treating her the way he treated her teammates who weren't as fast or who were injured.  He hardly spoke to those girls at all.

204.    These office meetings spanned nearly the entire academic year that Ms. Bevins attended UT-Austin.  They were all variations on the same theme.  Ms. Bevins felt alone, trapped, threatened, and scared. In the picture shown below, Ms. Bevins cut her hair shorter her freshman year in the hopes that Rembao would stop touching her platinum blonde hair:

1
2
3
4
5
6
7
8
9
10
11
12
13



14   205.   Rembao took every opportunity to seclude and isolate Ms. Bevins, to make her

15  feel that she was doing something wrong so that she began to doubt her own feelings and

16  judgment about events.  He did that so he had complete power and control over her.  To this day,

17  Londa Bevins cannot be in a closed office with a male without suffering from a panic attack.

18   206.   Prior to the winter break in 1999, Ms. Bevins was not feeling well.  She was

19  mandated to run six miles, but only ran four. When Rembao heard, he ordered Ms. Bevins to stay

20  at school a week longer during the Christmas break as punishment because he did not "trust" her.

21  Jessica Johnson was also punished in the same way.  Rembao arranged for them to stay at Erin

22  Aldrich's apartment. During that time, Rembao and his wife Sue invited Ms. Bevins and Ms.

23  Johnson over for dinner.

24   207.   When Ms. Bevins finally went home, Rembao telephoned her almost every single

25  day under the guise of seeing if she did her workout.  He would say things like, "Do you miss

26  me?" and she would nervously laugh, and he would say "Oh, I see how it is.  You don't miss me

27  at all."

28   208.   In January 2000, Ms. Bevins was required to take the Texas Academic Skills

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

1  Program (TASP) test, administered at Southwest Texas State in San Marcos, Texas.  Ms. Bevins

2  had arranged for a ride with a friend, but Rembao insisted on driving her.

3      209.    During that 30-minute car ride, Rembao put his hand on her thigh, moving it all

4  the way up, trying to reach and touch her labia and vagina.  He told her that she had nice legs and

5  hamstrings, that they were "really sexy."  He also told her that if she was younger, he would

6  "definitely date" someone like her.  Ms. Bevins squirmed away from his hand.  She was too

7  afraid to tell him to stop.  Ms. Bevins shook the entire time she took the test, dreading the car ride

8  back.

9      210.    Early in 2000, Ms. Bevins competed in the Big 12 Indoor Track and Field

10  Championships in Iowa.  That indoor track and field season was the first time that she had ever

11  competed on an indoor track.

12      211.    At some point between the preliminaries and the finals, Rembao asked Ms. Bevins

13  to come to his hotel room under the guise of discussing the finals.  While there Rembao told Ms.

14  Bevins that she looked stressed and he began to rub her shoulders, and he asked her to sit on the

15  bed in front of him.  He managed to move her back towards him so that her body touched his

16  erection.  Ms. Bevins was scared, ashamed and disgusted, and told him that she was tired and left

17  his room.

18      212.    To her surprise because she had never run on an indoor track, she ran two personal

19  bests times in the 1000m, coming in fifth place, and set a school record in the distance medley

20  relay, with the relay team coming in second.  Despite these personal and team successes, the

21  coaches made it feel like a funeral.  At a team meeting at the conclusion of the meet, Ms. Bevins

22  was reduced to tears.

23      213.    Jessica Johnson attempted to console Ms. Bevins afterwards, telling her that she

24  knew what it felt like to be yelled at, screamed at, told she was fat or not good enough, and what

25  it was like to cry a lot.  Ms. Bevins asked Ms. Johnson why she wasn't crying and Ms. Johnson

26  said, "I don't have any tears left."

27      214.    That evening, after returning to the hotel from dinner, Rembao pointed to certain

28  girls walking down the hall and said, "You, you, you, and you," and directed those girls to his

- 38 -

hotel room.  He said to those remaining girls, including Ms. Bevins, "The rest of you can go to your rooms."  After that meeting, one of the girls who was selected to go to Rembao's hotel room confided in Ms. Bevins that Rembao had told them to stay away from Londa Bevins because "she will be a bad influence on you."  Ms. Bevins, who had always prided herself on hard work, was humiliated.

215.    By the Spring of 2000, Ms. Bevins could not sleep.  For nights at a time, she would lay in bed, crying, wishing that she was not at University of Texas at Austin and did not have to go to practice.  She could not face Rembao, and she dreaded track practice.  She did not want to be near the track, which was near Rembao's office.

216.    In high school, running was the most important thing in Ms. Bevins's life, and she enjoyed it so much.  Now the thing she loved so much was making her dreadfully sad and hopeless.  She contemplated taking a bunch of pills because she could not deal with the situation any longer.

217.    She was also exhausted from other girls on her team coming to her dorm room at night and crying about how unhappy they also were.  Ms. Bevins had no answers, and could not help herself, let alone her teammates.

218.    In or around March 2000, Ms. Bevins and Ms. Johnson admitted to each other that they were both victims of Rembao's sexual and mental abuse.  They both discussed that they needed to get out of there, to leave UT-Austin because of his conduct.

219.    Attending track practice began to provoke anxiety attacks in Ms. Bevins.  She would be relatively fine during the day, and when she would walk from class to the track, the closer she got her stomach would turn into a knot, she would get nervous, and her legs would start to shake.

220.    One day in or around April, during warm-ups, she just started sobbing.  She could not stop and she could not breathe.  She started shaking and thought that she was going to throw up.  She did not know why she was crying because no one had said anything to her that particular day.  She went into the bathroom and sat on the floor and just cried.  Two teammates attended her and tried to talk her into going back to practice.  She eventually did, and was determined to

1    complete the workout, but continued to cry.

2        221.    Ms. Bevins walked to the starting line and turned and saw Rembao and she started

3    crying harder.  He looked at her and said, "Get that look out of your eyes.  I don't like that.  I

4    know that look."  She responded, "I don't know if I can do this.  I'm crying and shaking and I

5    can't breathe, and I don't know what's wrong with me."  Rembao responded, "Then leave.  You

6    are a distraction to the other girls.  Just get your stuff and leave."

7        222.    And so she did.  She took the bus and went straight to Jessica Johnson's dorm

8    room and Ms. Johnson attempted to console Ms. Bevins.  To distract her, Ms. Johnson took Ms.

9    Bevins to a movie.  After the movie Ms. Bevins telephoned her roommate to tell her where she

10   was.

11       223.    Her roommate said that Coach John Rembao had called a number of times, and

12   that Ms. Bevins must call him.  She did not want to telephone him but did.  He told Ms. Bevins

13   that he wanted to meet with her the next day.

14       224.    The next day, Rembao told Ms. Bevins to quit running.  She tried to talk to him

15   about why she was so upset, why she was having anxiety attacks, but he did not want to listen to

16   her.  He encouraged her to call her parents and tell them that she wanted to quit track.  He would

17   only get her scholarship money back if she quit.

18       225.    The stress made Ms. Bevin physically sick a few days later. Although sick, she

19   was relieved for the physical excuse of missing track practice.

20       226.    Around April 2000, Ms. Bevins quit the Texas track team, ending her high school

21   dream and terminating her scholarship.  Her parents came to Austin to help Ms. Bevins approach

22   Rembao to have him sign a required paper "releasing" her so that she could transfer to another

23   school yet still participate in track.  This was an NCAA requirement – that the victim of the abuse

24   had to ask her abuser for "permission" to compete in track at another institution.

25       227.    During the Summer of 2000, Ms. Bevins attended counseling and was diagnosed

26   with depression and anxiety and was prescribed anti-depressant medication.  If she did not take

27   the medication, she would lay in bed and cry, but if she did take the medication, she would feel

28   physically awful and unable to train.

228.     That summer she contacted the University of Arkansas and made plans to transfer in the fall of 2000.

229.     Ms. Bevins received only a 50% scholarship to be a member of the Arkansas track team in exchange for attending.  The transition to a new school and a new track program was very difficult for Ms. Bevins.  She was very depressed and angry at giving up her full scholarship at the university of her choice, all because of Rembao's abuse.  At one point she attempted suicide.

230.     After the first year at the University of Arkansas, Ms. Bevins lost her 50% scholarship due to lack of performance.

231.     Jessica Johnson had filed a formal complaint with UT-Austin regarding Coach John Rembao.  Ms. Johnson identified Ms. Bevins as a witness who could support Ms. Johnson's allegations.

232.     While Ms. Bevins was at the University of Arkansas, a lawyer for UT-Austin summarily interviewed Ms. Bevins.

233.     During the interview Ms. Bevins had a hard time explaining the abuse she suffered because she was still traumatized and could barely talk about it.  During the interview, the attorney asked if she was certain that the events happened and asked her if she was sure, attempting to cast doubt what she said.  He led her to believe that she did not have a claim, and that Rembao's conduct was not wrong or abusive.  The interview re-traumatized her.

234.     Even though Ms. Bevins left UT-Austin to get away from Rembao, she nevertheless could not because the University of Arkansas was in the same NCAA Region as SMU, where Rembao was then coaching.  As a result, she had to run every cross-country, indoor track, and outdoor track regional and national meets for the next three years in front of John Rembao.  As she looped the track in her events, she had to see Rembao, who was on the sidelines, again and again. At times he said things to her.  One time she distinctly heard him call her a "bitch."

235.     During her junior year Ms. Bevins qualified for the 2003 NCAA DI Outdoor Track and Field Championships in Sacramento, California, where she ran a personal best in preliminaries in the 1500m.  Rembao came up to Ms. Bevins during the meet and said words to

1    the effect that he had helped her achieve that result.  Not only was seeing him deeply distressing

2    to Ms. Bevins, but Rembao arrogantly claiming Ms. Bevins's success, when in fact he was the

3    cause of her emotional and psychological problems, was profoundly disturbing.

4        236.    During her senior year, Ms. Bevins qualified for the NCAA DI Outdoor Track and

5    Field Championships, which to Ms. Bevins's distress, was by chance held at the University of

6    Texas at Austin.  She became physically sick to her stomach.  She was so distraught from being at

7    that venue where she was abused that she pinned her bib number upside down, and another

8    competitor pointed that out to her at the starting line.  As a result, she had a terrible race and

9    placed seventh overall.

10       237.    Ms. Bevins qualified to run in the 1500m at the 2004 USA Outdoor Track and

11   Field Championships held in Sacramento, California, which is a qualifying meet for the United

12   States Olympic Team.  This was Ms. Bevins very last track meet.  Again, Ms. Bevins saw

13   Rembao at that event, causing her additional distress and trauma.



23       238.    Ms. Bevins was forced to transfer schools, to start in new athletic and academic

24   programs, and all the while manage depression and anxiety due to Rembao's abuse.  Rembao not

25   only physically and emotionally harmed Ms. Bevins but caused her to lose opportunities as a

26   track and field runner.  She does not believe that she ever performed to the best of her abilities.

27   College athletes have a mere four years to perform in their sports, and no more.  Coaches like

28   Rembao, however, have entire careers.

239.    Due to Rembao's abuse, Ms. Bevins forfeited a full scholarship at the University of Texas; as a result, she was required to pay one-half of tuition at the University of Arkansas her sophomore year and her full tuition her junior year.

240.    The sexual and emotional assaults that Rembao inflicted on Ms. Bevins at the University of Texas affected her athletic performance her entire college career, and her personal life to this day.  Even today, Ms. Bevins suffers anxiety and panic attack under certain circumstances, such as being in a confined space with a man.  Her work and interpersonal relationships have suffered.  She has a mistrust of people and has a hard time communicating her feelings.  Ms. Bevins also has difficulty in establishing and maintaining intimate relationships, and she gets angry easily.

### 4.    **Plaintiffs and the Class were damaged.**

241.    In cases of delayed reporting of physical, emotional or sexual student-athlete abuse, the focus becomes on not the adult, predator coaches or the institutions that harbored them for entire careers, but on the victims' delay in reporting. Why did the innumerable young, innocent, and impressionable boys and girls who were their prey wait so long to come forward?

242.    The answer is simple:  the victims have been trapped in a system created from the top down by organizations such as the NCAA and their member institutions of higher learning which have placed a higher value on protecting their respective revenue streams by maintaining secrecy of this epidemic of abuse, rather than protecting the innumerable young lives over which the predators have trod.

243.    Also asked is how could assaults like this have gone on for years and years?  Joan Ryan, author of "Little Girls in Pretty Boxes, the Making and Breaking of Elite Gymnasts and Figure Skaters," offered an explanation relevant to any sport and not limited to gymnastics:

> Elite gymnastics systematically strips away a girl's connection to her own body and mind as she is groomed from a young age to distrust what her body and mind are telling her. When she's in too much pain to train, her coach says she's lazy. When she's hungry, he says she's fat and eats *too* much. When she's too exhausted for one more high-risk vault, she's a loser. She comes to understand that her own feelings and perceptions not only are unreliable, they don't matter. Her pain is dismissed. Her hunger is dismissed. Her

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

> exhaustion is dismissed. To fit into elite gymnastics' reality, a gymnast has to deny her own. She becomes an expert at withstanding all manner of insult to her body. She doesn't complain or make waves. She is the perfect target for a sexual predator like Larry Nassar.[50]

244.    As such, the sexual, physical and mental abuse that many young student-athletes, such as the Plaintiffs in this case, have suffered is accompanied by self-doubt, shame, blame, and guilt, and only after years of reflection, meditation, counseling, medication, and psychotherapy are these individuals able to see the events for what they were:  sexual, physical, and emotional abuse and exploitation.  All the while many of these young lives are plagued with eating disorders, alcoholism, drug use and abuse, self-harm, emotional disorders, intimacy issues, and many to this day are simply broken individuals.

245.    Sexual abuse in athletes results in long-term posttraumatic symptomology, with core symptoms including re-experiencing, avoidance, and hyperarousal.  Furthermore, disclosing or recounting the experience of sexual abuse can be traumatic and lead to a "double-trauma," which can cause an aftermath involving intense ruptures in day-to-day life.[51]

246.    Sex abuse also leads to depression, phobias, obsessive-compulsive disorder, panic disorder, posttraumatic stress disorder, sexual disorders, and suicidal ideation and attempts.[52]

### 5.    SafeSport finds that Rembao abused Plaintiffs.

247.    At the end of 2019, Plaintiffs reported Rembao to the U.S. Center for SafeSport ("SafeSport").  On December 18, 2019, SafeSport imposed temporary measures, temporarily suspending Rembao from coaching.  SafeSport conducted an investigation of Plaintiffs' allegations, which included extensive interviews of Plaintiffs, and the opportunity for Plaintiffs to identify witnesses and present documents.

248.    After conducting its investigation, on August 17, 2020, SafeSport found that John

---

[50] Joan Ryan, "Little Girls in Pretty Boxes, the Making and Breaking of Elite Gymnasts and Figure Skaters," Introduction to 2018 Edition at 3-4 (emphasis original).

[51] Helen Owton & Andrew C. Sparkes (2017), Sexual abuse and the grooming process in sport: Learning from Bella's story, Sport Education and Society, 22:6, 732-743, at 733, available at https://doi.org/10.1080/13573322.2015.1063484.

[52] Ingunn Bjørnseth & Attila Szabo (2018) Sexual Violence Against Children in Sports and Exercise: A Systematic Literature Review, Journal of Child Sexual Abuse, 27:4, 365-385, at 365

Rembao violated the applicable policies, as outlined in the SafeSport Code for the U.S. Olympic and Paralympic Movement, by assaulting three adult athletes he coached – the Plaintiffs in this case.

249.    It is a violation of the SafeSport Code for a Participant to engage in "any conduct that would violate community standards analogous to Prohibited Conduct that existed at the time of the alleged conduct, including then applicable criminal and/or civil laws."  SafeSport Code, IX.[53]

250.    SafeSport issued a 1,200-page Investigative Report, discussing its investigation, the evidence, and its findings, and its August 17, 2020 Notice of Decision.  SafeSport suspended Rembao for two (2) years, followed by a term of probation for three (3) years, during which he is prohibited from recruiting minor athletes.

251.    Pursuant to SafeSport's rules, absent a Court Order, Plaintiffs are not permitted to share either document, but may disclose the ultimate conclusion.

252.    The SafeSport public website shows that Rembao has been suspended for "Sexual Misconduct, Intimate Relationship – involving a Power Imbalance, Inappropriate Conduct" and that the SafeSport's determination is subject to appeal.[54]

253.    On September 1, 2020, Plaintiffs were notified that Rembao requested arbitration of that decision.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS FOR PLAINTIFFS' CLAIMS

### A.    The statute of limitations should be tolled by A.R.S. § 12-502 and the discovery rule.

254.    After she left the University of Arizona, Ms. Aldrich repressed the majority of her memories of Rembao's sexual contact with her.

255.    The Arizona Supreme Court has explained repressed memories as follows:

> In laymen's terms, memory repression is the involuntary blocking of memory so that the memory remains stored but inaccessible to the conscious mind. Repression is a psychological defense

---

[53] https://uscenterforsafesport.org/wp-content/uploads/2019/05/2019-SafeSport-Code-04.15.19-Hyperlinked.pdf (last visited 9/26/20).
[54] https://safesport.i-sight.com/published (last visited 9/24/20)

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

mechanism that protects the individual from being confronted with the memory of an event that is too traumatic to cope with. A documented example is the woman known as the "Central Park Jogger," who was incapable of recalling the brutal attack and repeated rape she suffered just one year earlier. Physiological research conducted on the functioning of memory demonstrates the brain's biological capacity to retain memories yet prevent conscious access to them. See Cynthia Grant Bowman & Elizabeth Mertz, A Dangerous Direction: Legal Intervention in Sexual Abuse Survivor Therapy, 109 HARV. L. REV. 549, 600-04 (1996). The memory is not lost but remains dormant and inaccessible. The individual functions with no conscious awareness of the traumatic event. Researchers and clinicians attest that the inaccessible memory may nonetheless adversely impact the individual's psychological well-being and is frequently manifested by substance abuse, severe depression, suicidal tendencies, and sexual and social dysfunctions. See Judith Herman & Emily Schatzow, Recovery and Verification of Memories of Childhood Sexual Trauma, 4 PSYCHOANALYTIC PSYCHOL. 1, 2 (1987).

*Doe v. Roe*, 955 P.2d 951, 957 (Ariz. 1998).

256.    In late March or early April of 2019, Ms. Aldrich watched the HBO documentary called *Leaving Neverland,* which was about two boys, now men, who were sexually abused by Michael Jackson as children. These men had previously denied any sexual abuse during Jackson's criminal trial, but admitted in the documentary that it took years to recognize that Jackson did in fact abuse them.

257.    While watching the documentary, Ms. Aldrich experienced strong flashback memories of Rembao's sexual abuse of her. It was the first time Ms. Aldrich realized she had been sexually abused.

258.    Ms. Aldrich's realization is consistent with experts' recognition that an athlete "might not recognise the events as sexual abuse for several years after the event."[55]

259.    "Research on the biology of memory verifies the brain's capacity to retrieve previously inaccessible memory in response to stimuli. These stimuli, commonly referred to as triggers, include sensory experiences, therapy, and spontaneous recall." *Doe*, 955 P.2d at 957.

---

[55] Helen Owton & Andrew C. Sparkes (2017), Sexual abuse and the grooming process in sport: Learning from Bella's story, Sport Education and Society, 22:6, 732-743, at n.1, available at https://doi.org/10.1080/13573322.2015.1063484.

260. In Ms. Aldrich's case, the documentary *Leaving Neverland* was the trigger leading to her recall and (partially) understand the sexual abuse.

261. Upon realizing the abuse, Ms. Aldrich developed feelings of panic, remorse, distress, shame, and guilt. She sought counseling, but is still unable to recall whether she ever was forced to engage in any sexual acts, other than Rembao taking advantage of her (by penetrating her with his fingers and performing oral sex on her).

262. The realization of the abuse also manifested itself in physical injury. Shortly after watching *Leaving Neverland,* with the pressure and stress of the past triggered and realized, Ms. Aldrich was hospitalized with sepsis from bacterial pneumonia for eight days. Her body had literally shut down. For eight long days, she feared she was going to die with the secret of Rembao's abuse.

263. To this day and despite counseling, she continues to experience feelings of guilt, shame, self-doubt, depression, and anxiety.

264. Ms. Aldrich's statute of limitations was tolled until the end of March or early April 2019, when she viewed that HBO documentary.

265. Since watching the documentary and recovering her memories of abuse, Ms. Aldrich has exercised due diligence to investigate and discover the nature and extent of her injuries.

266. Several months after watching the documentary, in October of 2019, Ms. Aldrich telephoned Ms. Johnson. After not having heard from Ms. Aldrich in 20 years, Ms. Johnson intuitively knew the subject of the telephone call: "Is this about our coach?" Ms. Aldrich shared the facts of her interactions with Rembao, and Ms. Johnson confirmed that she, too, was sexually abused and harassed by Rembao.

267. Because of her repressed memories, the statute of limitations should also be tolled for Ms. Aldrich pursuant to A.R.S. § 12-502, which provides:

> If a person entitled to bring an action…is at the time the cause of action accrues…of unsound mind, the period of such disability shall not be deemed a portion of the period limited for commencement of the action. Such person shall have the same time after removal of the disability which is allowed to others.

268.    "Unsound mind" is interpreted broadly and applies when an individual is unable "to understand his legal rights and liabilities." *Doe v. Roe*, 955 P.2d 951, 957 (Ariz. 1998).

269.    The *Doe* court found that statutes of limitations should be tolled where:

> Plaintiff repressed memories of abuse (one cannot understand legal rights with respect to a wrong of which the person was unaware); she was in denial that any abuse took place, was unable to accept that the events had occurred, and was unable to articulate them; she experienced feelings of complicity with her abuser (evidencing, perhaps, that she did not understand that a wrong had occurred); and she experienced feelings of responsibility and guilt for the abuse (same).... Moreover, in the present case consultation with an attorney, the single factor evidencing an ability to understand legal rights in both *Allen* and *Florez*, occurred within two years of the filing date.

*Doe*, 955 P.2d at 967.

270.    Ms. Aldrich was not able to comprehend her legal rights until the fall of 2019. Then she was unable to understand her legal rights and that she had been sexually abused. Because Ms. Aldrich filed this lawsuit within two years of understanding her legal rights, Ms. Aldrich's claims are timely.

271.    On September 3, 2020, this Court ruled that Arizona law applied to the statute of limitations analysis for Ms. Aldrich's claims. Dkt. #72 at p.24.  This Court denied defendants' motions to dismiss, finding that because Ms. Aldrich repressed memories of the sexual abuse, her claims may be timely under A.R.S. § 12-502 because she was of "unsound mind" until watching *Leaving Neverland* triggered her realization of the abuse. *Id.*  This Court found that "unsound mind" under Arizona law applies where one is unable to understand her legal rights, and this Court found that there is a dispute about whether Ms. Aldrich was able to understand her legal rights because of her repressed memories. *Id.* This Court rejected the argument that the victim must become an amnesiac for repressed memories to toll the statute of limitations.  To the contrary, this Court found that tolling may apply when a victim represses parts of the events, or the entire experience. *Id.* at 24-25.

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

B.    **The statutes of limitations should be tolled based on equitable estoppel, fraudulent concealment, and/or equitable tolling.**

272.    Jessica Johnson complained to the University of Texas at Austin of Rembao's abuse on June 16, 2000, and, at the university's direction, was required to file a formal complaint in writing, which she did on August 9, 2000.  In connection with its investigation of her complaint, UT-Austin interviewed 23 witnesses and reviewed over 200 documents.

273.    On November 21, 2000, the university issued its Final Report on Complaint of Sexual Harassment by Jessica Johnson ("UT-Austin Report")

274.    The UT-Austin Report is an unmitigated whitewash where the university goes to great lengths to minimize Rembao's unquestionably inappropriate conduct in order to exonerate itself, finding that Rembao did not violate University of Texas at Austin's Sexual Misconduct or Sexual Harassment Policies.  UT-Austin Report at 11.[56]

275.    Rembao, himself, interviewed as a part of the investigation, admitted much of the conduct but rationalized it in a way that made it seem not sexual, but connected to his coaching duties. Thus, Rembao, was a participant in the sham investigation and his goals were aligned with the University of Texas at Austin – to ensure there were no findings of sexual harassment or abuse.

276.    The UT-Austin Report is utterly dismissive of Ms. Johnson's facially plausible allegations, many of which were corroborated, making untenable excuses for what was nothing more than sexual abuse she suffered at Rembao's hands. For example, Ms. Johnson complained that Rembao gave her a massage at his house on her upper thighs and gluteus. Rembao did not deny this and admitted giving Ms. Johnson three massages, including two "stomach massages." Although such massages were not authorized by the Women's Athletic Department, the university absurdly concluded that such touching was done by Rembao in his role as a coach. *Id.*

---

[56] Two such "whitewash" investigations with hauntingly parallel facts were recently reported in, "Internal Investigations Won't Stop Abusive Coaches" (Feb. 26, 2020), available at https://www.outsideonline.com/2409753/alberto-salazar-dave-scott-thomas-coaching-abuse#close (last visited 2/28/20) ("both coaches benefitted from being ensconced in a large institution – the University of Guelph [in Canada] and Nike – that said it would look into the issue, despite having little incentive to expose the wrongdoings of its more prominent employees").

SECOND AMENDED COMPLAINT
CASE NO. 5:20-CV-01733-EJD

1  at 6.

2  277.   Regarding Rembao licking Ms. Johnson's neck, the report concluded, "a lick on

3  the neck may be boorish but it is not sexual misconduct or sexual harassment." *Id.* at 24. The

4  same is true of the "chair hugs," to which Rembao subjected his athletes. The UT-Austin Report

5  states that "virtually every athlete interviewed expressed at least initial discomfort with the 'bear

6  hugs' and 'chair hugs' Mr. Rembao engages in," yet concluded that hugging student-athletes in

7  such a way does not violate the university's Sexual Harassment and Sexual Misconduct policy.

8  *Id.* at 7.

9  278.   The University of Texas at Austin exonerated Rembao from sexual harassment and

10 sexual abuse and, predictably, laid the blame for the events at Ms. Johnson's feet. The

11 investigative process showed no care or concern for Ms. Johnson's or Ms. Bevins's well-being.

12 The University of Texas failed to have a trauma-informed trained professional interview them

13 who would have immediately recognized and identified their allegations, which included doubt,

14 self-blame, minimization, and uncertainty, as classic ones of survivors of sexual abuse. The UT-

15 Austin Report was designed to protect the school's reputation and cause Ms. Johnson and Ms.

16 Bevins to believe they did not have any legal rights.

17 279.   The manner in which the University of Texas at Austin conducted its investigation

18 of Rembao, and its exoneration of him for sexual harassment and assault, effectively tolled the

19 statutes of limitations for the claims alleged by Plaintiffs herein based on the doctrines of

20 equitable estoppel, fraudulent concealment, and/or equitable tolling.

21 280.   University of Texas at Austin's exoneration of Rembao from sexual harassment

22 and sexual abuse was fraudulent in a number of ways.  First, Texas's exoneration of Rembao **in**

23 **the face of the UT-Austin Report's factual findings**, cannot be reconciled.  There is only one

24 conclusion based on UT-Austin's own documented factual findings, and that is that by any

25 standard and under any guidelines, Rembao sexually harassed and abused both Ms. Johnson and

26 Ms. Bevins.

27 281.   Second, the University of Texas's characterizations of Ms. Johnson and Ms.

28 Bevins, and the information they provided, was intentionally designed to detract from Rembao's

1   serial predation, to divert from any question that there may have been other victims, and to shame

2   and embarrass the complainants (on top of the shame and blame that victims of sexual abuse

3   already suffer), further bolstering the fraudulent, result-oriented conclusion while at the same

4   time undermining the credibility of Ms. Johnson and Ms. Bevins.

5          282.    The University of Texas at Austin undertook this fraudulent conduct in order to

6   silence Ms. Johnson and Ms. Bevins, to ensure, among other things, that they would not make

7   their experiences public by complaining in other fora or otherwise filing suit. When the UT-

8   Austin Report was issued on November 21, 2000, UT-Austin unequivocally told Ms. Johnson and

9   Ms. Bevins that their allegations were not believable and that they did not have a claim. With

10  such a conclusion, University of Texas at Austin also implicitly told them their complaints were

11  isolated and that there were no other victims.

12         283.    As set out above, in October 2019, Jessica Johnson received a telephone call from

13  Erin Aldrich.

14         284.    It was at that point that Ms. Johnson was informed that in addition to Londa

15  Bevins, there were indeed other victims of Rembao's abuse.  Because of the university's acts and

16  omissions, Jessica Johnson's statute of limitations was tolled from November 21, 2000, the date

17  of the UT-Austin Report, until October 2019.

18         285.    In October 2019, Ms. Johnson telephoned Ms. Bevins to advise her of the call

19  from Erin Aldrich. Because of University of Texas at Austin's acts and omissions, Ms. Bevins's

20  statute of limitations was also tolled from November 21, 2000 until October 2019.

21         286.    This Court found that equitable tolling may provide cause to toll the statute of

22  limitations for Ms. Johnson's and Ms. Bevins' claims.  Dkt #72, p.27.  This Court stated that the

23  manner in which the University of Texas at Austin conducted the investigation, and Rembao's

24  participation in it, whether active or inactive, led Ms. Johnson and Ms. Bevins to believe that they

25  did not have claims.  *Id.*  As soon as they realized they did have claims -- after Ms. Aldrich's

26  phone call -- they filed this action.  This Court noted that equitable tolling is to ensure

27  fundamental practicality and fairness, and fairness may dictate tolling for Ms. Johnson's and Ms.

28  Bevin's statutes because the injustice arising from a refusal to toll the statute of limitations would

be great. *Id.* at 25-26. This Court noted, "[a]s society progresses and the acts of the past are condoned, it seems unjust to deprive a plaintiff of her day in court." *Id.* at 26.

**C.**  **Because Ms. Johnson and Ms. Bevins filed this lawsuit promptly after understanding their legal rights, their claims are timely. A new rule must be created to toll the statute of limitations favoring victims sexually abused by a person in a position of authority over them.**

287.  Statutes of limitations are not intended to shield wrongdoers, yet this is precisely the state of the law today in nearly every jurisdiction regarding sexual abuse claims. Recently, there has been some progress made in changed limitations periods regarding the sexual abuse of minors, but the law still imposes an artificial cutoff after an individual celebrates their eighteenth birthday. Such statutory changes are for the legislature, but the judiciary has crafted certain exceptions to toll statutes of limitations, like those mentioned above.

288.  Plaintiffs contend that courts – and this Court in particular –  should create an exception called the victimization exception to toll limitations periods for victims of sexual abuse in instances where the abuser is in a recognized position of power over their victims, like an NCAA coach over a student-athlete. The limitations period should be tolled until the victim can identify the conduct for what it was:  sexual abuse.

289.  Such an exception is essential because sexual abuse is not an event with a discrete begin and end date – a factor which is imperative for the application of all existing statutes of limitations and the existing exceptions. Instead, sexual abuse is a course of conduct that may extend over time. During much, or sometimes even all, of that time, the victim does not realize that the predator's conduct is unlawful, or even inappropriate.  With some victims, the abnormal events become normalized; with others, the events are suppressed because of shame, fear, or manipulation. Not only are the events themselves viewed through the victim's distorted lens, but the victim is not emotionally capable of understanding their victimization and taking meaningful action for their own protection.  With some victims, memories are not always completely repressed so as to fall within the discovery rule, but they are unclear, unfocused, and uncertain about the nature of the acts and conduct inflicted upon them.

290.  For these reasons and in such circumstances, the "discovery rule" regarding tolling

is wholly inadequate, therefore requiring a judicially created exception predicated on equitable considerations. Plaintiffs are not asking this Court to forge new ground or rewrite the law. Instead, Plaintiffs ask this Court to apply well-established equitable principles to sexual abuse claims where the perpetrator is in a position of power and trust.

291.    Equitable concepts benefitting victims are not new in the law. For example, the marital privilege affords a spouse the ability to bar his spouse from testifying against him in civil or criminal proceedings.  This privilege arises from medieval jurisprudence where the wife had no separate legal existence. The common law then crafted an equitable and, indeed, humanitarian exception where the defendant committed an offense against the witness-spouse. This common law exception was designed to afford the victimized witness-spouse the opportunity to testify over the defendant's objection. It has since been extended in situations where the defendant also commits offenses against their children. This common law exception to the marital privilege shows that the law valuing protecting victims over wrongdoers.

292.    Plaintiffs contend that this equitable theory must be judicially created and applied where a victim is sexually abused by a person in a recognized position of authority, and the limitations period remains tolled until the victim is able to comprehend that the conduct was sexual abuse.  To hold otherwise would allow sexual predators and the organizations that protected them to escape liability from suit by the victims, who, because of the nature of sexual abuse, oftentimes for years cannot immediately and timely (so as to comply with inflexible limitations periods) identify the conduct for what it is.

## VII.    CLASS ALLEGATIONS

293.    Plaintiffs bring this action on behalf of the following Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and/or 23(c)(4): "All female student-athletes who were coached by John Rembao."

294.    Plaintiffs reserve the right to modify or amend the class definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

295.    Excluded from the Class is Defendant; all persons who make a timely election to

be excluded from the class; governmental entities; and all judges assigned to hear any aspect of this litigation, including their immediate family members.

296.     Numerosity:  Rembao coached from 1984 until early 2020, or for approximately 36 years.  During that career, Rembao coached hundreds of student-athletes.

297.     Typicality:  Plaintiffs' claims are typical of the claims of each class member in that Plaintiffs and the class were groomed and abused by Rembao and suffered harm as a result. Plaintiffs are advancing the same legal theories on behalf of themselves and the Class.

298.     Adequacy:  Plaintiffs will fairly and adequately protect the interest of the Class. Plaintiffs' interests and the interests of all other members of the Class are identical, and Plaintiffs are cognizant of their duty and responsibility to the Class. Accordingly, Plaintiffs can fairly and adequately represent the interests of the Class. Moreover, Plaintiffs' counsel are competent and experienced in litigating class actions, including litigation of this kind.  Plaintiffs and counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

299.     Commonality and Predominance:  There are numerous questions of law and fact common to the Class, and these common questions predominate over any issues affecting only individual class members, making certification appropriate under Rule 23(b)(3).  Questions common to the Class include:

        a.     Whether John Rembao battered, assaulted, and falsely imprisoned Plaintiffs and the Class; and

        b.     Whether John Rembao intentionally or negligently inflicted emotional distress on Plaintiffs and members of the Class.

300.     Superiority:  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The purpose of a class action is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Individual litigation by each class member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay

1    and expense to all parties and the court system. Moreover, the highly sensitive and traumatic

2    nature of the facts involved here makes a class action superior, because in circumstances like

3    these, there will be some victims who are emotionally ready and able to come forward and bring

4    suit on behalf of the many others who may not be able or ready to come forward to bring suit on

5    their own. In sum, the class action presents far fewer management difficulties and provides the

6    benefits of a single adjudication, economies of scale, and comprehensive supervision by a single

7    court.

8        301.    This action is also properly maintainable under Rule 23(c)(4) in that particular

9    issues common to the Class, as set out *supra*, are most appropriately and efficiently resolved via

10   class action, and would advance the disposition of this matter and the parties' interests therein.

11   **VIII.   CAUSES OF ACTION**

12                                  **COUNT I**
                                **CIVIL BATTERY**
13

14       302.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if

15   fully set forth herein.

16       303.    Rembao intended to commit an act of unwanted contact and/or caused imminent

17   apprehension of such an act against Plaintiffs and the Class members. He did so by, *inter alia*:

18              a.    Isolating Plaintiffs and Class members in closed quarters and dismissing

19                    any bystanders; and

20              b.    Demanding or threatening sexual contact.

21       304.    Rembao did commit an unwanted contact with Plaintiffs and the Class members'

22   person or property in a harmful or offensive manner, including, but not limited to, causing sexual

23   contact between Rembao and each Class member.

24       305.    Rembao's battery of Plaintiffs and the Class caused harm, including physical,

25   mental, and/or emotional harm of each Class member.

26       306.    Rembao's conduct was committed within the scope of his position as an NCAA

27   coach.

28       307.    A causal nexus existed between (i) Rembao's recruitment and grooming of

                                        - 55 -                    SECOND AMENDED COMPLAINT
                                                                 CASE NO. 5:20-CV-01733-EJD

student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter those women.

308. Each act of battery of a Class member lured with the prospect of being an NCAA student-athlete and/or to be coached by Rembao was foreseeable.

**COUNT II**
**ASSAULT**

309. Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

310. Rembao intended to cause apprehension of harmful or offensive conduct against Plaintiffs and the Class members. He did so by, *inter alia*:

    a.    Isolating Plaintiffs and the Subclass members in closed quarters and dismissing any bystanders;

    b.    Demanding or threatening sexual contact;

    c.    Cornering, blocking, or otherwise using his heft to cause Plaintiffs and the Class to fear that Rembao had the ability to carry out his physical threats; and

    d.    Threatening harm to the athletic careers, team participation, scholarships, and reputations of Plaintiffs and the Class members if they did not participate in such conduct.

311. Rembao's actions did, in fact, cause Plaintiffs and the Class members to fear imminent harmful or offensive contact by Rembao.

312. Rembao's conduct was committed within the scope of his position as an NCAA coach.

313. A causal nexus existed between (i) Rembao's recruitment and grooming of student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter those women.

314. Each act of assault of a Class member lured with the prospect of being an NCAA student-athlete and/or to be coached by Rembao was foreseeable.

**COUNT III**
**FALSE IMPRISONMENT**

315.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

316.    Plaintiffs and Class members were willfully detained by Rembao, without their consent, without lawful privilege, for an appreciable length of time, however short, while he battered, assaulted, and attempted to assault them.

317.    Rembao willfully detained Plaintiffs and Class Members through physical force, intimidation, confinement by physical barriers or other means of unreasonable duress. In many instances, Rembao used such intimidation that Plaintiffs and Class Members stopped resisting rather than risk injury.

318.    Rembao's actions caused Plaintiffs and the Class members harm.

319.    Rembao's conduct was committed within the scope of his position as an NCAA coach.

320.    A causal nexus existed between (i) Rembao's recruitment and grooming of student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter those women.

321.    Each act of false imprisonment of a Class member lured with the prospect of being an NCAA student-athlete and/or to be coached by Rembao was foreseeable.

**COUNT IV**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

322.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

323.    Rembao's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiffs and the Class members.

324.    Rembao's outrageous conduct was not the type of ordinary rude or obnoxious behavior that student-athletes should be expected to weather. Rather, Rembao's conduct exceeded all possible bounds of decency.

325.    Rembao acted with intent or recklessness, knowing that the student-athletes were likely to endure emotional distress. Indeed, he used this distress to subdue and threaten the women and prevent them from complaining or suing based on his actions. He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

326.    Rembao's conduct caused suffering for Plaintiffs and the Class members at levels that no reasonable person should have to endure.

327.    Plaintiffs and the Class members were in a specific zone of danger meeting with Rembao and at risk of physical harm, causing their fear.

328.    Plaintiffs and the Class members, immediately or shortly after meeting with Rembao, suffered severe distress and emotional harm.

329.    Rembao's conduct was committed within the scope of his position as an NCAA coach.

330.    A causal nexus existed between (i) Rembao's recruitment and grooming of student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter those women.

331.    Each act of intentional infliction of emotional distress of a Class member lured with the prospect of being an NCAA student-athlete and/or to be coached by Rembao was foreseeable.

**COUNT V**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

332.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

333.    Rembao's conduct negligently caused emotional distress to Plaintiffs and the Class members.

334.    Rembao could reasonably foresee that his action would have caused emotional distress to Plaintiffs and the Class members.

335.    Plaintiffs and the Class members were in a specific zone of danger meeting with Rembao and at risk of physical harm, causing their fear.

1     336.    Plaintiffs and the Class members, immediately or shortly after meeting with

2     Rembao, suffered distress and emotional harm.

3     337.    Rembao's conduct was committed within the scope of his position as an NCAA

4     coach.

5     338.    A causal nexus existed between (i) Rembao's recruitment and grooming of

6     student-athletes to participate in the NCAA; and (ii) his abuse of his power to coerce and batter

7     those women.

8     339.    Each act of negligent infliction of emotional distress on a Class member lured with

9     the prospect of being an NCAA student-athlete and/or to be coached by Rembao was foreseeable.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request

that the Court enter a judgment on their behalf and against John Rembao, and further grant the

following relief:

A.    Certify the proposed Class pursuant to the Federal Rules of Civil Procedure Rule

23(a), (b)(3) and/or (c)(4);

B.    Designate Plaintiffs as representatives of the proposed Class and Plaintiffs'

counsel as Class counsel;

C.    Award Plaintiffs and Class members compensatory damages, punitive damages,

pain and suffering, and any other relief to which they are entitled under the law;

D.    Award Plaintiffs and the Class prejudgment interest, costs, and attorneys' fees; and

E.    Award to the Plaintiffs and Class for such other and further relief as the Court

deems just and proper.

## X.    DEMAND FOR TRIAL BY JURY

Plaintiffs, individually and on behalf of the proposed Class, respectfully request a trial by

jury as to all matters so triable.

Dated: September 30, 2020                    Respectfully submitted,

1

2                                              By: /s/ Elizabeth A. Fegan
                                               Elizabeth A. Fegan *(admitted pro hac vice)*
3                                              beth@feganscott.com
                                               **FEGAN SCOTT, LLC**
4                                              150 S. Wacker Dr., 24th Floor
                                               Chicago, IL 60606
5                                              Telephone: (312) 741-1019
                                               Facsimile: (312) 264-0100
6

7                                              Lynn A. Ellenberger (*admitted pro hac vice*)
                                               lynn@feganscott.com
8                                              **FEGAN SCOTT, LLC**
                                               500 Grant St., Suite 2900
9                                              Pittsburgh, PA 15219
                                               Telephone: (412) 515-1529
10                                             Facsimile: (412) 785-2400

11                                             Jonathan D. Selbin (Cal. Bar No. 170222)
                                               jselbin@lchb.com
12                                             Annika K. Martin *(admitted pro hac vice)*
                                               akmartin@lchb.com
13                                             Rhea Ghosh *(admitted pro hac vice)*
                                               rghosh@lchb.com
14
                                               **LIEFF CABRASER HEIMANN & BERNSTEIN,**
15                                             **LLP**
                                               275 Battery Street, 29th Floor
16                                             San Francisco, CA  94111
                                               Telephone: (415) 956-1000
17                                             Facsimile: (415) 956-1008

18

19                                             *Attorneys for Plaintiffs and the Proposed Class*

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT
                                               CASE NO. 5:20-CV-01733-EJD